**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
AT KANSAS CITY**

| | | |
|---|---|---|
| LARRY BLAIR | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CHARLIE DAVIS, | ) | |
| | ) | |
| On Behalf Of Themselves And | ) | |
| All Other Persons Similarly Situated, | ) | Case No: 09-CV-2443 EFM/KGG |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | |
| | ) | |
| TRANSAM TRUCKING, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

_____

## MEMORANDUM IN SUPPORT OF DEFENDANT TRANSAM TRUCKING, INC.'S MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

SEIGFREID BINGHAM, P.C.

By: /s/ Shannon Johnson
    Rachel H. Baker   US-KS #70148
    Shannon Johnson   KS #23496
    2800 Commerce Tower
    911 Main Street
    Kansas City, Missouri 64105
    rbaker@seigfreidbingham.com
    sjohnson@seigfreidbingham.com
    Phone:   816-421-4460
    Fax:      816-474-3447

ATTORNEYS FOR DEFENDANT
TRANSAM TRUCKING, INC.

## TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................. 1

II. STATEMENT OF UNCONTROVERTED FACTS .................................................. 3

III. SUMMARY JUDGMENT STANDARD ............................................................. 29

IV. ARGUMENT AND AUTHORITIES .................................................................. 31

    A. Applicable Law ........................................................................................ 31

        1. TransAm does not Exhibit the Requisite Degree of Control over its Owner Operators under Either the FLSA or KWPA. ............................................. 33

        (a) TransAm does not control the means, manner, and method by which its Owner Operators perform their services ................................................... 34

        (b) TransAm Does Not Require That Services be Provided Personally by the Worker, and Owner Operators Hire and Pay Their Own Employee or Contractor Drivers ..................................................................................... 38

        (c) TransAm and its Owner Operators Intended to Form an Independent Contractor Relationship ............................................................................... 41

        (d) TransAm Provides Little Training to Owner Operators ......................... 42

        2. Owner Operators are Responsible for their Profit or Loss ........................... 44

        3. Owner Operators make Substantial Investment in their Businesses ............. 46

        4. Owner Operators may not be Terminated "At Will" ................................... 48

        5. Owner Operators Require Specialized Skills .............................................. 49

        6. The Services Provided by Owner Operators are an Integral Part of TransAm's Business ....................................................................................................... 50

    B. Results of IRS and DOL Investigations of Worker Classification Issues at TransAm ...... 50

V. CONCLUSION ................................................................................................. 53

## **TABLE OF AUTHORITIES**

Page

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................. 30

*Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238 (10th Cir. 1990) .......... 30

*Bradley v. Val-Mejias*, 379 F.3d 892 (10th Cir. 2004) ................................................ 29

*Brennan v. Sand Products, Inc.,* 371 F. Supp. 236 (W.D. Okla. 1973) ................................ 37, 46

*Cassara v. DAC Services, Inc.,* 276 F.3d 1210 (10th Cir. 2002) .................................... 42

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..................................................... 29, 30

*Goldberg v. Bellotto*, 207 F.Supp. 499 (S.D. Fla. 1962) .............................................. 49

*Haynes v. Level 3 Communicators, LLC,* 456 F.3d 1251 (10th Cir. 2006) ........................... 30

*Herman v. Express Sixty Minutes Delivery Servs., Inc.,* 161 F.3d 299 (5th Cir. 1998)................ 32

*In re FedEx Ground Package Sys., Inc.,* 734 F. Supp. 2d 557
 (N.D. Ind. 2010) ........................................................ 30, 32, 33, 37, 38, 40, 42, 48, 49

*Johnson v. Unified Gov't of Wyandotte Co.,* 371 F.3d 723 (10th Cir. 2004) ........................ 31

*Lowen Corp. v. United States*, No. 90-1589-MLB, 1993 WL 245960, at *7
 (D. Kan. June 14, 1993) .......................................................................... 39, 44, 51

*Luxama v. Ironbound Exp., Inc.*, No. 11-2224, 2012 WL 5973277
(D.N.J., June 28, 2012) ........................................................................... 45, 46, 49

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).......................... 30

*Mazzei v. Rock N Around Trucking, Inc.,* 246 F.3d 956 (7th Cir. 2001) ............................ 38, 49

*McDonnell v. Music Stand, Inc.,* 20 Kan. App. 2d 287 P.2d 895 (1994) ............................ 49

*Peterson v. Exide Corp.*, 123 F. Supp. 2d 1265 (D. Kan. 2000)..................................... 29

*Ruiz v. Affinity Logistics Corp.,* No. 05CV2125, 2012 WL 3672561
(S.D. Cal. 2012) ............................................................ 33, 38, 40, 41, 42, 43, 47, 48

*Seidl v. Greentree Mortg. Co.*, 30 F. Supp. 2d 1292 (D.  Colo. 1998) ............................. 33

*Spaulding v. United Transp. Union*, 279 F.3d 901 (10th Cir. 2002) ............................... 30

*State Comp. Ins. Fund v. Brown*, 32 Cal. App. 4th 188, 38 Cal. Rptr. 2d 98 (1995) ............. 38, 42

**Statutes**

29 U.S.C. § 206(a) ........................................................................................ 31

29 U.S.C.A. § 203(e)(1) ................................................................................. 31

49 C.F.R. §§ 390.1 ....................................................................... 3, 16, 39, 42

Kan. Stat. Ann. § 44-313(b) ......................................................................... 31

**Rules**

Fed. R. Civ. P. 1 ............................................................................................ 29

Fed. R. Civ. P. 56(c) ..................................................................................... 29

## I.   INTRODUCTION

This is a worker classification case in which the named Plaintiffs (and purported class representatives) Larry Blair and Charlie Davis allege they were misclassified as independent contractors for TransAm Trucking, Inc. ("TransAm") rather than employees, and are thus entitled to minimum wage as employees under the Fair Labor Standards Act ("FLSA"). Plaintiffs also claim violation of the Kansas Wage Payment Act ("KWPA").

TransAm is an interstate and intrastate for-hire motor carrier (as defined by the Federal Motor Carrier Safety Act) engaged in the business of over-the-road transport of goods in commerce.   In order to fulfill its customers' needs, TransAm utilizes the services of qualified drivers who hold a Commercial Driver's License ("CDL") to haul loads for its customers across the United States.   TransAm's truck drivers fall into two categories:   (1) drivers who are employed by TransAm ("Company Drivers"); and (2) drivers who provide services to TransAm as independent contractors by leasing a tractor to TransAm via an Independent Contractor Agreement ("Owner Operators").   TransAm's business requires both Company Drivers and Owner Operators to meet the varying needs and business fluctuations of its customers.

Named Plaintiffs Larry Blair and Charlie Davis were both Owner Operators for TransAm.  Larry Blair was an Owner Operator from 2007 until 2008, and during that time leased four tractors to TransAm and employed five other drivers to provide services to TransAm on his behalf.  Charlie Davis was an Owner Operator for TransAm from 2005 until 2010, and during that time leased four tractors to TransAm and employed one other driver to provide services to TransAm on his behalf.

As Owner Operators for TransAm, Blair and Davis were owners of their own businesses. In fact, Blair and Davis chose to become Owner Operators instead of Company Drivers in the first place because they wanted to own their own trucks.  As independent business owners, they

were responsible for their own business expenses and had the right to choose the tractors they would drive, choose the loads they would haul, and choose their own routes and fuel locations. But most importantly, they also had the right to choose how many tractors their business would operate and who would perform those services, as neither Davis or Blair, or any other independent contractor, were required to personally perform services under their written agreements with TransAm.  In fact, as noted previously, Blair and Davis each leased multiple trucks to TransAm and employed or paid other drivers to drive on their behalf rather than performing all of the services themselves.

By contrast, TransAm's Company Drivers enjoy much less autonomy.  They are assigned a tractor, and are not allowed to refuse loads.  They must drive the route prescribed by TransAm when they are dispatched to haul and deliver a load to TransAm's customer.  Company Drivers must fuel at the times and locations ordered by TransAm, and purchase the specific amount of fuel dictated by TransAm.  Their tractors are "governed" by a device which limits the speeds at which the tractor can operate so that they may not drive at a speed in excess of limits set by TransAm (which are usually set below the speed limits established by the state which they may drive through in transporting loads across the country).  Company Drivers must have maintenance and repairs performed on their tractors at the times and locations ordered by TransAm, and are only allowed four days off per month.  They are not responsible for any expenses incurred in the course of their employment.  Rather, Company Drivers are paid a set base rate per mile (approximately 18 to 24 cents per mile), much less than the rate paid to Owner Operators (approximately 84 cents per mile).

Despite these key differences, differences which are reflected in both written agreements and in actual practice, Blair and Davis now contend they were employees, and not independent

contractors, of TransAm.   However, an analysis of the Tenth Circuit's applicable "economic realities test" and the undisputed material facts show that TransAm is entitled to judgment as a matter of law on these claims because TransAm's Owner Operators, including the named Plaintiffs in this action, are properly classified as independent contractors.  Plaintiffs' FLSA and KWPA claims cannot survive if, as a matter of law, TransAm's Owner Operators are properly classified as independent contractors.  Accordingly, TransAm requests this Court enter summary judgment in favor of TransAm on each and every one of Plaintiffs' claims asserted herein.

## II.    STATEMENT OF UNCONTROVERTED FACTS[1]

1.     TransAm Trucking, Inc. is an interstate and intrastate for-hire motor carrier (US DOT No. 315503, Docket No. MC-197897) with facilities in Olathe, Kansas, and Rockwall, Texas.  Affidavit of Murray Droescher, attached as Exhibit A, at ¶ 4.

2.     In order to fulfill its' customers' needs, TransAm requires the services of a number of qualified drivers to haul tractor-trailer loads on its behalf. Exh. A, Droescher Affidavit, at ¶ 5.

3.     As an interstate motor carrier, TransAm is governed by the Federal Motor Carrier Safety Act ("FMCSA") and the United States Department of Transportation.  Drivers who haul for TransAm, whether as employed Company Drivers or Owner Operators, are required to be hired pursuant to specific regulatory requirements set forth in the Federal Motor Carrier Safety Regulations promulgated by the Federal Motor Carrier Safety Administration.   Exh. A, Droescher Affidavit, at ¶ 8; see also, e.g., 49 C.F.R. §§ 390.1 et seq.

4.     TransAm has both Company Drivers (who are employees of TransAm) and Owner Operators (who enter into Independent Contractor Agreements with TransAm).   The

---

[1] TransAm has asserted numerous "facts" for purposes of this Summary Judgment, and notes that no "fact" which has been asserted as such here shall be considered an admission, and TransAm  reserves the right to vigorously contest various facts at trial.

company utilizes the services of both types of drivers for the business reason that Company Drivers are only entitled to limited time off, and further, because the company's business can fluctuate tremendously.  As such, in order to ensure customer demands are met a timely manner, TransAm uses both Company Drivers and Owner Operators to haul its loads.  Exh. A, Droescher Affidavit, at ¶¶ 6-7; Deposition of Russ McElliott, attached in relevant part as Exhibit B, at p. 25:3 – 11.

**Independent Contractor Agreements**

5.      TransAm's relationships with its Owner Operators are governed by written Independent Contractor Agreements.  Exh. A, Droescher Affidavit, at ¶ 9.

6.      The Independent Contractor Agreement is a lease whereby an Owner Operator agrees to lease to TransAm the use of a tractor for the hauling of freight to TransAm's customers:

> [Owner Operator] owns and/or leases motor vehicle equipment and is engaged in the business of transporting freight by motor vehicle pursuant to long term arrangements with for-hire motor carriers; and…[TransAm] desires to lease [Owner Operator's] motor vehicle equipment and to obtain certain personnel services from [Owner Operator] from time to time, and [Owner Operator] desires to lease such motor vehicle equipment to [TransAm] and to make available such personnel services from time to time…

Independent Contractor Agreement dated March 23, 2007, attached as Exhibit C, at Whereas Clauses 2, 3.

7.      In the Independent Contractor Agreement, the Owner Operator agrees to "furnish to [TransAm] the motor vehicle equipment….for the purpose of hauling freight from time to time pursuant to the terms and conditions of this Agreement.  Such Equipment shall be furnished to [TransAm] on a schedule to be determined by [Owner Operator]."  Exh. C, at ¶ 1(a).

8.     Every Owner Operator signs a separate Independent Contractor Agreement for each tractor he leases to TransAm.   Exh. A, Droescher Affidavit, at ¶ 9.

9.     The Independent Contractor Agreement dictates and describes the relationship between the parties:

> The parties intend to create by this Agreement an independent contractor relationship and not an employment or master/servant relationship between Carrier and Contractor.  Neither Contractor nor any personnel furnished by Contractor to perform services hereunder shall be considered employees of Carrier at any time, under any circumstances or for any purpose.

Exh. C, at § 20.

10.     Further, the Independent Contractor Agreement provides: "Contractor shall determine the method, means and the manner of performing Contractor's obligations pursuant to this Agreement and shall be responsible to Carrier for the performance of this Agreement in accordance with the rules and regulations of appropriate regulatory agencies."  Exh. C, at § 20.

11.     Further, the Independent Contractor Agreement provides: "Carrier shall neither have nor exercise any control or direction over the specific methods by which the Contractor (or Contractor's employees or agents) shall perform services hereunder."  Exh. C, at § 20.

12.     By the terms of the Agreement itself, the Owner Operator signing the Agreement does not have any obligation to perform the hauling services personally.  Rather, the Owner Operator can hire others to perform the services called for under the Agreement.  Exh. A, Droescher Affidavit, at ¶ 10; Exh. C, at § 2.

**The Named Plaintiffs**

13.     Named Plaintiff Larry Blair was a Company Driver for TransAm from December 2002 until May 2004.   Deposition of Larry Blair, attached in relevant part as Exhibit D, at p. 47:25 – 48:23, 50:3 – 50:8.

14.     Mr. Blair testified he has a degree in Business Management from The Ohio State University.  Exh. D, Deposition of Larry Blair, at p. 16:12 – 16:19.

15.     Mr. Blair voluntarily resigned his employment with TransAm in 2004.  Exh. D, Deposition of Larry Blair, at p. 44:18 – 44:21.

16.     In March 2007, Mr. Blair elected to return to TransAm.  At that time, he had the option of being either a Company Driver or an Owner Operator.   He voluntarily elected to become an Owner Operator.  Exh. D, Deposition of Larry Blair, at p. 54:2 – 56:2, 81:25 – 85:1, 87:3 – 88:4.

17.     Mr. Blair became an Owner Operator for TransAm when he signed his first Independent Contractor Agreement with TransAm on March 23, 2007.  *See* Exh. C.

18.     Mr. Blair elected to become an Owner Operator because he wanted to own his own business.  Exh. D, Deposition of Larry Blair, at p. 90:2 – 90:15.

19.     Named Plaintiff Charlie Davis became an Owner Operator for TransAm in December 2005 by signing his first Independent Contractor Agreement on December 9, 2005.  *See* Independent Contractor Agreement dated December 9, 2005, attached as Exhibit E.

20.     Mr. Davis elected to become an Owner Operator because he wished to choose whether he was home for holidays, which he understood was not an option available to Company Drivers, who are only entitled to four days off per month.  Deposition of Charlie, attached in

relevant part as Exhibit F, at p. 107:13 – 109:7.  He also wanted to own his own truck.  Exh. F, at p. 249:20 – 249:22.

21.     According to the First Amended Complaint, "the Putative Class Members are those current and former Leased Drivers [Owner Operators] improperly misclassified as independent contractors who were issued compensation via ComData Cards provided by Defendant or otherwise had Charges Deducted from their compensation."  Amended Complaint for Damages – Class Action, Doc. No. 22, at ¶ 24.  As defined, the putative Plaintiffs' class would include all Owner Operators who entered into Independent Contractor Agreements during the relevant time period.  *See id.*

22.     Owner Operators who enter into Independent Contractor Agreements with TransAm include contractors who leased their tractors from other companies and then, in turn, lease those same tractors to TransAm, as well as independent contractors who own their own trucks and lease them to TransAm under an Independent Contractor Agreement.  Exh. A, Droescher Affidavit, at ¶ 11.

**Compensation**

23.     Owner Operators are paid a base rate of 84 cents per mile, while Company Drivers are paid a base rate of approximately 18 to 24 cents per mile.  Exh. B, Deposition of Russ McElliott, at p. 95:19 – 95:25.

24.     Owner Operators are issued 1099s for their services and do not receive W-2 wages.  Exh. F, Deposition of Charlie Davis, at p. 130:6 – 131:15; Exh. A, Droescher Affidavit, at ¶ 12.

25.     Per their Agreement, Owner Operators are provided weekly settlement statements to account for payments due the driver by TransAm.  The Agreement provides in relevant part:

> In consideration for furnishing the Equipment and the provision of the personnel services as specified herein, Carrier shall pay to Contractor the compensation described in Exhibit C…All such payments to Contractor and any applicable deductions shall be reflected in an operator's settlement which Carrier shall produce both on a weekly basis and as a final statement following termination of this Agreement...

Exh. C, Independent Contractor Agreement, at § 3.

26. Blair never had charges deducted from his settlement that he did not authorize, other than some loading receipts he did not believe he was reimbursed for and which he discussed with his fleet manager.  Exh. D, Deposition of Larry Blair, at p. 191:19 – 193:2.

27. Davis has never made a claim to TransAm that there were charges deducted from his settlement statements that were not authorized by him.  He does not have any information or documentation that indicates that his charges were unauthorized.  Exh. F, Deposition of Charlie Davis, at p. 179:17 – 180:20.

28. In practice, and per the Agreement, payments from TransAm to Owner Operators do not include employee withholding:

> Contractor understands and agrees that Carrier shall not withhold on behalf of Contractor (or Contractor's employees or agents) pursuant to this Agreement any sums for income tax, unemployment insurance, Social Security or any other withholding pursuant to any law or requirement of any governmental body relating to them, or make available to Contractor (or Contractor's employees or agents) any of the benefits afforded to employees of Carrier.

Exh. C, Independent Contractor Agreement, at § 20; Exh. A, Droescher Affidavit, at ¶ 12.

29. Davis admits he kept receipts and submitted his Owner Operator-related business expenses as a deduction on his income taxes.  Exh. F, Deposition of Charlie Davis, at p. 200:24 – 201:4, 232:21 – 233:5, 240:23 – 241:21.

**Required and Optional Training**

30.     Only experienced drivers may elect to become Owner Operators; inexperienced drivers are only eligible to hold positions as Company Drivers until they gain required experience.  Deposition of Rhonda McFarland, attached in relevant part as Exhibit G, at p. 53:15 – 54:6.

31.     Both Company Drivers and Owner Operators attend at least a three-day orientation at TransAm's Olathe, Kansas or Rockwall, Texas facilities.  Exh. G, Deposition of Rhonda McFarland, at p. 18:7 – 13.

32.     During the three-day orientation session, Owner Operators complete FMCSA and DOT-required evaluations and testing, receive their Owner Operator Information Handbooks, and sign their Independent Contractor Agreements.  *See* Defendant's Answers and Objections to Plaintiff's First Set of Interrogatories, attached as Exhibit H, at No. 6.

33.     Owner Operator Information Handbooks are different from the handbooks provided to Company Drivers.  Affidavit of Rhonda McFarland, attached as Exhibit I, at ¶ 8.

34.     Company Drivers are also required to attend at least a three-day orientation, and inexperienced Company Drivers are also required to complete an additional 22-day training.  During training and orientation, Company Drivers receive their Driver Information Handbook, complete FMCSA and DOT-required evaluations, and complete W-4s and other payroll documents.  Exh. H, at No. 6.

35.     Although Company Drivers and Owner Operators attend the same three-day orientation session, the information provided to the two groups of drivers is different in some respects, including but not limited to home time, maintenance of equipment, routes, and fuel solution.  Owner Operators are dismissed from the orientation when TransAm covers topics that

are applicable only to employees, such as employee benefits.  Exh. G, Deposition of Rhonda McFarland, at p. 18:9 – 21:12; *see also* Training PowerPoint, attached as Exhibit J.

36.     Blair and Davis each provided a signed acknowledgement to TransAm stating they had received an Owner Operator Information Handbook, reviewed the contents, and understood they were responsible for becoming familiar with the contents.  Owner Operator Acknowledgement of Receipt signed by Larry Blair, attached as Exhibit K; Owner Operator Information Handbook Receipt signed by Charlie Davis, attached as Exhibit L.

37.     Blair and Davis also acknowledged that "any policies or procedures of TransAm that are applicable only to employees of TransAm will not apply to me or [to] the services I provide." Exh. K; Exh. L.

38.     During the orientation period, Owner Operators choose their tractors if they elect to lease a tractor through TransAm Leasing, Inc.[2]  Exh. B, Deposition of Russ McElliott, at p. 57:18-24.  Owner Operators may also choose to provide their own truck from another source. Exh. G, Deposition of Rhonda McFarland, at p. 63:5 – 65:14.

39.     Davis admits he chose the truck he wanted to lease and received the truck he requested.  Exh. F, Deposition of Charlie Davis, at p. 110:8 – 111:14, 122:6 – 122:9.

40.     Company Drivers are assigned their tractors following orientation, and do not have a choice in what tractor to which they are assigned.  Exh. G, Deposition of Rhonda McFarland, at p. 75:14 – 21; Exh. I, McFarland Affidavit, at ¶ 9; *see also* Exh. D, Deposition of Larry Blair, at p. 48:3 – 48:13.

41.     In addition to orientation, TransAm also offers an annual "Ethics and Techniques" class and quarterly "safety" classes on a variety of topics, with some topics relating specifically

---

[2] TransAm Leasing, Inc. is a separate corporation engaged in the business of leasing motor vehicle equipment to Owner Operators and is not a defendant in this lawsuit.

to Company Drivers and some relating specifically to Owner Operators.  Exh. G, Deposition of Rhonda McFarland, at p. 30:3 – 30:19, 39:8 – 39:23.

42.     The Ethics and Techniques class and the quarterly safety classes are mandatory for Company Drivers.  Missing a class results in discipline, up to and including termination. Exh. G, Deposition of Rhonda McFarland, at p. 31:15 – 31:22, 39:8 – 21.

43.     However, Owner Operators are not required to attend the Ethics and Techniques class or the quarterly safety classes.  They may skip these classes, but are awarded a yearly incentive bonus of a one cent per mile increase if they voluntarily choose to attend all classes. Exh. F, Deposition of Charlie Davis, at p. 198:14 – 200:20; Exh. G, Deposition of Rhonda McFarland, at p. 31:15 – 33:10, 39:18 – 40:6.

44.     Only approximately 70 percent of Owner Operators choose to attend all classes and become eligible for the incentive bonus.  Exh. G, Deposition of Rhonda McFarland, at p. 32:10 – 32:15.

45.     Blair did not choose to attend all classes; therefore he was ineligible for the incentive bonus.  He was not disciplined or terminated for his failure to attend safety classes because he was not required to attend them as an Owner Operator.  *See* Safety Class records for Larry Blair, attached as Exhibit M; Exh. I, McFarland Affidavit, at ¶ 10.

**Inability to Receive Employee Benefits**

46.     TransAm's Independent Contractor Agreement specifically prohibits Owner Operators from receiving employee benefits through TransAm:

> Neither contractor nor any of Contractor's employees or agents shall have any claim under this Agreement or otherwise against Carrier for worker's compensation, unemployment compensation, vacation pay, sick leave, retirement benefits, Social Security benefits, disability insurance benefits, or any other employee benefits, all of which shall be the sole responsibility of Contractor.

Exh. C, § 20.

47.     Owner Operators may opt to receive certain benefits at their own cost directly through a third party provider. For example, Owner Operators may obtain health insurance at their own cost from a company that is unrelated to TransAm, and from which TransAm does not receive any benefit for the Owner Operator's election to purchase the benefit.  TransAm only offers company health insurance benefits to its employees and Company Drivers. Exh. A, Droescher Affidavit, at ¶ 13.

**Investment Required by Owner Operators**

48.     Pursuant to the Independent Contractor Agreements between the Owner Operators and TransAm, Owner Operators are responsible for paying all costs associated with their tractor, including lease or ownership payments, fuel, and maintenance:

> Carrier shall have no responsibility for operating and maintenance expenses in connection with the Equipment.  Contractor shall be responsible for all costs and expenses in connection with the operation and maintenance of the Equipment, including, but not limited to, fuel, oil, lubrication, routine tractor maintenance and repairs, and tractor washes.

Exh. C, Independent Contractor Agreement, at §1(d).

49.     Owner Operators are not required to lease a truck from TransAm Leasing, Inc., but that option is available to all Owner Operators.  Some Owner Operators bring their own tractors.  This tractor may be owned or leased by the driver and is subject to certain criteria relating to age, ability to haul gross weight, and availability of a mobile communication device. Exh. G, Deposition of Rhonda McFarland, at p. 63:5 – 65:14, 66:14 – 67:2; Exh. A, Droescher Affidavit, at ¶ 14; Exh. B, Deposition of Russ McElliott, at p. 49:4 – 49:11, 126:17 – 128:4.

50.     Owner Operators who choose to lease a tractor through TransAm Leasing, Inc. may select their own tractors, with varying lease terms and lease costs available depending on

the age and miles on the tractor chosen.  Exh. A, Droescher Affidavit, at ¶ 15; Exh. F, Deposition of Charlie Davis, at p. 110:8 – 111:14, 122:6 – 122:9; Exh. B, Deposition of Russ McElliott, at p. 52:23 – 53:23.

51.    Owner Operators who choose to lease a tractor through TransAm Leasing have the option to purchase their tractor upon completion of the lease.  Exh. B, Deposition of Russ McElliott, at p. 51:14 – 52:22.

52.    Blair entered into four Independent Contractor Agreements and leased four different tractors from TransAm Leasing, Inc.  Exh. D, Deposition of Larry Blair, at p. 151:6 – 151:17.  Each of these Agreements contained substantially similar terms as those contained in Exhibits C and E.  Exh. A, Droescher Affidavit, at ¶ 17.

53.    Davis also entered into four Independent Contractor Agreements and leased four different tractors from TransAm Leasing. Exh. F, Deposition of Charlie Davis, at p. 247:20 – 247:23.  Each of these Agreements contained substantially similar terms as those contained in Exhibits C and E.  Exh. A, Droescher Affidavit, at ¶ 17.

54.    Per the Independent Contractor Agreement, Owner Operators have the option to participate in a Maintenance Savings Account to assist in coverage of maintenance expenses:

> At Contractor's discretion, Contractor may fund $0.02 to $0.05 per mile into a voluntary Maintenance Savings Account to cover costs and expenses related to maintenance and repair of the Equipment…PLEASE NOTE THAT THE MAINTENANCE SAVINGS ACCOUNT IS A COMPLETELY VOLUNTARY OPTION FOR CONTRACTOR.  IT IS NOT A MANDATORY MAINTENANCE ESCROW.

Exh. C, Independent Contractor Agreement, at § 1(e) (emphasis in original).

55.    Davis initially made the decision not to participate in the Maintenance Savings Account.  He later opted to participate.  This was his choice and not directed or required by TransAm.  Exh. F, Deposition of Charlie Davis, at p. 129:1 – 130:1.

56.     Owner Operators are free to choose the location of any needed maintenance or repairs for their tractors.  TransAm does not tell Owner Operators where they must go to get any needed maintenance or repairs for their tractors, though they may choose to have the repairs made at TransAm's Olathe or Rockwall facilities.  Exh. B, Deposition of Russ McElliott, at p. 121:14 – 122:22.

57.     Under the Independent Contractor Agreement, Owner Operators are "solely responsible for all fuel taxes, mileage taxes, highway use taxes, road taxes, and all other levies or similar assessments based upon the operation of the Equipment hereunder."  Exh. C, Independent Contractor Agreement, at ¶ 7.  In practice, TransAm does not pay these expenses for Owner Operators it does for Company Drivers.  Rather, if these items were charged by a taxing authority to TransAm, the Company would then deduct the charge from the Owner Operator's Settlement Statement.  Exh. A, Droescher Affidavit, at ¶ 16.

58.     Owner Operators are also required to provide their own insurance, including physical damage, bobtail/deadhead, and occupational/accident insurance.  Exh. H, Defendant's Answers and Objections to Plaintiffs' First Set of Interrogatories, at No. 10; _see also_ Exh. C and E, at Addendum to Independent Contractor Agreement.

59.     Though this insurance is available through TransAm, Owner Operators are informed they are not required to purchase it through TransAm:  "I understand that I am not required to purchase this, or any item or product from TransAm Trucking, Inc." Exhs. C and E, at the Addendum to Independent Contractor Agreement; Exh. F, Deposition of Charlie Davis, at p. 125:24 – 127:9.

60.     Owner Operators are also required to provide this insurance for any drivers they employ or pay to drive under their Independent Contractor Agreements with TransAm  _See, e.g.,_

Exh. D, Deposition of Larry Blair, at p. 180:3 – 180:7; Exh. F, Deposition of Charlie Davis, at 171:11 – 171:17.

61.     Owner Operators may opt to purchase Prepass Plus/scale bypass transponder services through TransAm.  The Prepass Authorization specifies that Owner Operators are "not required to purchase this service from TransAm Trucking, Inc."  *See* Prepass Authorization, attached as Exhibit N.

62.     Charlie Davis opted to purchase the Prepass Plus.  Exh. N.

63.     Unlike Owner Operators, Company Drivers are reimbursed for all job-related costs and expenses if a proper receipt is provided.  Exh. H, Defendant's Answers and Objections to Plaintiff's First Set of Interrogatories, at Nos. 13, 19.

**Ability to Hire Drivers**

64.     Owner Operators do not have to personally perform services for TransAm under the terms of their Independent Contractor Agreements.  Owner Operators may hire their own employees or contractors to drive the equipment they lease to TransAm under the Independent Contractor Agreement.  Exh. F, Deposition of Charlie Davis, at p. 146:13 – 146:19; Exh. D, Deposition of Larry Blair, at p. 148:24 – 149:15; Exh. C, Independent Contract Agreement, at § 2; Exh. A, Droescher Affidavit, at ¶ 10.

65.     Per their Agreement, any persons hired or paid by Owner Operators are considered employees or agents of the Owner Operator, and not TransAm:

> All personnel furnished or used by Contractor to perform the personnel services hereunder, including drivers, driver's helpers and laborers, are and shall be at all times the employees or agents of Contractor and not the employees or agents of Carrier.

Exh. C, at § 2(c).

66.     TransAm's Owner Operators are solely responsible for paying and providing benefits to any persons who drive on their behalf for TransAm:

> Contractor shall be solely and totally responsible for payment of their wages, employment benefits, including, but not limited to workers compensation benefits, and all other amounts required by government agencies to be paid by employers on behalf of or to employees.

Exh. C, at § 2(c).

67.     Pursuant to the Independent Contractor Agreement, TransAm does not control or supervise any persons hired or paid by its Owner Operators:   "Carrier shall neither have nor exercise control, direction or supervision over the personnel furnished or used by Contractor to perform the services hereunder." Exh. C, at § 2(c).

68.     The Independent Contractor Agreement states that "Contractor shall be solely and totally responsible for selecting, hiring, firing, supervising, directing, training, and setting wages, hours and working conditions for its employees." Exh. C, at § 2(c).

69.     Based on FMCSA regulations, persons hired or paid by TransAm's Owner Operators to provide services for TransAm must complete DOT and FMCSA-required qualification and testing.   *See, e.g.*, 49 C.F.R. §§ 390.1 *et seq*.; Exh. C, at § 2(b); Exh. F, Deposition of Charlie Davis, at p. 164:12 – 165:13; Exh. D, Deposition of Larry Blair, at p. 154:20 – 155:20.

70.     In fact, both Larry Blair and Charlie Davis hired and paid other people to drive on their behalf for TransAm. Exh. F, Deposition of Charlie Davis, at p. 162:4 – 5; Exh. D, Deposition of Larry Blair, at p. 151:6 – 151:17.

71.     Per TransAm's policy, any time an Owner Operator hired another person to perform the services provided for in the Independent Contractor Agreement, the Owner Operator had to complete an Independent Contractor Personnel Form.  Per that policy, for each of the

persons hired or paid by the named Plaintiffs to provide services for TransAm, the named Plaintiffs signed "Independent Contractor Personnel" forms, which stated:

> Pursuant to that certain Independent Contractor Agreement between the undersigned independent contractor ("Contractor") and TransAm Trucking, Inc. (TransAm"), the Contractor leases motor vehicle equipment to TransAm and utilizes the services of the undersigned personnel ("Personnel"). The undersigned represent and warrant to TransAm that the undersigned Personnel is an independent contractor of Contractor, and not an employee of Contractor.

*See* Independent Contractor Personnel forms, attached as Exhibit O; Exh. A, Affidavit of Murry Droescher, at ¶ 10.

72.    Larry Blair employed five persons to drive tractors he leased to TransAm Trucking, Inc., including Toby Hartley, John Shirey, Matt Dunivan, Daniel Wilbanks, and Scott Ross. Exh. O, at p. 1 – 5.

73.    Larry Blair admits he hired drivers on his own terms and TransAm neither instructed him to hire them nor dictated how they were paid. Exh. D, Deposition of Larry Blair, at p. 166:22 – 172:2, 179:3 – 179:20.

74.    Blair issued each of his drivers 1099s at the end of the year. Exh. D, Deposition of Larry Blair, at p. 171:25 – 172:14.

75.    Blair paid his drivers all of the profit from the tractor they drove. TransAm did not dictate how he paid his drivers. Exh. D, Deposition of Larry Blair, at p. 167:20 – 169:17.

76.    Blair instructed his drivers that they were not allowed to refuse any loads because he did not want his trucks to sit idle: "I told him nobody can refuse a load because I'm not going to let the truck sit two to three, four days…" Exh. D, Deposition of Larry Blair, at p. 170:22 – 171:6.

77.   TransAm did not pay Blair's drivers directly; rather, TransAm provided settlement statements and payment to Blair and Blair was responsible for paying his drivers.  *See* Settlement Statement attached as Exhibit P; Exh. D, Deposition of Larry Blair, at p. 170:8 – 170:2, 193:6 – 194:18.

78.   Charlie Davis employed one driver, Anthony Terry.  Exh. O, at p. 6.

79.   Davis met Anthony Terry through a friend.  Davis admits he hired Mr. Terry on his own terms and TransAm neither instructed him to hire Mr. Terry nor dictated how Mr. Terry should be paid.  Exh. F, Deposition of Charlie Davis, at p. 170:15 – 172:21.

80.   Davis terminated Terry because he had two accidents; TransAm did not dictate that Mr. Terry be fired.  Exh. F, Deposition of Charlie Davis, at p. 180:24 – 182:24.

81.   TransAm did not pay Mr. Terry directly; rather, TransAm provided settlement statements and payment to Davis, and Davis agreed to pay Mr. Terry 30 cents per mile.  *See* Settlement Statement attached as Exhibit Q; Exh. F, Deposition of Charlie Davis, at p. 169:2 – 170:11, 175:5 – 176:11.

**Right to Accept or Decline Loads**

82.   At TransAm, loads are assigned using a software program called MicroMap.  Exh. B, Deposition of Russ McElliott, at p. 32:20 – 35:16; Exh. H, Defendant's Answers and Objections to Plaintiffs' First Set of Interrogatories, at No. 20.

83.   In MicroMap, there are approximately 150 weighted categories that determine which tractor will be assigned to each load.  Exh. B, Deposition of Russ McElliott, at p. 32:25 – 33:6.

84.     MicroMap is weighted to favor assignment of loads to Owner Operators so that they are assigned loads more quickly than Company Drivers.   Exh. B, Deposition of Russ McElliott, at p. 32:20 – 35:16.

85.     The longer a driver waits for a load, the more MicroMap is weighted to favor assignment of a load to that particular truck.  Exh. B, Deposition of Russ McElliott, at p. 96:16 – 97:10.

86.     Load assignments originate from MicroMap to a TransAm employee called a "planner," who then assigns the load to a tractor based on MicroMap's instruction.  A driver manager then sends that load assignment to a tractor via the truck's satellite communication system once an empty or availability call is received.  Exh. B, Deposition of Russ McElliott, at p. 152:10 – 152:17.

87.     If an Owner Operator does not want to accept a load, he is only required to notify TransAm over his satellite communication device that he is declining the load.  Owner Operators are not required to accept any loads, and can reject loads whenever they want to. Exh. A, Droescher Affidavit, at ¶ 18.

88.     Driver managers do not have access to driver qualification files where load rejection messages are retained. Exh. B, Deposition of Russ McElliott, at p. 154:1 – 154:16.

89.     Drivers are unable to contact or communicate with planners directly.  Exh. B, Deposition of Russ McElliott, at p. 153:3 – 153:8; Exh. F, Deposition of Charlie Davis, at p. 206:23 – 206:25.

90.     Driver managers cannot override a planner's load assignment and do not have access to view what loads are available at any given time.  Exh. B, Deposition of Russ McElliott, at p. 152:18 – 153:2.

91.     In contrast to Owner Operators, Company Drivers are required to drive any load to which they are assigned.  Exh. B, Deposition of Russ McElliott, at p. 25:12 – 26:5; Exh. D, Deposition of Larry Blair, at p. 242:14 – 18.

92.     Owner Operators can "choose any work assignment they like and refuse any work they would like."  There are no restrictions on what loads they can take or what loads they can refuse, with no penalty for refusal.  Exh. B, Deposition of Russ McElliott, at p. 96:7 – 97:2.

93.     Independent contractors can specify their preferences for loads and/or load destinations, though they are not guaranteed any particular loads or load destinations.  Exh. H, Defendant's Answers and Objections to Plaintiffs' First Set of Interrogatories, at No. 20.

94.     The Independent Contractor Agreement states:  "Contractor may refuse to haul any load offered to Contractor by Carrier, for any reason, with no penalty for refusal."  Exh. C, at § 2(a).

95.     Further, the Independent Contractor Agreement states "Contractor shall have the right to reject any load assignment…" Exh. C, at § 20.

96.     Though TransAm previously did not retain load rejection messages in its driver files, it began keeping such information once this lawsuit was filed in order to document the fact that Owner Operators regularly reject load assignments from TransAm.  Those rejection messages were produced in the litigation and prove there have been over 6,000 load rejections since 2009. Exh. B, Deposition of Russ McElliott, at p. 97:14 – 98:9; Exh. A, Droescher Affidavit, at ¶ 19.

97.     Davis admits he rejected load assignments.  Exh. F, Deposition of Charlie Davis, at p. 49:25 – 50:11.

98.   Charlie Davis also made his truck unavailable in order to take extended home time on a number of days.  *See* Movement Display Records for Charlie Davis, attached as Exhibit R; Exh. A, Droescher Affidavit, at ¶ 20.

99.   The home time requested by Davis well exceeds the home time allowed to Company Drivers of only four days per month.  Exh. A, Droescher Affidavit, at ¶ 20.

100.   Davis admits he does not know the specific factors considered by trip planners when assigning loads to any particular truck, and he was not terminated or disciplined for declining loads. Davis also admits he regularly had to wait one day for a load even when he had not rejected a load, and occasionally had to wait two days even when he had not rejected a load. Exh. F, Deposition of Charlie Davis, at p. 58:14 – 59:11, 64:7 – 70:8.

101.   Larry Blair admits he knew other Owner Operators who refused loads.  Exh. D, Deposition of Larry Blair, at p. 133:4 – 8.

102.   Larry Blair also made his truck(s) unavailable to accept loads on a number of days.  *See* Movement Display Records for Larry Blair, attached as Exhibit S; Exh. A, Droescher Affidavit, at ¶ 20.

103.   The home time requested by Blair well exceeds the home time allowed to Company Drivers of only four days per month.  Exh. A, Droescher Affidavit, at ¶ 20.

**Right to Select Routes**

104.   Under the terms of their Independent Contractor Agreement, Owner Operators do not have to take the routes selected by TransAm – they can drive whatever route they choose:

> Contractor shall have the right to reject any load assignment and further has the right to choose the route of travel of the Equipment and at what points Contractor's drivers shall take rest stops and refuel the equipment, all of which shall be the sole obligation and responsibility of Contractor.

Exh. C, at § 20.

105.    Charlie Davis admits he had the right to, and did, choose his own routes while driving for TransAm because he did not believe the routes recommended by his Fuel Optimizer were as efficient as the routes he chose himself.  Exh. F, Deposition of Charlie Davis, at p. 138:9 – 139:11.

106.    Larry Blair also admits he could choose his own routes while driving for TransAm, but chose not to do so. Exh. D, Deposition of Larry Blair, at p. 101:24 – 102:14, 225:10 – 225:13.

107.    TransAm's Owner Operators regularly determine their own routes and do not always follow the recommended routes suggested by TransAm.  Exh. A, Droescher Affidavit, at ¶ 29.

108.    In contrast to Owner Operators, Company Drivers must take the routes dictated by TransAm and may be disciplined for driving out-of-route.  Exh. D, Deposition of Larry Blair, at p. 58:22 – 59:24.

**Right to Select Method and Location of Fuel Purchases**

109.    Owner Operators have the right to choose how they pay for fuel.  According to the Independent Contractor Agreement, the "Contractor is <u>not</u> required to use the Comdata card or TCH card to purchase fuel."  Exh. C, §1(f).

110.    However, Owner Operators can take advantage of discounts negotiated by TransAm with fuel suppliers by using a TCH card at any fuel stop within TransAm's network. Exh. F, Deposition of Charlie Davis, at p. 158:18 – 159:11; Exh. B, Deposition of Russ McElliott, at p. 134:12 – 137:11; Exh. C, Independent Contractor Agreement, at § 1(f).

111.     This discount may be utilized regardless of whether the Owner Operator is driving on the route recommended by TransAm or driving his or her own chosen route.  Exh. F, Deposition of Charlie Davis, at p. 158:18 – 159:11; Exh. A, Droescher Affidavit, at ¶ 21.

112.     Owner Operators have the option to voluntarily purchase a fuel optimization program to help maximize efficiency of fuel use.  Exh. B, Deposition of Russ McElliott, at p. 134:12 – 135:25.

113.     Because they are not required to use the fuel solution, Owner Operators may choose when and where they want to stop for fuel, and how many gallons of diesel they wish to purchase at any given stop.  Exh. G, Deposition of Rhonda McFarland, at p. 21:4 – 21:12.

114.     Charlie Davis and Larry Blair both opted to use the fuel optimizer.  _See_ Fuel Optimizer authorizations, attached as Exhibit T; Exh. F, Deposition of Charlie Davis, at p. 125:5 – 125:23; Exh. D, Deposition of Larry Blair, at p. 104:4 – 104:21.

115.     Company Drivers are told where and when to make fuel purchases through TransAm's fuel solution.  Participation in and compliance with this program is mandatory for Company Drivers.  Exh. B, Deposition of Russ McElliott, at p. 133:1 – 133:7; Exh. G, Deposition of Rhonda McFarland, at p. 21:4 – 21:7; Exh. A, Droescher Affidavit, at ¶ 22.

116.     Company Drivers are not obligated to pay for fuel; so long as the Company Driver did not drive any out-of-route miles, fuel was paid by TransAm.  Exh. D, Deposition of Larry Blair, at p. 58:2 – 58:15; Exh. B, Deposition of Russ McElliott, at p. 133:1 – 133:4.

**TransAm's Driver Supervision**

117.     TransAm trains its Driver Managers and Operations Managers to treat its Owner Operators and Company Drivers differently.  Exh. I, Affidavit of Rhonda McFarland, at ¶ 4.

118.    For example, during training for Driver Managers and Operations Managers, TransAm instructs these employees as to how home time, vacation time, out-of-route driving, and fuel stops are handled differently as to Owner Operators and Company Drivers.  Exh. I, McFarland Affidavit, at ¶ 5; Itinerary for Driver Manager, attached as Exhibit U; Itinerary for Operations Management Trainee, attached as Exhibit V.

119.    Driver Managers and Operations Managers are instructed that although Company Drivers must drive the route chosen by TransAm, Owner Operators may drive any route they choose and are not to be disciplined for driving out-of-route.  Exh. I, McFarland Affidavit, at ¶ 6.

120.    Driver Managers and Operations Managers are trained that although employee drivers must fuel their tractors at the times and locations chosen by TransAm, independent contractors may fuel at the location and time, and in the amount they choose, and are not to be disciplined for failing to fuel their tractors in accordance with the Fuel Solution.  Exh. I, McFarland Affidavit, at ¶ 7.

121.    Owner Operators are not required to give notice when they wish to have "home time," though an 8-day notice will assist TransAm in routing the Owner Operator as close to their home as possible.  Exh. G, Deposition of Rhonda McFarland, at 19:18 – 19:22; Exh. J, Training PowerPoint, at p. 3.

122.    Owner Operators may take as many days off as they wish.  Exh. A, Affidavit of Murray Droescher, at ¶ 23.

123.    Company Drivers may have only four days off per month.  Exh. F, Deposition of Charlie Davis, at p. 108:10 – 108:14; Exh. J, Training PowerPoint, at p. 2; Exh. B, Deposition of Russ McElliott, at p. 25:12 - 22.

124.    Company Drivers must provide 8 days notice in order to request home time. Exh. G, Deposition of Rhonda McFarland, at 19:18 – 19:22; Exh. J, Training PowerPoint, at p. 2.

125.    Company Drivers' trucks are governed to drive no more than 62 miles per hour. Exh. B, Deposition of Russ McElliott, at p. 44:14 – 45:1.

126.    Software is installed on Company Drivers' tractors that restrict the speed of the truck to no more than 62 miles per hour.  Exh. B, Deposition of Russ McElliott, at p. 44:14 – 45:1.

127.    This speed restriction ensures Company Drivers do not exceed speed limits and maximizes fuel efficiency on TransAm's tractors.  Exh. A, Affidavit of Murray Droescher, at ¶ 24.

128.    Tractors driven by Owner Operators are not similarly governed with a 62 mile-per-hour speed restriction. Exh. B, Deposition of Russ McElliott, at p. 44:14 – 45:1.

**Ability to Drive for other Carriers**

129.    Owner Operators who lease their tractor from TransAm Leasing, Inc. enter into written Equipment Lease Agreements.  Under these agreements Owner Operators may use their equipment to drive for other carriers with TransAm Leasing, Inc.'s  permission:

> The parties acknowledge that, for purposes of conducting Lessee's freight transportation business, during the term hereof Lessee intends to lease the Equipment to at least one for-hire motor carrier.  Lessee agrees to notify Lessor in writing of the name of any motor carrier to which Lessee intends to lease the Equipment, and the name and address of such carrier shall be set forth on Exhibit A attached hereto.  Such lease shall be subject to the prior approval of the Lessor, which approval shall not be unreasonably withheld.

*See, e.g.,* Equipment Lease Agreement, attached as Exhibit W, at § 5.

130.    However, while a tractor is leased to TransAm pursuant to an Independent Contractor Agreement, it may only be driven on TransAm's behalf, pursuant to Federal Motor

Carrier Safety Administration regulations.  Exh. B, Deposition of Russ McElliott, at p. 59:15 – 59:20; Exh. C, Independent Contractor Agreement, at §§ 1(h), 20.

**Ability to Control Profit and Loss**

131.    Owner Operators have a variety of ways in which they can increase their profits and decrease expenses.  Exh. F, Deposition of Charlie Davis, at p. 188:25 – 194:10.

132.    As an independent contractor, an Owner Operator's objective is to increase profits.  Exh. F, Deposition of Charlie Davis, at p. 189:8 – 189:12.

133.    Owner Operators can increase profits by increasing the miles driven by the particular truck.  Exh. F, Deposition of Charlie Davis, at p. 189:18 – 189:22.

134.    Owner Operators can also increase profits by decreasing expenses.   Exh. F, Deposition of Charlie Davis, at p. 189:23 – 190:1.

135.    Owner Operators can increase profit and decrease fuel costs by choosing routes that will result in less fuel consumption.  Exh. F, Deposition of Charlie Davis, at p. 190:2 – 190:10.

136.    Owner Operators can also decrease expenses by declining optional payments, such as voluntary contributions to Maintenance Savings Accounts.  Exh. F, Deposition of Charlie Davis, at p. 192:8 – 8; 218:13 – 219:21.

137.    In addition, Owner Operators can increase profitability by choosing when and what preventative maintenance they wish to do on their equipment, and at what times.  Further, Owner Operators can increase profitability by making decisions relating to the age of their equipment, factoring in the impact of the maintenance needs and fuel costs associated with running a particular tractor.   For example, some Owner Operators may choose to lease or purchase older trucks and run them for a longer period of time, while other Owner Operators

may choose to lease or buy newer tractors which could require less maintenance and are more fuel efficient.  Exh. A, Droescher Affidavit, at ¶ 25.

138.    Owner Operators can also increase profitability in the manner that they set pay and benefits rates for those persons whom they may employ or contract with to drive their equipment.  For example, Owner Operators can set the pay for their drivers, and may choose to pay less to those drivers to increase the profit they receive on the miles driven by that driver. Exh. A, Droescher Affidavit, at ¶ 26.

139.    Owner Operators can increase profitability by choosing to run their routes at slower speeds, thus decreasing the cost of fuel, or in turn, make the business decision to run their equipment at higher speeds in order to allow for more files to be covered, increasing mileage revenue.  Exh. A, Droescher Affidavit, at ¶ 27.

**Termination**

140.    Company Drivers are terminable "at will."  Exh. I, McFarland Affidavit, at ¶ 11.

141.    Owner Operators enter into a one-year agreement with TransAm, under which either party may terminate the contract with appropriate notice:

> Subject to the provisions for early termination set forth herein, the terms of this Agreement shall commence as of the day and year first above written and continue for a period of one (1) years, and thereafter shall automatically renew for additional consecutive one (1)-year terms.  Either party may terminate this Agreement without cause by giving the other party at least fourteen (14) days' prior written notice thereof.

Exh. C, § 5.

142.    The Independent Contractor Agreement does not contain a noncompetition provision.  As such, an Owner Operator may enter into an Independent Contractor Agreement with TransAm, and hire another driver to perform the services required under the Agreement,

leaving the Owner Operator free to accept employment or work from other entities if he so chooses.  Exh. A, Droescher Affidavit, at ¶ 27.

**Internal Revenue Service and Department of Labor Investigations**

143.    On or about May 3, 2010, the Internal Revenue Service sent a letter to TransAm stating it was conducting an investigation into the worker classification of an Owner Operator named Christopher Barr.  The IRS sought to determine whether Barr should be classified as an independent contractor or as an employee for purposes of federal employment taxes.  *See* Letter from IRS dated May 3, 2010, attached as Exhibit X.

144.    At the close of its investigation, the IRS determined Mr. Barr was properly considered an independent contractor.  *See* IRS Determination of Worker Status dated April 23, 2012, attached as Exhibit Y.

145.    In making its decision, the IRS reviewed the Independent Contractor Agreement, and considered factors such as whether the driver had the right to accept or decline a load, choose the route of travel, choose fuel purchase locations, and choose a substitute driver.  The IRS also considered ownership of the tractor-trailer, and the driver's obligation to pay for the vehicle, fuel, insurance, maintenance, and satellite service fees, as well as the method of compensation for the driver, including lack of company-provided health insurance and other benefits.  *See* Exh. Y.

146.    According to the IRS determination letter, the ruling "pertains to all workers performing services under the same or similar circumstances" – in other words, all other Owner Operators at TransAm.  *See* Exh. Y, at p. 3.

147.    The Wage and Hour Division of the Department of Labor (the "DOL"), through a fax to TransAm from investigator Jeffrey DePew, instigated an investigation of TransAm in

approximately July 2012.  Deposition of John M. Neyens, attached in relevant part as Exhibit Z, at p. 60:25 – 65:13; Records from the U.S. Department of Labor, attached as Exhibit AA.

148.    The DOL visited TransAm in July 2012 in order to determine, in part, whether TransAm was in compliance with the FLSA.  Exh. AA.

149.    The DOL's investigation was focused, in part, on driver minimum wage and worker classification of TransAm's drivers.  Exh. AA.

150.    As part of its investigation, the DOL reviewed Independent Contractor Agreements, driver logs, payroll records, employee records, and other corporate records.   In determining driver classification, the DOL also took into account the driver's obligation to pay operating and maintenance expenses, fuel costs, insurance, and equipment costs, as well as the fact that independent contractor drivers have the right to refuse loads.  _See_ Exh. AA; Notes dated 8/27/12, attached as Exhibit BB.

151.    Although no written opinion was generated by the DOL, ultimately it found _no violation_ by TransAm of the FLSA and that TransAm's Owner Operators were properly classified as independent contractors and not employees. Exh. Z, Deposition of John M. Neyens, at p. 79:3 – 79:18; Exh. AA, at p. 2.

### III.    SUMMARY JUDGMENT STANDARD

Summary judgment is "designed to secure the just, speedy and inexpensive determination of every action." _Celotex Corp. v. Catrett_, 477 U.S. 317, 327 (1986) (_quoting_ FED. R. CIV. P. 1); _Peterson v. Exide Corp._, 123 F. Supp. 2d 1265, 1269 (D. Kan. 2000).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); _Bradley v. Val-Mejias,_ 379 F.3d 892, 897 (10th Cir. 2004); _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242,

247 (1986).  When determining whether judgment as a matter of law is appropriate, "we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party."  *Bradley*, 379 F.3d at 897 (citations omitted); <u>*see also*</u> *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).  A "material" fact is one "that might affect the outcome of the suit under the governing law."  *Anderson,* 477 U.S. at 248.  A "genuine" issue is one for which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.; <u>*see also*</u> *Haynes v. Level 3 Communicators, LLC,* 456 F.3d 1251, 1219 (10th Cir. 2006).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Spaulding,* 279 F.3d at 904 (<u>*citing*</u> *Celotex,* 477 U.S. at 322-23).  Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."  *Spaulding*, 279 F.3d at 904 (<u>*citing*</u> *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)); <u>*see also*</u> *Anderson*, 477 U.S. at 256; <u>*see also*</u> *Celotex,* 477 U.S. at 324.  The nonmoving party "may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir. 1990).  More than a scintilla of evidence is required to demonstrate a genuine factual issue.  *Anderson*, 477 U.S. at 250–51.  If the non-moving party's evidence is merely colorable or is not significantly probative, summary judgment should be granted.  *Id*. at 249–250.

"Whether an individual is an employee or an independent contractor generally is considered a question of fact for the jury or trier of fact."  *In re FedEx Ground Package Sys., Inc.,* 734 F. Supp. 2d 557, 584-85 (N.D. Ind. 2010) interpreting Kansas law) (citations omitted).

"When the facts are undisputed or the evidence is susceptible of only a single conclusion, however, it is a question of law for the court." *Id.*

## IV.    ARGUMENT AND AUTHORITIES

Plaintiffs allege TransAm improperly classified its Owner Operators as independent contractors instead of employees, and that as a result, they did not earn minimum wage as required under the FLSA and the KWPA.   However, the undisputed facts demonstrate that TransAm's Owner Operators are properly classified under both the FLSA's "economic realities test" and the KWPA's substantially similar "right to control" analysis.   Accordingly, TransAm is entitled to judgment as a matter of law and Plaintiffs' claims should be dismissed.

### A.    <u>Applicable Law</u>

The FLSA establishes a minimum wage that must be paid to employees by employers whose business is an "enterprise engaged in commerce or in the production of goods for commerce."  29 U.S.C. § 206(a).  The FLSA defines an "employee" broadly as "any individual employed by an employer."  29 U.S.C.A. § 203(e)(1).  Likewise, the KWPA applies to payment of wages to "employees" and defines an employee as "any person allowed or permitted to work by an employer."  Kan. Stat. Ann. § 44-313(b).  Thus, both the FLSA and the KWPA require an individual be an "employee" before an employer is liable under the Acts.

Because of these broad definitions of "employee," the Tenth Circuit employs an "economic reality test" to distinguish between independent contractors and employees for FLSA purposes.  In determining whether an individual is covered by the FLSA, the "inquiry is not limited by any contractual terminology or by traditional common law concepts of 'employee' or 'independent contractor.'"  *Johnson v. Unified Gov't of Wyandotte Co.,* 371 F.3d 723, 729 (10th Cir. 2004).  Instead, "the economic realities of the relationship govern, and the focal point is

'whether the individual is economically dependent on the business to which he renders service…or is, as a matter of economic fact, in business for himself.'" *Id.*

In applying the economic realities test, the Tenth Circuit analyzes the following six elements: (1) the degree of control exerted by the alleged employer over the worker; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the permanence of the working relationship; (5) the degree of skill required to perform the work; and (6) the extent to which the work is an integral part of the alleged employer's business. *Id.* None of these factors alone are dispositive; instead, the Court employs a totality of the circumstances approach. *Id.* TransAm need not prove all six factors apply in order for the Court to find its Owner Operators are properly classified as independent contractors. For example, Courts have found drivers were properly classified as independent contractors where only three of the factors were in favor of independent contractor status. *See, e.g., Herman v. Express Sixty Minutes Delivery Servs., Inc.*, 161 F.3d 299 (5th Cir. 1998) (analyzing five of the six factors).

Similarly, under the KWPA, "[t]he primary test used in determining whether an employment relationship exists is 'whether the employer has the right of control and supervision over the work of the alleged employee, and the right to direct the manner in which the work is to be performed, as well as the result which is to be accomplished.' *In re FedEx Ground Package Sys., Inc.,* 734 F. Supp. 2d at 584-85. The existence of the right or authority to interfere or control by the employer, not the actual interference or exercise of control, renders one an employee rather than an independent contractor. *Id.* at 585.

Under the KWPA, the right to control the *manner* and *methods* of the worker is the "single most important factor in determining a worker's status." *Id.* (emphasis added). However, other relevant factors include: "whether there is an agreement to perform a certain

kind of work for a definite period of time; whether the employer has the right to discharge the worker at any time; whether the worker must furnish necessary tools, supplies, and materials; whether the worker is paid by the hour or by the job; whether the work is part of the regular business of the employer; whether the worker's business is independent in nature; and whether the worker has the right to employ assistants and supervise their work." *Id.* In other words, though the "economic reality test" has not been formally adopted for purposes of analyzing a KWPA claim, ultimately Courts analyze primarily the same factors. *See, e.g., In re FedEx Ground*, 734 F. Supp. 2d at 584-601.

### 1.   **TransAm does not Exhibit the Requisite Degree of Control over its Owner Operators under Either the FLSA or KWPA.**

Under both the FLSA and the KWPA, the most critical factor in determining whether a worker is an employee or an independent contractor is the employer's right to control the means and manner of the services performed.  Independent contractors are not free from all control. "They may be subject to control sufficient to ensure that the end result contracted for is reached, even though they are not subject to control over the means and methods of accomplishing that result." *Seidl v. Greentree Mortg. Co.*, 30 F.Supp.2d 1292, 1300 (D. Colo. 1998).  Notably, the control that is extended over a worker can be discounted to the extent the control is necessary or driven by a need to comply with federal regulations or with a customer's business requirements and preferences. *See Ruiz v. Affinity Logistics Corp.*, No. 05CV2125, 2012 WL 3672561 (S.D. Cal. 2012).  Under this "right to control" analysis, TransAm's Owner Operators are properly classified as independent contractors pursuant to both the FLSA and the KWPA.

(a)   TransAm does not control the means, manner, and method by which its Owner Operators perform their services

Though TransAm conducts certain minimum safety and FMCSA-required evaluation of its Owner Operators and their personnel at the time it hires them, it otherwise does not direct the manner and means by which its Owner Operators perform their services for TransAm.  In fact, in the Independent Contractor Agreement, TransAm's Owner Operators agree to lease tractors to TransAm "on a schedule to be determined by [Owner Operator]."  Statement of Facts ("SOF") ¶ 7.   TransAm "shall neither have nor exercise any control or direction over the specific methods" by which its Owner Operators shall perform the services contemplated in the Independent Contractor Agreement.  SOF ¶ 11.   Further, Owner Operators have the right to "determine the method, means, and the manner of performing Contractor's obligations…" SOF ¶ 10.

For example, although TransAm's Company Drivers are required to drive any load to which they are assigned, Owner Operators may decline or reject loads pursuant to the Independent Contractor Agreement, which states "Contractor may refuse to haul any load offered to Contractor by Carrier, for any reason, with no penalty for refusal."  SOF ¶¶ 91 - 94. The Independent Contractor Agreement also states "Contractor shall have the right to reject any load assignment."  SOF ¶ 95.  In fact, TransAm's Owner Operators regularly decline loads, as evidenced by the thousands of load rejection messages produced by TransAm in this litigation. SOF ¶ 96.  Named plaintiff Charlie Davis admits he rejected load assignments while an Owner Operator.  SOF ¶ 97.

In fact, Owner Operators may take as much home time as they wish, simply by notifying TransAm that their tractor is unavailable.  SOF ¶ 122.  Both Blair and Davis effectively rejected loads by frequently making themselves and/or their tractors unavailable so that they could have

frequent "home time." SOF ¶¶ 98, 102.  The home time enjoyed by Blair and Davis well exceeds the home time allowed to Company Drivers of only four days per month, and demonstrates Owner Operators indeed take advantage of the flexibility of their independent contractor status. SOF ¶¶ 99, 103.  In fact, being able to determine his own schedule was a key factor in Charlie Davis' decision to become an Owner Operator instead of a Company Driver. SOF ¶ 20.

Though Plaintiffs testified they would be penalized for rejecting loads by having to "sit" or wait for another load, those allegations are not supported by actual knowledge.  *See* SOF ¶ 100.  TransAm trains its Driver Managers to treat its Company Drivers differently from Owner Operators, including training them that it is TransAm's practice and policy that Owner Operators are entitled to refuse loads without penalty, in contrast to Company Drivers. SOF ¶¶ 117 - 120. Further, while plaintiff testified that he was told that if he refused a load he would have to sit and wait for another one, he admits he did not know how loads were assigned, or whether other loads were actually available in his area through TransAm at the time he rejected the loads. SOF ¶ 100.  Davis also admitted he sometimes had to wait for one to two days for another load even when he had not rejected a load. SOF ¶ 100.

In fact, TransAm has safeguards in place to ensure no such "penalty" could be assessed against its Owner Operators.  At TransAm, loads are assigned using a software program called MicroMap. SOF ¶ 82.  In MicroMap, there are approximately 150 weighted categories which determine what tractor will be assigned to each load. SOF ¶ 83.  MicroMap is weighted to favor assignment of loads to Owner Operators. SOF ¶ 84.   The longer a driver waits for a load, the more MicroMap is weighted to favor assignment of a load to that particular truck. SOF ¶ 85. Load assignments originate from MicroMap to a planner, who then assigns the load to a tractor

based on MicroMap's instruction.  SOF ¶ 86.  A driver manager then sends that load assignment to a tractor via the truck's satellite communication system once an empty or availability call is received.  SOF ¶ 86.  Driver managers cannot override a planner's load assignment and do not have access to view what loads are available at any given time.  SOF ¶ 90.  Further, driver managers do not have access to driver qualification files where load rejection messages are retained and drivers are unable to contact or communicate with planners directly. SOF ¶¶ 88 - 89.   In sum, because planners have no way of knowing which drivers are rejecting load assignments, and driver managers have no way of overriding load assignments, there is no time "penalty" that can possibly be assessed as a result of load rejections.  In fact, under the software used by the company, a load rejection would result in a driver getting priority for the next available load because he or she has been waiting longer.  If a driver must wait for another load assignment after rejecting a load, it is merely because there is no other load available in their area at the time.

Further, although TransAm provides a recommended route to all of its drivers, Owner Operators are not required to follow TransAm's recommended route.  SOF ¶¶ 104, 107. According to the Independent Contractor Agreement, an Owner Operator "has the right to choose the route of travel of the Equipment and at what points Contractors' drivers shall take rest stops and refuel the equipment."  SOF ¶ 104.  In fact, TransAm's Owner Operators regularly determine their own routes and do not follow the recommended routes that are suggested by TransAm.  SOF ¶ 107.  Davis admits he frequently determined his own routes and did not follow TransAm's recommended routes, and Blair admits he had the freedom to choose his routes, and chose not to do so.  SOF ¶¶ 105 - 106.  This freedom was not allowed to Company Drivers, who

must drive the routes selected by TransAm and may be disciplined for driving out-of-route.  SOF ¶ 108.

Likewise, though Owner Operators may opt to have fuel optimization on their tractors to guide them as to the most economical use of fuel, Owner Operators are not required to follow the recommendations given.  SOF ¶¶ 109 - 119.   Instead, Owner Operators may fuel their tractors when and where they like.  SOF ¶ 113.  And, if they opt to take advantage of fuel discounts negotiated by TransAm with fuel stations, they may do so simply by using their TCH card for payment.  SOF ¶ 110.  Use of the TCH card is strictly voluntary and is not required.  SOF ¶ 109.

In addition, Company Drivers' tractors are governed by TransAm to drive no more than 62 miles per hour in order to maximize fuel efficiency.  SOF ¶¶ 125, 127. This is accomplished via software installed on Company Drivers' tractors.  SOF ¶ 126.  By contrast, Owner Operators are not so governed.  SOF ¶ 128.  As a result, while TransAm controls the speed and route of its Company Drivers, Owner Operators are free to take the routes they want and do so at a speed which they choose.

In sum, TransAm exerts little control over its Owner Operators other than the direction and safety mandates required by federal regulation.  In sharp contrast to Company Drivers, Owner Operators have the freedom to choose what loads they will haul, where and how they will purchase fuel, and on what roads they will travel.  In a number of similar cases, Courts have found drivers to be properly classified as independent contractors.  *See, e.g., In re FedEx Ground,* 734 F.Supp.2d at 600-01 (holding "[w]hen all reasonable inferences are drawn in plaintiffs' favor, the evidence is insufficient to show that FedEx retained the right to control the plaintiffs and direct the manner in which they performed their work."); *Brennan v. Sand Products, Inc.,* 371 F. Supp. 236 (W.D. Okla. 1973) ("…the Court finds and concludes from the

evidence herein that the truckers were not at anytime employees of the Defendant under the Act but were in fact independent contractors and not covered by the Act."); *see also State Comp. Ins. Fund v. Brown*, 32 Cal. App. 4th 188, 203, 38 Cal. Rptr. 2d 98, 105 (1995) ("...the contracts into which the independents voluntarily entered when MVT restructured its operations gives them complete control over their working conditions and the manner in which a load is transported (including whether or not to hire assistants), and leaves them entirely free to accept or reject an assignment without reprisal..."); *see also Mazzei v. Rock N Around Trucking, Inc.,* 246 F.3d 956, 964 (7th Cir. 2001) ("...the control RNA exercises over its owner-drivers amounts to little more than the basic level of supervision required to ensure that the arrangement between RNA and its owner-drivers is of some value to RNA."); *see also Ruiz v. Affinity Logistics Corp.,* 887 F. Supp. 2d 1034 (S.D. Cal. 2012) ("Although Affinity did exercise some control over Plaintiffs, for the most part this control was either unrelated to the manner and means by which Plaintiffs accomplished their work, or it was a result of other factors—such as federal regulatory requirements or Sears' preferences—rather than direct control by Affinity.").  Accordingly, this analysis favors a finding that TransAm did not direct or control its Owner Operators under either the FLSA or KWPA.

(b)     TransAm Does Not Require That Services be Provided Personally by the Worker, and Owner Operators Hire and Pay Their Own Employee or Contractor Drivers

A worker's "ability to hire others to complete their work affords contractors more autonomy in running their businesses" and therefore is a factor weighing in favor of independent contractor status in both an FLSA and KWPA analysis.  *See, e.g., In re FedEx Ground*, 734 F.Supp.2d at 596; *Ruiz,* 887 F. Supp. 2d 1034.  "If the services must be rendered personally, presumably the person or persons for whom the services are performed are interested in the

methods used to accomplish the work as well as in the results." *Lowen Corp. v. United States*, No. 90-1589-MLB, 1993 WL 245960, at *7 (D. Kan. June 14, 1993). "If one worker hires, supervises, and pays the other assistants pursuant to a contract under which the worker agrees to provide materials and labor and under which the worker is responsible only for the attainment of a result, this factor indicates an independent contractor status." *Id.*

Here, TransAm does not require its Owner Operators' services be provided personally by the driver. SOF ¶ 64. An Owner Operator may choose to hire his or her own employees, personnel, agents, or contractors to provide services to TransAm on their behalf, pursuant to the Independent Contractor Agreement. SOF ¶¶ 64 - 69. Though any person driving for the Owner Operator must be initially qualified by TransAm pursuant to FMCSA regulations, *see* 49 C.F.R. §§ 390.1 *et seq.*, TransAm expressly states in the Independent Contractor Agreement that "All personnel furnished or used by Contractor to perform the personnel services hereunder, including drivers, driver's helpers and laborers, are and shall be at all times the employees or agents of Contractor and not the employees or agents of Carrier." SOF ¶¶ 65, 69.

Further, according to the Independent Contractor Agreement, TransAm is not responsible for selecting, supervising, paying or providing benefits to any of its Owner Operator's personnel, which instead is wholly its Owner Operators' responsibility: "Contractor shall be solely and totally responsible for selecting, hiring, firing, supervising, directing, training, and setting wages, hours and working conditions for its employees." SOF ¶ 68.

In this case, both of the named Plaintiffs who now wish for this Court to declare they are TransAm employees hired and paid drivers to perform driving services for TransAm on their behalf. SOF ¶¶ 70 – 72, 78. Both Blair and Davis admit TransAm did not recommend or require they hire these drivers. SOF ¶¶ 73, 79. Blair and Davis admit they made their own agreements

to pay these drivers, and TransAm neither dictated how these drivers to were to be paid nor actually paid these drivers.  SOF ¶¶ 73 – 75, 77, 79, 81.  Blair and Davis provided the required liability insurance for their drivers.  SOF ¶ 60.  Blair provided 1099 statements to his drivers. SOF ¶ 74.  Though TransAm communicated directly with the drivers as to load assignments, as it must with any driver hauling loads for TransAm, it did not dictate how they performed their services.  Blair admits <u>he</u> instructed his drivers not to reject loads because he wanted to ensure his trucks stayed busy; TransAm did not dictate any such instruction to Blair's drivers.  SOF ¶ 76.   Davis admits he terminated his driver Anthony Terry, and further admits TransAm did not tell him he had to terminate Terry.  SOF ¶ 80.  Put simply, the drivers paid by Owner Operators are the sole responsibility of the Owner Operator both by agreement and in practice, and are not employees or contractors directly for TransAm.

In similar cases interpreting this factor, Courts have found drivers were properly classified as independent contractors.  For example, in finding drivers were properly classified as independent contractors, the Court in *In re FedEx Ground* noted these key facts:

> Contractors have the right to hire replacement drivers to run their routes or assistants to help with their routes, subject to FedEx's approval requirements.  FedEx retains the right to monitor the replacement drivers' performance and hold the contractor responsible if the driver fails to comply with the requirements imposed upon the contractor.  Contractors must, therefore supervise their replacement drivers…Subject to FedEx approval, contractors can own more than one service area and hire other drivers to run their additional routes, providing the contractor with an opportunity to expand his business and income.

*In re FedEx Ground*, 734 F.Supp. 2d at 596.  Likewise, the *Ruiz* Court stated:

> The most prominent evidence that Affinity did not control the time, manner and method of the drivers is that Ruiz and the other drivers did not themselves have to do the work for which they were hired—drivers could hire other drivers to load the trucks, drive the trucks, run the routes, make the deliveries, unload the trucks, and perform virtually all other aspects of the job.... In fact, some of the drivers operated multiple trucks

> to complete the deliveries on any given day and hired drivers and helpers to staff those extra trucks… Based on this evidence, the Court found—and still finds—"that the *Plaintiffs' ability to hire others to operate the trucks and perform the services they contracted with Affinity to perform is highly indicative of an independent contractor relationship*. An employee is not able to hire a substitute to do their work as these drivers were permitted, and even encouraged, to do."

*Ruiz,* 887 F. Supp. 2d 1034 (emphasis added) (internal citations omitted).  Here, as in *Ruiz* and *FedEx,* TransAm's Owner Operators are free to hire personnel or contractors to drive on their behalf, and do not personally have to drive the tractors leased to TransAm through their Independent Contractor Agreements.  Accordingly, TransAm does not have the requisite control over its Owner Operators and they are properly classified as independent contractors.

  (c)  TransAm and its Owner Operators Intended to Form an Independent Contractor Relationship

TransAm's Owner Operators have the option of whether to become Company Drivers or Owner Operators when they apply to drive for TransAm.  SOF ¶ 16.  Becoming an Owner Operator is completely voluntary.  SOF ¶ 16.  Both Blair and Davis admit they voluntarily chose to become Owner Operators because they wanted to own their own businesses.  SOF ¶¶ 16, 20.  Mr. Davis testified he chose to become an Owner Operator, in part, because wanted to control his time off over the holidays, and understood that was not an option for Company Drivers.  SOF ¶ 20.

  The Independent Contractor Agreements signed by TransAm's Owner Operators clearly express the intention of the parties in entering into the agreement:

> *The parties intend to create by this Agreement an independent contractor relationship* and not an employment or master/servant relationship between Carrier and Contractor.  *Neither Contractor nor any personnel furnished by Contractor to perform services hereunder shall be considered employees of Carrier at any time, under any circumstances or for any purpose.*

SOF ¶ 9 (emphasis added).

In cases such as this one, where the parties "expressly and voluntarily agreed to independent contractor status," Courts have found this favors a finding that drivers are independent contractors and not employees.  *See In re FedEx Ground,* 734 F.Supp.2d at 588-89; *see also State Comp. Ins. Fund,* 32 Cal. App. 4th at 203; *see also Ruiz,* 887 F. Supp. 2d 1034 (finding drivers were independent contractors in part due to a contract in which the parties agreed "The parties intend to create an independent contractor relationship and not an employer-employee relationship.").  Accordingly, this factor weighs in favor of a finding that TransAm's Owner Operators are properly classified.

(d)   TransAm Provides Little Training to Owner Operators

To promote greater safety in the operation of large trucks on the nation's highways, the United States Department of Transportation promulgated the Federal Motor Carrier Safety Regulations ("FMCSR"), which establishes "minimum qualifications for commercial motor vehicle drivers and requiring employers to investigate the driving record and employment history of prospective employees being hired to drive large trucks."  *Cassara v. DAC Services, Inc.,* 276 F.3d 1210, 1213 (10th Cir. 2002) (citing 49 C.F.R. §§ 390.1-390 .37, 391.1-391.69 (2000)).  "These FMCSR requirements establish a *minimum* standard for the evaluation of driver qualifications."  *Id.*  Trucking companies may enforce "more stringent requirements relating to safety of operation" than the general requirements found in the FMCSR, and "may require driver applicants to provide information in addition to that required to be disclosed by the regulations."  *Id.* (internal citations omitted).

TransAm provides little training or evaluation of its Owner Operators other than enforcement of the stringent safety standards required by the FMCSR.  At TransAm, Owner Operators must be experienced drivers; inexperienced drivers are ineligible to become Owner

Operators without further training.  SOF ¶ 30.  Therefore, TransAm's Owner Operators attend only a three-day orientation in which they complete their FMCSA and DOT-required evaluation and testing, including drug and alcohol evaluations and other background checks.  SOF ¶¶ 30 - 35.  Though TransAm offers additional quarterly safety classes and an annual "Ethics and Techniques" course, Owner Operators (unlike employees) are not required to attend these classes and are not disciplined if they fail to attend the classes.  SOF ¶¶ 41 - 45.   Instead, they are offered an incentive to attend, at their option.  SOF ¶ 43.

This is not only TransAm's policy, it is also *in fact* how TransAm operates.   Only approximately 70 percent of Owner Operators choose to take all quarterly safety classes and the annual Ethics and Techniques class.  SOF ¶ 44.  Indeed, named Plaintiff Larry Blair chose not to attend all quarterly safety classes, and therefore did not receive the incentive offered by TransAm.  SOF ¶ 45.

The control extended over TransAm's Owner Operators in training and evaluation is little more than that necessary to comply with the safety requirements of the FMCSR and DOT, and therefore does not weigh against TransAm in the independent contractor analysis.  *See Ruiz v. Affinity Logistics Corp.*, No. 05CV2125, 2012 WL 3672561 (S.D. Cal. 2012) ("…Affinity's requirements in this regard must be discounted to the extent they were driven by a need to comply with federal regulations or with [its customers] requirements…").  Accordingly, given the relatively little training required and the voluntary nature of the additional safety courses offered at TransAm, this analysis favors a finding that TransAm's Owner Operators are properly classified as independent contractors.

2.   **Owner Operators are Responsible for their Profit or Loss.**

By choosing to become independent contractors and business owners, TransAm's Owner Operators are in control of whether they earn a profit or sustain a loss.  "A worker who can realize a profit or suffer a loss as a result of the worker's services (in addition to the profit or loss ordinarily realized by employees) is generally an independent contractor, but the worker who cannot is an employee." *Lowen Corp.,* 1993 WL 245960, at *9.  Further, a Court determining employment status considers the method of payment, type of compensation, negotiation of pay rates, and whether the employer withholds deductions for taxes, unemployment, and other employee benefits. *See* *In re FedExGround,* 734 F.Supp.2d at 598.

Here, TransAm's Owner Operators are not W-2 employees like Company Drivers.  SOF ¶ 24.  Instead, they receive payments on a per-mile basis, reflected in weekly settlement statements provided to the Owner Operators pursuant to the Independent Contractor Agreement. SOF ¶¶ 23, 25.  TransAm does not withhold any sums for income tax, unemployment insurance, Social Security, or any other withholding.  SOF ¶¶ 28 – 29.

Owner Operators are, for the most part, responsible for their own trip-related expenses including fuel, tractor maintenance and repairs, and travel expenses such as meals.  SOF ¶¶ 48 - 63.   Because of this, there are a number of opportunities and choices available to Owner Operators in which they could increase or decrease their profit and/or loss.  SOF ¶¶ 131 - 139 . For example, Owner Operators have the option to purchase a Fuel Solution program to help maximize the efficiency of fuel use, the cost of which (if elected) will appear as a deduction from the Owner Operators' settlement statement.  SOF ¶¶ 112 - 113.   By contrast, Company Drivers are told when and where to make fuel purchases and participation in the Fuel Solution program is mandatory.  SOF ¶¶ 115 – 116.   Therefore, Owner Operators may determine if they wish to

subscribe to the fuel solution in order to make any given trip more profitable by maximizing fuel savings.  In fact, both Blair and Davis elected to receive the Fuel Solution, and Davis admits he did not always choose to follow it, as he may have determined a different route or fuel stop was in his best interest.  SOF ¶¶ 105, 11, 114.

Likewise, because TransAm allows its Owner Operators to enter into multiple Independent Contractor Agreements and hire additional drivers, Owner Operators had the ability to increase profitability by operating more than one tractor for TransAm at a time.   SOF ¶¶ 12, 52 – 53, 138.  In fact, both Blair and Davis took advantage of this opportunity and had additional trucks and drivers.  SOF ¶¶ 12, 52 – 53, 70, 72, 78, 138.  They determined the rate to be paid for the additional drivers, and therefore were in control of whether the additional tractors would increase their own profits.  SOF ¶¶ 73, 75, 77, 79, 81.  For example, though Davis paid his employee driver 30 cents per mile, Blair elected to pay his employee drivers all of the profit earned from the tractor.  SOF ¶¶ 75, 81.  Thus, Davis attempted to increase profit from the running of an additional tractor, while Blair chose not to make any profit from the additional tractors he leased to TransAm.

Though there is no Tenth Circuit case directly on point, in *Luxama v. Ironbound Exp., Inc.*, the Court held that under certain circumstances, working additional hours and taking more trips in conjunction with other factors can demonstrate an opportunity to increase profits. *Luxama v. Ironbound Exp., Inc.*, No. 11-2224, 2012 WL 5973277 (D.N.J., June 28, 2012).  In *Luxama*, the Plaintiffs argued that they "lack[ed] the opportunity for profit or loss other than by working longer hours" because they were paid on a "per-trip" basis.  *Id.*  However, the Court reasoned that the Plaintiffs were able to increase their profits by acquiring additional trucks and

employing drivers to assist with hauling cargo. Thus, the "plaintiffs' investment coupled with their skills in managing additional employees, present meaningful opportunities for profit." *Id.*

Likewise, the *Brennan* Court noted that where a driver was held responsible for his own expenses, he was properly classified as an independent contractor. *Brennan,* 371 F. Supp. at 238. In reaching its conclusion, the Court noted:

> The profit made by a trucker depends on the difference from what he gets for hauling and his cost of operating the truck. The truckers own no part of Defendant's business or its physical plant. His profit is affected by his initiative, his industry, his care and ability in driving, his care and maintenance of his vehicle, and the extent of his investment in the vehicle as it relates to load capacity and the hauls he desires to accomplish.

*Id.*

As in *Luxama* and *Brennan*, TransAm's Owner Operators have the ability to control their own profit or loss through their own initiative, hard work, and financial savvy, as well as the use of additional trucks and employee drivers. Therefore, this factor favors a finding that they are properly classified as independent contractors.

3.    **Owner Operators make Substantial Investment in their Businesses.**

The investment required by TransAm's independent contractor drivers also favors a finding that TransAm's drivers are properly classified. Pursuant to the Independent Contractor Agreement, Owner Operators are responsible for paying <u>all</u> costs associated with their tractor, including lease or ownership payments, fuel, and maintenance:

> Carrier shall have no responsibility for operating and maintenance expenses in connection with the Equipment. Contractor shall be responsible for all costs and expenses in connection with the operation and maintenance of the Equipment, including, but not limited to, fuel, oil, lubrication, routine tractor maintenance and repairs, and tractor washes.

SOF ¶ 48.

The most significant costs for an Owner Operator are their tractors and fuel. Owner Operators must provide a tractor to lease to TransAm, which may be owned by the driver, leased to the driver by TransAm Leasing, Inc., or leased to the driver from another company. SOF ¶¶ 49 - 50. Owner Operators have the option to purchase their tractors upon successful lease completion. SOF ¶ 51. Further, Owner Operators are "solely responsible for all fuel taxes, mileage taxes, highway use taxes, road taxes, and all other levies or similar assessments based upon the operation of the Equipment hereunder." SOF ¶ 57. Owner Operators are also required to provide their own insurance, including physical damage, bobtail/deadhead, and occupational/accident insurance. SOF ¶ 58. Owner Operators are also required to provide this insurance for any drivers they employ or pay to drive additional tractors for TransAm. SOF ¶ 60.

By contrast, Company Drivers are not responsible for any expenses relating to the services they provide to TransAm. SOF ¶ 63. Company Drivers are reimbursed for all job-related costs and expenses. SOF ¶ 63.

The investment required of TransAm's Owner Operators is similar to that in other trucking cases in which drivers were found to be independent contractors. For example, in analyzing the six factors of the economic realities test, the Court in *Ruiz v. Affinity Logistics Corporation* found that where the drivers were responsible for the cost of their truck lease, they were properly considered independent contractors. In reaching this decision, the Court noted:

> If the worker is using his employer's tool or instrumentalities, especially if they are of substantial value ... this indicates that the owner is a master. The relevant tools and instrumentalities here include tools such as maps, drills, hand tools, protective blankets, pads, and ties—all of which were furnished by the drivers—and, importantly, the delivery truck. The delivery truck was the main tool Plaintiffs used to conduct their business. Some of the drivers owned their own trucks, but most leased them, either from Affinity under the ELA, or from some other entity. For those drivers

who leased the trucks, the Court finds that they—not Affinity—furnished the "tool" of the truck. As explained, pursuant to the ELA, Ryder leased the truck to Affinity, Affinity subleased that truck to a driver, and ultimately the driver leased the truck plus a driver back to Affinity. As noted in the Memorandum Decision, this arrangement "is consistent with the Federal Leasing Regulations, which define the 'owner' of the truck as one '(1) to whom title to equipment has been issued, or (2) who, without title, has the right to exclusive use of equipment, or (3) who has lawful possession of equipment registered and licensed in any State in the name of that person.'"  Thus, the Court concludes that Plaintiffs, not Affinity, provided the majority of the tools or instrumentalities, including the delivery trucks…

*Ruiz,* 887 F. Supp. 2d 1034 (internal quotations and citations omitted).

Here, as in *Ruiz*, TransAm's Owner Operators are required to make the significant investment of providing their own equipment, notwithstanding the additional costs Owner Operators incur on a weekly basis in running their tractors, such as expenditures for fuel, maintenance, and taxes.  As such, this factor favors a finding that TransAm's Owner Operators are properly classified.

### 4.    Owner Operators may not be Terminated "At Will."

"The inability to terminate a worker at will supports independent contractor status." *Ground,* 734 F.Supp.2d at 598 (citations omitted).   Here, unlike Company Drivers, Owner Operators enter into an automatically-renewing one-year Independent Contractor Agreement, under which either party may terminate the contract with appropriate notice:

> Subject to the provisions for early termination set forth herein, the terms of this Agreement shall commence as of the day and year first above written and continue for a period of one (1) years, and thereafter shall automatically renew for additional consecutive one (1)-year terms.  Either party may terminate this Agreement without cause by giving the other party at least fourteen (14) days' prior written notice thereof.

SOF ¶ 141.

In similar cases in the trucking industry, Courts reviewed the termination provisions in the terms of the agreement between the parties in making a determination and found similar

agreements were evidence of an independent contractor relationship. *See, e.g., In re FedEx Ground,* 734 F.Supp.2d at 598; *McDonnell v. Music Stand, Inc.*, 20 Kan. App. 2d 287, 291, 886 P.2d 895, 899 (1994); *Goldberg v. Bellotto*, 207 F.Supp. 499, 500 (S.D. Fla. 1962); *Mazzei v. Rock N Around Trucking, Inc*., 246 F.3d 956 (7th Cir. 2001).

Given the Independent Contractor Agreement is terminable by either party only with prior notice, this factor favors a finding that TransAm's Owner Operators are properly classified as Independent Contractors.

### 5.   Owner Operators Require Specialized Skills.

"The amount of skill required to complete a job is indicative of employment status." *In re FedEx Ground*, 734 F. Supp. 2d at 599.  "The skill factor focuses on whether the work requires performance by someone who is 'highly educated or skilled' because such workers are less likely to submit to the hiring party's control."  *Id.* (citations omitted).   Though a drivers' management of business expenses and costs, compliance with regulations, and training of employees are not necessarily specialized skills, where a driver must manage multiple routes and other drivers, the skills may be considered specialized.  *See id.*  In fact, the Court in *Luxama* recently found truck driving is a specialized skill.  *Luxama v. Ironbound Exp., Inc.*, 2012 WL 5973277.

Here, TransAm's Owner Operators must have truck driving experience, possess a CDL, and be FMCSA and DOT-qualified to enter into an Independent Contractor Agreement with TransAm.  SOF ¶¶ 30, 32, 34.  Further, the initiative required to be an Owner Operator far surpasses that needed to perform as a Company Driver.  Owner Operators must manage their business so as to maximize profits, including knowledge of routes and fuel consumption. Indeed, Blair testified he has a Business Management degree from The Ohio State University. SOF ¶ 14.  Blair utilized his business acumen in managing up to five other drivers who drive

various routes and loads with four tractors as an Owner Operator for TransAm.  SOF ¶¶ 14, 72 -

77.  Accordingly, this factor favors a finding that TransAm's Owner Operators are properly

classified as Independent Contractors.

      **6.**      **The Services Provided by Owner Operators are an Integral Part of TransAm's Business.**

TransAm concedes that the services provided by its Owner Operators are a necessary

component of its business.

    **B.**      **Results of IRS and DOL Investigations of Worker Classification Issues at TransAm**

Both the IRS and the United States Department of Labor have analyzed whether

TransAm's Owner Operators are properly classified as independent contractors, and determined

TransAm's Owner Operators are properly classified.  Though these findings are not binding on

this Court, these agency determinations are persuasive in analyzing the status of TransAm's

Owner Operators.

The IRS uses a twenty-factor test for determining employee and independent contractor

status.  The twenty factors largely overlap the factors considered in an FLSA or KWPA analysis

and include: (1) the right to require compliance with instructions; (2) required training;

(3) integration of the workers' services into the business operations; (4) whether services must be

rendered personally by the worker; (5) whether workers can hire, supervise, and pay assistants;

(6) whether there is a continuing relationship between the worker and an employer; (7) the

establishment of set hours of work; (8) whether the worker must devote substantially full time to

the business of the company or may choose to work when he or she chooses; (9) whether the

work is performed on the premises of the company; (10) whether the worker must perform

services in the order or sequence set by the company; (11) whether the worker is required to

submit regular or written reports; (12) whether payment is by the hour, week, or month, or made by the job or on a straight commission; (13) whether the company ordinarily pays the worker's business and/or traveling expenses; (14)  whether the worker must invest in or furnish significant tools, materials, or other equipment in the business; (15) whether the worker invests in facilities that are used by the worker in performing services; (16) whether the worker has the ability to realize a profit or loss as a result of the performance of services; (17) whether the worker may perform more than de minimus services for multiple companies at the same time; (18) whether the worker makes his or her services available to the general public on a regular and consistent basis; (19) whether the company has the right to discharge a worker at any time; and (20) whether the worker has the right to end his or her relationship with the company at any time without incurring liability. *Lowen Corp.,* 1993 WL 245960 at *12 (citing IRS Rev. Rul. 87-41, 1987-1 C.B. 296 (1987)).  "The presence or absence of all or any of the factors is helpful in determining, but not determinative of, the nature of the employment relationship." *Id.*

Beginning in 2010, the Internal Revenue Service investigated TransAm to determine whether Christopher G. Barr, a TransAm Owner Operator, should be classified as an independent contractor or as an employee for purposes of federal employment taxes.  Mr. Barr was a driver who was first a Company Driver, and then later signed an Independent Contractor Agreement. After its investigation, the IRS determined Mr. Barr was properly considered an independent contractor.  SOF ¶¶ 143 - 144.

The IRS opinion was issued on April 23, 2012 and sets forth the bases for its determination in considerable detail, both factually and legally.  In making its decision, the IRS reviewed the Independent Contractor Agreement, and considered factors such as whether the driver had the right to accept or decline a load, choose the route of travel, choose fuel purchase

locations, and choose a substitute driver.  SOF ¶ 145.  The IRS also considered ownership of the tractor-trailer, and the driver's obligation to pay for the vehicle, fuel, insurance, maintenance, and satellite service fees, as well as the method of compensation for the driver, including lack of company-provided health insurance and other benefits.  SOF ¶ 145.

The findings by the IRS make clear that, after consideration of the behavioral control, financial control, and relationship of the parties, the driver was an independent contractor and not an employee of TransAm.  SOF ¶ 145.  According to the IRS, the ruling "pertains to all workers performing services under the same or similar circumstances" – in other words, all other independent contractor drivers at TransAm.  SOF ¶ 146.

In addition, the Wage and Hour Division of the Department of Labor investigated TransAm in July 2012.  SOF ¶ 147.  The DOL visited TransAm on Thursday, July 12, 2012, in order to determine whether TransAm was in compliance with the FLSA.  As part of its investigation, the DOL reviewed Independent Contractor Agreements, driver logs, payroll records, employee records, and other corporate records. SOF ¶¶ 148 - 150.   In determining driver classification, the DOL also took into account the driver's obligation to pay operating and maintenance expenses, fuel costs, insurance, and equipment costs, as well as the fact that independent contractor drivers have the right to refuse loads.  SOF ¶¶ 150 - 151.  Although no written opinion was generated by the Department of Labor, ultimately the Department of Labor found _no violation_ by TransAm of the FLSA and that TransAm's Owner Operators were properly classified as independent contractors and not employees.  SOF ¶ 157.

Though TransAm acknowledges these decisions are not binding precedent on this Court's decision on a _Motion for Summary Judgment_, these administrative findings are persuasive evidence that TransAm's Owner Operators are properly classified as independent contractors.

This is especially so given the factors considered by the IRS are substantially similar to those factors analyzed by the Courts in both FLSA and KWPA claims.  Accordingly, this Court should find TransAm's Owner Operators are properly classified as independent contractors.

## V.    CONCLUSION

TransAm's Owner Operators are properly classified.  TransAm does not exhibit the requisite control under the FLSA or KWPA such that its Owner Operators should be considered employees.  Instead, the undisputed material facts show that TransAm is entitled to judgment as a matter of law on these claims because TransAm's Owner Operators have significant autonomy and control in running their own independent businesses, in direct contrast to TransAm's employed Company Drivers.  Because liability under Plaintiffs' FLSA and KWPA claims is dependant upon a finding that workers are employees, the fact that TransAm's Owner Operators are properly classified as independent contractors as a matter of law is fatal to Plaintiffs' claims.  Accordingly, TransAm requests this Court dismiss all of Plaintiffs' claims.

Dated:  April 1, 2013.

Respectfully submitted,

SEIGFRIED BINGHAM, P.C.

By: /s/ Shannon Johnson
    Rachel H. Baker   US-KS #70148
    Shannon Johnson       KS #23496
    2800 Commerce Tower
    911 Main Street
    Kansas City, Missouri 64105
    rbaker@seigfreidbingham.com
    sjohnson@seigfreidbingham.com
    Phone:    816-421-4460
    Fax:      816-474-3447

ATTORNEYS FOR DEFENDANT
TRANSAM TRUCKING, INC.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 1st day of April, 2013, the foregoing was served on all parties of interest receiving electronic notices in the above-captioned proceedings through the Court's CM/ECF System, including:

Teresa A. Woody
**THE WOODY LAW FIRM**
1621 Baltimore Avenue
Kansas City, Missouri 64108
(816) 421-4246
(816) 471-4883 [Fax]
Teresa@woodylawfirm.com

Rik N. Siro
Eric W. Smith
Athena M. Dickson
**SIRO SMITH DICKSON P.C.**
1621 Baltimore Avenue
Kansas City, Missouri 64108
(816) 471-4881
(816) 471-4883 [Fax]
Rsiro@sirosmithdickson.com
Esmith@sirosmithdickson.com
Adickson@sirosmithdickson.com

Michael F. Brady
**BRADY & ASSOCIATES**
10901 Lowell Avenue, Suite 280
Overland Park, KS 66210
913.696.0925
913.696.0468 [Fax]
brady@mbradylaw.com

*Counsel for Plaintiffs*

/s/ Shannon Johnson
Attorney for Defendant