**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| LARRY BLAIR and | ) | |
| CHARLIE DAVIS, | ) | |
| On Behalf Of Themselves And | ) | |
| All Other Persons Similarly Situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No: 09-CV-2443-EFM-DWB |
| | ) | |
| TRANSAM TRUCKING, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION CLASS CERTIFICATION UNDER FED.R.CIV.P. 23 FOR KWPA CLAIMS

**COME NOW** the Plaintiffs, Larry Blair and Charlie Davis, on behalf of themselves and all others similarly situated, and set forth the following Memorandum in Support of Plaintiffs' Motion for Class Certification under Fed. R. Civ. P. 23 for their Kansas Wage Payment Act claims, K.S.A. § 44-313 *et seq*.

## I.     INTRODUCTION

The Defendant, TransAm Trucking, Inc. ("TransAm" or "Defendant"), is an over the road freight carrier that uses both employee drivers and "Leased Drivers" to service its customers. The putative class includes "Leased Drivers" meaning individuals who Defendant designates as "independent contractors" who have entered into an Independent Contractor Agreement with Defendant and who have leased a truck through TransAm Leasing, the wholly owned subsidiary of Defendant. As explained below, there are two distinct substantive bases for Plaintiffs' KWPA claims: 1) Defendant's failure to pay class members in accordance with the substantive requirements of the Fair Labor Standards Act for work performed; and 2) Defendant's improper deduction of a transaction fee from wages earned by class members.

The Kansas Supreme Court has made clear that an employer's failure to pay wages as required by the FLSA constitutes the employer's failure to pay "wage due" under the KWPA. Thus, to the extent that putative class members are owed minimum wages pursuant to the substantive requirements of the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.,* such substantive statutory claims amount to "wages due" to class members for purposes of the KWPA.

As detailed below, the Plaintiffs have satisfied the requirements of Rule 23(a) for class certification. At any given time during the relevant period, TransAm has employed hundreds of "Leased Drivers" who were misclassified by Defendant as independent contractors. The case involves common questions of law and fact as to all class members concerning whether TransAm has a policy and practice of violating KWPA by refusing to allow its Leased Drivers to receive all of their "wages due" by refusing to pay them minimum wages as required by the FLSA and by making improper deductions from their wages. The two named Plaintiffs, Larry Blair and Charlie Davis, and their attorneys, will fairly represent the Members of the class.

The Plaintiffs have also met the requirements of Rule 23(b)(3). The questions of law and fact are common to the entire group of "Leased Drivers." There is no benefit for the class members to individually control their own actions since all questions of law and fact are essentially the same as to the class members. There should not be any difficulties encountered by litigating this matter as a class.

Most notably, for purposes of "commonality," "typicality," and "predominance" of factual and legal issues common to the claims of putative class members, TransAm's "right to control" their work, rather than TransAm's actual exercise of such control vis-à-vis the individual members of the putative class, governs TransAm's status as their "employer" under

the KWPA.  As explained below, given that governing legal landscape of the KWPA claims of all of the putative class members, Plaintiffs' have satisfied the various elements for Rule 23 certification.

For these reasons, the Plaintiffs' Motion for Class Certification under Rule 23 should be granted.  This Court should enter an order granting class certification for all Leased Drivers.

## II.     NATURE OF THE MATTER

On August 21, 2009, Plaintiffs filed their Complaint (Doc. No. 1).  Under Count I, the Plaintiffs brought a collective action claim under §216(b) of the Fair Labor Standards Act (FLSA), 29 U.S.C. §201 *et seq*. on behalf of all "Leased Drivers" of Defendant who were misclassified as independent contractors.  (Doc No. 1).  Under Count II, the Plaintiffs brought a Rule 23 class action claim under the Kansas Wage Payment Act (KWPA), K.S.A. §44-313 *et seq*. regarding Defendant's failure to pay "wages due" to the putative class members.   On January 28, 2010, Plaintiffs filed their First Amended Complaint.  (Doc No. 22).  Under Count I, Plaintiffs brought a collective action claim under §216(b) of the Fair Labor Standards Act (FLSA), 29 U.S.C. §201 *et seq*. on behalf of all "Leased Drivers" of Defendant who were misclassified as independent contractors for failure to pay minimum wages. (Doc. No. 22)  On April 1, 2014, Plaintiffs filed their Second Amended Complaint.  (Doc. No. 88).   In Court II, Plaintiffs alleged violations of the KWPA as follows; (1) KWPA violations predicated on Defendant's misclassification of "Leased Drivers" as independent contractors resulting in Defendant's failure to pay "wages due" pursuant to Defendants' agreements with the respective class members, or, in the alternative, pursuant to the substantive requirements of the FLSA; (2) KWPA violations based on Defendant's policy and practice of making improper deductions from their wages.  (Doc. No. 88).  Regarding this Motion, the Plaintiffs are seeking Rule 23 class

certification for their KWPA claims in Count II of their Complaint and to serve as class representatives regarding such claims.

### III.   ISSUES PRESENTED

The Plaintiffs have met the requirements of Rule 23(a) and Rule 23(b)(3) for this Court to issue an order certifying a class under the KWPA for all current and former "Leased Drivers" of Defendant.  "Leased Drivers" are those designated by Defendant as independent contractors who have entered into an Independent Contractor Agreement with TransAm and who have leased a truck through Defendant's wholly-owned subsidiary, TransAm Leasing, Inc. since August 21, 2006.

### IV.   STATEMENT OF FACTS

The Plaintiffs hereby set forth the following Statement of Facts ("SOF"):

1. Defendant TransAm Trucking, Inc. ("TransAm Trucking") at all pertinent times is, and has been, an over-the-road freight carrier, with its principal place of business in Olathe, Kansas.  Doc. No. 88, ¶ 4; and Doc No. 90, ¶4.

2. Defendant uses both drivers that it admits are employees of Defendant, and drivers that Defendant designates as "independent contractors."  Deposition of TransAm corporate representative and President, Russ McElliott, pertinent portions of which are attached **as Exhibit A**, pp. 15-17; and and Owner/Operator Manual 2-3 Bates Stamped TA002689-TA002835 attached hereto as **Exhibit B**.

3.  "Leased Drivers" are drivers designated by TransAm as independent contractors who lease trucks from TransAm Leasing, a wholly-owned subsidiary of Defendant; the Leased Drivers then lease the trucks back to TransAm Trucking through requirements of an

Independent Contractor Agreement.  Declaration of Larry Blair, ¶ 4, attached hereto as **Exhibit C**; Declaration of Charlie Davis, ¶¶ 2-3, attached hereto as **Exhibit D**.

4.      Plaintiff Larry Blair was employed as a Leased Driver for TransAm from May 2007 to March 2008.  Exhibit C, ¶¶ 2-4, 8, 23.

5.      Plaintiff Charlie Davis was employed as a Leased Driver for TransAm from approximately December 2005 until May 2010.  Exhibit D, ¶ 2.

6.      For the years 2008 through February of 2013, the average number of TransAm drivers has remained relatively constant, averaging between 1,064 and 1,091 on any given day.  However, the percentage of drivers designated as independent contractors versus employee drivers has grown in that same time from approximately half designated independent contractors and half employees in 2008, to approximately two-thirds designated independent contractors and one-third employees in later years. Exhibit A, pp. 18-19; and Exhibit B.

7.      Specifically, as of December 31, 2008, TransAm designated 570 of its drivers as independent contractors.  As of December 31, 2009, TransAm designated 639 of its drivers as independent contractors. As of December 31, 2010, TransAm designated 632 of its drivers as independent contractors.  As of December 31, 2011, TransAm designated 720 of its drivers as independent contractors.  As of December 31, 2012, TransAm designated 702 of its drivers as independent contractors.  As of February 8, 2013, TransAm designated 712 of its drivers as independent contractors.    Exhibit A, pp. 14-15; and Exhibit B.

8.      Out of these individuals designated as independent contractors, sixty to seventy drivers own their own truck and do not lease a truck from TransAm Leasing.  Exhibit A, p. 51.

9.      TransAm has a driver turnover rate, including drivers it designates as independent contractors, of approximately 140% each year.  Exhibit A, pp. 19-20.

10.     All Leased Drivers complete an application and other required evaluations and testing. Deposition of Rhonda McFarland, p. 49, pertinent portions of which are attached **as Exhibit E** and Defendant's Answer to Plaintiffs' Interrogatory No. 5, attached hereto as **Exhibit F**.

11.     Neither TransAm Leasing nor TransAm Trucking requires any financial information or security, or information of credit worthiness, before leasing a tractor to any Leased Driver. Leased Drivers are not required to make any down payment or prepayment in order to lease a truck.  Deposition of Plaintiff Larry Blair pertinent portions of which are attached **as Exhibit G**, pp. 229- 230; Exhibit C; Exhibit D; Deposition of Plaintiff Charlie Davis, pertinent portions attached as **Exhibit H**, pp. 247- 252.

12.     All Leased Drivers must attend a training session at TransAm's facilities, located in Olathe, Kansas or Rockwall, Texas.  Exhibit G, pp. 228 – 229; and Exhibit E, pp. 18-20; *See* Exhibit F, Interrogatory No. 6.

13.     During this training, all Leased Drivers undergo road and drug tests.  Exhibit E, pp. 18 – 20; *See* Exhibit F, Interrogatory No. 7.

14.     During this training, all Leased drivers are given an identical Owner/Operator Handbook and guided through a PowerPoint presentation of TransAm's policies and procedures. The revisions to the Owner/Operator Handbook during the relevant period have included the implementation of an electronic, rather paper, log system and other minor revisions such as typographical errors and formatting changes.  *See* Exhibit E, pp. 15-20; *See* Exhibit F, Interrogatory No. 6.

15. All Leased Drivers must be "experienced drivers."  Under TransAm's policies, an "experienced driver" is a driver who has at least one month's previous experience driving a truck solo, a three month's previous experience driving with another driver in the same truck, the driver must drive with another TransAm driver for three weeks. *See* Exhibit E, pp. 50- 57.

16. Once the training is complete, all "Leased Drivers" lease a truck from TransAm Trucking's wholly owned subsidiary, TransAm Leasing, Inc. ("TransAm Leasing"), and enter into TransAm's "Independent Contractor Agreement" ("ICA") with TransAm Trucking.  Exhibit E, pp. 50 - 57.  All Leased Drivers entered into the same or substantially similar ICA.  Exhibit A, p. 49.

17. As part of the ICA, Leased Drivers agree to lease back to TransAm Trucking the truck that was leased to the driver from TransAm Leasing through an Equipment Lease Agreement.  Exhibit C, ¶4, along with true and correct copies of an Equipment Lease Agreement and corresponding ICA entered into by Mr. Blair, attached as Exhibits C-1 and C-2, respectively; Exhibit D, ¶ 3, along with true and correct copies of an Equipment Lease Agreement and corresponding ICA entered into by Mr. Davis, attached as Exhibits D-1 and D-2, respectively.

18. As part of the ICA, the truck that is leased from TransAm Leasing to the Leased Driver is leased back to TransAm Trucking; pursuant to that lease back, the truck can only be used to haul loads for TransAm Trucking.  Exhibit C, ¶12, C-2; Exhibit D-2; Exhibit A, pp. 59-61; Dec. of Larry Blair, Ex. E; Dec. of Charlie Davis, Ex. F.

19. Defendant purchases semi-tractor trucks ("trucks") and issues each such truck a depreciation schedule of either 48 or 60 months. All of these trucks are owned by

TransAm Trucking, Inc. After each truck is fully depreciated, the truck is retired, and TransAm Trucking, Inc. sells the truck.  The trucks leased through TransAm Leasing, Inc. are part of the fleet of trucks that are owned and are being depreciated by TransAm Trucking, Inc.  *See* Exhibit A, pp. 45 - 47, 52 - 57.

20.     The lease period for any individual truck leased by TransAm Leasing to the Leased Drivers is not any longer than the remaining depreciation period assigned to that truck by TransAm Trucking. *Id.*

21.     Each Equipment Lease Agreement signed by Leased Drivers provides for a monthly lease payment and provides that the Leased Driver will be responsible for all maintenance and repairs, insurance, taxes, and fuel and other costs.  Exhibits C-1 and D-1.

22.     At the end of each such lease, there is a balloon buy-out payment required in order for the lessee to purchase the truck. *Id.*, Exhibit A, p. 51.

23.     Neither TransAm Leasing nor TransAm Trucking requires any financial information or security, or information of credit worthiness, before leasing a tractor to any Leased Driver. Leased Drivers are not required to make any down payment or prepayment in order to lease a truck. Exhibit G, pp. 229 – 230; Exhibit C, ¶10; Exhibit D, ¶5; Exhibit H, pp. 247 – 252.

24.     The ICA signed by all Leased Drivers is for a one year term and automatically renews unless cancelled. The ICA provides that either the driver or Defendant may terminate the ICA upon 14 days written notice. Exhibits C-1 and D-1; Exhibit A, pp.61-62.

25.     The ICA provides that the trucks Leased Drivers leased back to TransAm Trucking, Inc. must be used exclusively to haul loads only for TransAm Trucking. Exhibits C-1 and D-1; Exhibit A, pp.61-62.

26.     Leased Drivers must use the company-required satellite system for communications. Exhibit A, p. 90.

27.     Leased Drivers are required to use a company-provided governing system, which provides detailed information regarding the routes taken, the gasoline used, the speeds of driving, and other driving patterns, and such information is routinely required to be downloaded to Defendant. *See* Exhibit E, pp. 33 – 35.

28.     Under the ICA, Leased Drivers cannot increase their revenues with respect to their leased truck through any action on their own part. Leased Drivers are not allowed to advertise for or solicit additional customers for Defendant, nor are they allowed to pick up or transport additional loads from any customer other than those TransAm assigns. *See* Exhibit G, pp. 200 – 204, 206 – 207; Exhibit H, pp. 249 – 252.

29.     Pursuant to the ICA, Leased Drivers are compensated on a per mile basis.  Under the ICA, Leased Drivers are paid based on a number of miles TransAm agrees to pay the Leased Driver regardless of the number of miles that the Leased Driver actually drives.  Exhibit C-2, at TA001749; Exhibit D-2, at TA002490; Exhibit B, at TA002712; Exhibit A, pp. 68-71.

30.     Pursuant to the ICA, Leased Drivers are reimbursed a portion of their fuel costs.  Prior to 2010 or 2011, the fuel surcharge portion of the ICA provided that the Leased Driver received 100% of the fuel surcharge the customer paid.  Following 2010 or 2011, the ICA provides that fuel surcharges are paid based on a rate schedule. *See* Exhibit A, pp. 79, 138.

31.     Pursuant to the Leasing Agreement, if a Leased Driver drives more than a given number of miles per week, the Leased Driver pays an extra charge.  *See* Exhibit A, p. 81.

32.   Pursuant to the ICA, TransAm makes several deductions from Leased Drivers' wages including:   Comdata and/or TCH card charges and transaction fees; charges related to TransAm's satellite communications system; charges related to TransAm trailers and other property; Performance Escrow Fund; tax obligations and charges related to fuel; any fuel credit; charges for loss or damage to cargo transported by Leased Drivers or the truck itself; reimbursement for costs and expenses arising out of trip completions; interest charges on negative Settlement balances;   and rental or purchase payments.   Exhibit C-2, ¶15, Exhibit D-2 at ¶ 15.

33.   During a given pay period, it is not uncommon for a Leased Driver to receive little or no net pay for their driving services.   After TransAm deducts all the relevant expenses, the Leased Drivers would frequently either break even or be in the negative status.   Exhibit C, ¶¶ 20,25, Exhibit D, ¶16; Declaration of Chad Frobos, attached hereto as **Exhibit I,** ¶9; Declaration of Robert Hanneken, attached hereto as **Exhibit J,** ¶8; Declaration of Scott Ross, attached hereto as **Exhibit K,** ¶9; Declaration of James Sturgeon, attached hereto as **Exhibit L,** ¶9.

34.   TransAm may terminate a Leased Driver if the driver had more than two preventable accidents in a three-year period or a single major accident involving driver negligence. Exhibit F, p. 29.

## V.   ARGUMENT

### A.   Requirements for Rule 23 Class Certification.

The requirements for class certification are set forth in Fed.R.Civ.P. 23.   A party seeking class certification must satisfy the four requirements of Rule 23(a), and also satisfy one of the three "pigeon holes" of Rule 23(b). *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.

Ct. 2231, 138 L. Ed. 2d 689 (1997); *In re Integra Realty Res.,* 354 F.3d 1246, 1262 (10th Cir.

2004). The ultimate decision whether to certify a class under Rule 23 is committed to the broad

discretion of the trial court. *Rector v. City & County of Denver,* 348 F.3d 935, 949 (10th Cir.

2003).

      In making the class certification determination, the court should accept the allegations in

the complaint as true, but it "need not blindly rely on conclusory allegations which parrot Rule

23 requirements [and] may . . . consider the legal and factual issues presented by plaintiff's

complaints." *Hart v. Valdez,* 186 F.3d 1280, 1290, n. 7 (10th Cir. 1999). However, the court

may not inquire into the merits of the case. *Adamson v. Bowen,* 855 F.2d 668, 676 (10th Cir.

1988).

**B.**    **The Two Distinct KWPA Claims for Class Certification.**

      The Plaintiffs are not required to establish the ultimate viability of their KWPA claims at

the class certification stage, *Adamson, supra.* Nonetheless, for purposes of establishing the

parameters of the two proposed class claims, the Plaintiffs provide the following explanation of

their two distinct KWPA claims.

      **1.**    **Wages Owed Pursuant to the FLSA Amount to "Wages Due" Under the KWPA.**

      Plaintiffs contend that as to the Leased Drivers, TransAm is an "employer" under the

KWPA, K.S.A. § 44-313(a) and the "Leased Drivers" at issue are covered "employees" under

the KWPA. K.S.A. § 44-313(b). Additionally, the Court has denied Defendant's Motion for

Summary Judgment and has determined that triable issues of fact are present as to Defendant's

status as an "employer" under the KWPA as to the two Named Plaintiffs' work as Leased

Drivers, and the two Named Plaintiffs' corresponding status as "employees" for purposes of the

KWPA while they worked as Leased Drivers. (Doc. No. 77).

The KWPA requires an employer to "pay all *wages due* to the employees of the employer" at least monthly on designated paydays within 15 days from the end of the pay period. K.S.A. § 44-314(a), (h) (emphasis added).  An employer may withhold, deduct or divert "wages due" to an employee only if the employer "is required or empowered to do so by state or federal law" or under other specified conditions.  K.S.A. § 44-319.  If an employer violates the wage payment requirements of K.S.A. § 44-314, the employer is liable to the affected employees for wages due, plus a statutory interest penalty of up to the amount of the unpaid wages due.  K.S.A. § 44-315(b).

In *Elkins v. Showcase, Inc.*, 704 P.2d 977 (Kan. 1985), the Kansas Supreme Court explained that "wages due" pursuant to the FLSA constituted "wages due" for purposes of the KWPA. *See also*, *Rukavitsyn v. Sokolov Dental Laboratories, Inc.,* 2012 W.L. 3066578 (D. Kan. July 27, 2012) (J. Robinson); *Tarcha v. Rockhurst Univ. Continuing Education Center, Inc.,* 2012 W.L. 2012 1998782 (D. Kan. June 4, 2012) (J. Vratil); *Veale v. Spring Corp.,* 1997 W.L. 49114 (D. Kan. Feb. 3, 1997) (J. Van Bebber).

2.   **Wages Owed Pursuant to TransAm Making Improper Deductions From Leased Drivers' Wages**

Plaintiffs contend that TransAm had a policy and practice of refusing to allow its Leased Drivers to receive all of their "wages due" by making improper deductions from Leased Drivers' wages in violation of the KWPA.  Generally, under the KWPA, an employer may not deduct any portion of an employee's wages unless otherwise provided by the statute.  Here, TransAm made various improper deductions from Leased Drivers' wages including but not limited to Comdata and/or TCH card charges and transaction fees; charges related to TransAm's satellite communications system; charges related to TransAm trailers and other property; Performance Escrow Fund; tax obligations and charges related to fuel; any fuel credit; charges for loss or

damage to cargo transported by Leased Drivers or the truck itself; reimbursement for costs and expenses arising out of trip completions; interest charges on negative Settlement balances; and rental or purchase payments.

**C.     The Rule 23(a) Requirements Have Been Met.**

The Plaintiffs have met the requirements set forth under Fed.R.Civ.P. 23(a) for class certification. Rule 23(a) provides the following four express requirements for class certification:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. Pro. 23(a).

**1.     Numerosity.**

Rule 23(a)(1) requires the proposed class to be so numerous that joinder of all members would be impracticable. To satisfy this requirement, the plaintiffs need not show that joinder of all members is not impossible, only that it is impracticable. It is not necessary that the plaintiffs identify the exact number of class members involved, and courts have often used common sense assumptions to support a finding of numerosity. *Pueblo of Zuni v. United States*, 243 F.R.D. 436, 444 (D.N.M. 2007). This is a fact-specific inquiry, as there is no set formula for determining if the class is so numerous that it should be certified. *Trevizo v. Adams,* 455 F.3d 1155, 2006 WL 2065084, at *5 (10th Cir. July 26, 2006). According to Defendant's corporate representative, at any given time during the relevant period, TransAm employees between approximately 500 to 700 "Leased Drivers." Each year, TransAm has a yearly turnover rate of approximately 140 percent. Thus, the number of Leased Drivers in the putative class is well over one thousand drivers. This number meets the numerosity requirement. *See, e.g., Bacon v.*

*Honda of America Mfg., Inc.,* 370 F.3d 565, 570 (6th Cir. 2004) (explaining that putative class of several hundred would plainly satisfy numerosity requirement); *Stewart v. Abraham,* 275 F. 3d 220, 226-27 (3rd Cir. 2001) (explaining that generally, a putative class of more than 40 would be sufficient to satisfy numerosity). The joinder of all the individual claims within the putative class would be overly burdensome on the court and costly to all involved.

### 2. Commonality.

Rule 23(a)(2) requires some question of law or fact common to the class. This prerequisite is met if there is single issue of law or fact common to the class. *J.B. ex rel. Hart v. Valdez,* 186 F.3d 1280, 1288 (10th Cir. 1999). However, commonality is not necessary on every issue raised in the case. *Realmonte v. Reeves*, 169 F.3d 1280, 1285 (10th Cir. 1999). This requirement is satisfied where members of a putative class "possess the same interest and suffer the same injury." The commonality requirement of Rule 23 must be construed liberally. *Meyer v. US Tennis Assoc.*, 297 F.R.D. 75, 84 (S.D. NY 2013). To meet the commonality requirement, putative class members must have "largely consistent duties, which lend themselves to common determinations." *Id.*; *Jacob v. Duane Reade, Inc*., 289 F.R.D. 408, 415 (S.D.NY 2013). "Despite the rigor of the Rule 23 requirements, commonality has never been understood to require 'that all issues must be identical as to each member,' but rather 'require[s] that plaintiffs identify some unifying thread among the members' claims that warrant[s] class treatment." *Jacob v. Duane Reade, Inc*., 289 F.R.D. 408, 414 (S.D.N.Y. 2013).

Defendant TransAm will likely argue that class certification must be denied because "Leased Drivers" were properly designated as independent contractors; thus, not entitled to "wages due" under the KWPA. Under the KWPA, "[t]he primary test used in determining whether an employment relationship exists is 'whether the employer has the right of control and

supervision over the work of the alleged employee, and the right to direct the manner in which the work is to be performed, as well as the result which is to be accomplished.'" *In re FedEx Ground Package Sys., Inc.*, 734 F.Supp.2d 557, 584-85 (N.D. Ind. 2010).  The Court already denied Defendant's Motion for Summary Judgment on this issue as to the two Named Plaintiffs. (Doc No. 77).

The ultimate merits of Plaintffs' position that TransAm has misclassified its Leased Drivers as independent cotractors is "largely beyond the scope of the class certification question. "The merits can, and do, affect class certification, in the same sense that merits questions and certification questions tend to overlap, but a premature inquiry into the merits should not serve as the *sine qua non* of a putative class's certification." *Meyer v. US Tennis Assoc.*, 297 F.R.D. 75, 83 (S.D. NY 2013); *Jacob v. Duane Reade, Inc*., 289 F.R.D. 408, 414 (S.D.NY 2013). Determining whether commonality exists at the class certification stage is a question of whether "a likelihood that common answers will be determined via a class action approach, or conversely, whether differences among [putative class members] will necessarily generate individualized, rather than common, determinations." *Id.*

In *Meyer v. US Tennis Assoc*., 297 F.R.D. 75 (S.D. NY 2013), the plaintiffs alleged that they, along with a class of tennis umpires, were employees for purposes of New York overtime law and were misclassified as independent contractors.   In granting Rule 23 class certification, the court found that despite differences in specific job duties between the different segments of the umpires, where the defendant oversaw their job duties pursuant to common policies, common training, common job description; and common procedures was "clearly a question that presents common factual issues that apply to all [putative class members] to satisfy the 'commonality' requirement of Rule 23(a)."   *Id* at 84.  The court explained:  "To find that this question is not a

common one would constitute an insurmountable bar for similar putative class plaintiffs to come." *Id.* In finding sufficient commonality, the *Meyer* Court noted that the putative class members had similar "baseline responsibilities" and explained that "[w]hether these baseline responsibilities require a degree of individualized proof that defeats [Rule 23 certification was] a question best suited for the predominance inquiry." *Id.*

Similarly in *Jacob v. Duane Reade, Inc.,* 289 F.R.D. 408, 414 (S.D.NY 2013), the plaintiffs alleged that the defendants had a policy of misclassifying assistant store managers ("ASMs") as exempt from overtime rights under State law. In granting Rule 23 class certification, the *Jacob* Court relied on the defendants' uniform description of ASMs' duties and the similarity among the stores and in which the putative class members worked and their duties related thereto to find "commonality." Id. at 415. The *Jacob* Court noted that the defendant uniformly classified all ASMs as exempt, without regard to an individualized determination of each ASM's individual job. *Id.*

Here, all putative class members are designated by TransAm as independent contractors. All putative class members have the same or similar job duties. All putative class members were subject to the same prerequisites to employment such as training at TransAm facilities. TransAm provided all putative class members with essentially the same Owner/Operator Handbook which outlines the employment policies and practices pertaining to Leased Drivers. All putative class members entered into an Independent Contractor Agreement ("ICA") with TransAm that contain the same or substantially similar terms. All putative class members entered into Equipment Lease Agreements whereby putative class members agreed to lease back to TransAm Trucking the truck that was leased to the driver from TransAm Leasing. The terms for the Equipment Lease Agreement required that all putative class members be

responsible for all maintenance and repairs, insurance, taxes, and fuel and other costs.  As part of the ICA, all putative class members are prohibited from hauling loads for any company other than TransAm Trucking.  All putative class members are compensated on a per mile basis. Thus, as in *Meyer* and *Jacob*, here, Leased Drivers are subject to the sufficiently uniform job duties, policies and procedures to satisfy the "commonality" component of Rule 23(a).

### 3.    Typicality.

Rule 23(a)(3) requires the claims of the representative parties to be typical of the claims of the class.

> Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class so that the court may properly attribute a collective nature to the challenged conduct. Claims do not have to be identical to be typical. A plaintiff's claim may differ factually and still be typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.

*Zapata v. IBP, Inc.,* 167 F.R.D. 147, 160 (D. Kan. 1996) (quotations omitted).  It is well established that "differing fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory."  *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988).  To satisfy typicality, the two Named Plaintiffs must not have interests significantly antagonistic to those of the putative class members.  *Wyandotte Nation v. City of Kansas City,* 214 F.R.D. 656, 660 (D. Kan. 2003).  The "'crux' of the inquiry 'is to ensure that "maintenance of a class action is economical and [that] the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'"  *Meyer v. US Tennis Assoc.*, 297 F.R.D. 75, 85 (S.D. NY 2013)(*citing Marisol v. Giuliani*, 126 F.3d 373, 376 (2d Cir. 1997)(*quoting General Telephone Co. of the SW v. Falcon*, 457 U.S. 147,

157 (1982).  "It is axiomatic that '[w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims.'"  *Id.* (quoting *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2nd Cir. 1993).

Both Plaintiff Blair and Plaintiff Davis, like all of the other Leased Drivers in the putative class, were similarly affected by Defendant's misclassification and deduction of wages.  Thus, as to the KWPA based on "wages due" under the FLSA, the claims of the two Named Plaintiffs are typical of the claims of the other putative class members.  As explained in *Meyer*, variations in individual profit and loss differences and minor variations in fact patterns as to the work and compensation of individual members of the putative class does not defeat class certification as to typicality.  297 F.R.D. at 85-86.  That is, "the particularities of these lead plaintiffs' circumstances do not 'threaten' to become the 'focus of the litigation' any more so than those of other members of the putative class."  *Id.* at 86.  Lastly, there are no interests of the two Named Plaintiffs that would be antagonistic toward any member of the class.  The typicality requirement has been met.

### 4.    Adequacy of Representation.

Rule 23(a)(4) requires that the representative party will fairly and adequately protect the interests of the class.  "To meet this requirement, the named plaintiff must be a member of the class he or she seeks to represent."  *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 219 F.R.D. 661, 668 (D. Kan. 2004) (citing *East Tex. Motor Freight Sys. v. Rodriguez*, 431 U.S. 395, 403, 97 S. Ct. 1891, 52 L. Ed. 2d 453 (1977)).  In analyzing the adequacy of representation under Rule 23(a)(4), courts routinely ask two questions: (1) do the named plaintiffs and their

counsel have any conflicts of interest with other class members, and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class? *Benedict v. Altria Group, Inc.*, 241 F.R.D. 668, 673 (D.Kan. 2007) (citing *In re Universal Serv. Fund Tel. Billing Practices Litig.,* 219 F.R.D. 661, 668 (D. Kan. 2004)).  This court has explained:

> Although *Rule 23(a)(4)* does not expressly authorize the examination of class counsel, courts often have employed it to evaluate the adequacy of class counsel. In 2003, though, *Rule 23* was amended to add subparagraph (g) which governs the manner in which courts should supervise the appointment of class counsel.

*Id.* at 668.

Both Plaintiff Blair and Davis were employed by TransAm as "Leased Drivers." Therefore, they are members of the prospective class.  There are no known conflicts of interest between the two class representatives, their counsel, and any class member.   Finally, there is no reason to believe that the representatives and class counsel will not vigorously represent the class members.  The three representatives have already participated in initial discovery in this matter and cooperated to the fullest extent in the litigation.   Class counsel, including Brady & Associates, the Woody Law Firm PC, and Siro Smith Dickson PC have extensive experience in prior collective and class claims.  *See, e.g, Sanderson v. Unilever Supply Chain, Inc.,* Case No. 10-CV-00775-FJG (W.D. Mo. December 19, 2011) (attached hereto as **Exhibit M**) (finding class counsel "particularly skilled in handling FLSA cases).  Rule 23(a)(4) has been met.

**D.**    **The Rule 23(b)(3) Requirements Have Been Met.**

After determining that the Plaintiffs satisfied all four of the requirements in Rule 23(a), the Court should proceed to consider whether they qualify under any of the alternative provisions of Rule 23(b).  To certify a class, the court only needs to find a fit within one of the three types of classes described in Rule 23(b).  For purposes of this motion, the Plaintiffs claim certification is appropriate under Rule 23(b)(3).

Rule 23(b)(3) allows certification where "the court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). The Supreme Court has explained:

> Rule 23(b)(3) also includes a nonexhaustive list of factors pertinent to a court's 'close look' at the predominance and superiority criteria: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in a particular forum; (D) the difficulties likely to be encountered in the management of a class action.

*Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 616, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)

### 1.    Predominance.

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). If the proposed class members will need to present evidence that varies from member to member in order to make out a prima facie case, then it is an individual question. If, on the other hand, the same evidence will suffice for each member to make out a prima facie case, then it is a common question. *In re Urethane Antitrust Litig.,* 237 F.R.D. 440, 449 (D. Kan. 2006). "While a plaintiff need not show the 'exclusivity' of common questions, it must show their predominance." *Meyer v. US Tennis Assoc.*, 297 F.R.D. 75, 87 (S.D.NY 2013). The predominance inquiry hinges on whether Plaintiffs can establish that the primary duties are sufficiently similar to not only allow for generalized proof, as commonality demands, but also to outweigh those issues 'subject only to individualized proof.' *Jacob v. Duane Reade, Inc.*, 289 F.R.D. 408, 419 (S.D.NY 2013).

In *Meyer*, the defendants asserted that determining whether plaintiffs were misclassified as independent contractors required an individualized determination as to whether the employer 'controls the means and manner' of their job duties.   297 F.R.D. at 87.  The *Meyer* Court noted that there are elements of the job that require varying degrees of individualized proof; "[h]owever, such distinctions do not defeat predominance unless they overshadow those common threads that bind the claims of a putative class." *Id.* at 88; *see also Jacob,* 289 F.R.D. at 419. The *Meyer* Court found that common, rather than individual, issues predominated where the evidence showed that putative class members were subject to a uniform code of conduct, the same handbook, were required to attend mandatory meetings, and performed similar day to day functions and duties.  297 F.R.D. at 88.  The *Meyer* court explained:  "Predominance requires meaningful consistency, not indistinguishable identity." *Id.* at 89.   Similarly, the *Jacob* Court found that common, rather than individual, issues predominated; the court explained that the inquiry associated with the executive and administrative exemptions was not sufficiently individualized because the putative class members shared similar primary job responsibilities, even though some ASMs performed tasks that others did not. *Jacob* at 420-422.

Here, all putative class members have the same or similar job duties—they are truck drivers hauling loads exclusively for TransAm.  All putative class members were subject to the same prerequisites for employment such as training at TransAm facilities.  TransAm provided all putative class members with essentially the same Owner/Operator Handbook outlining Defendant's policies and practices pertaining to Leased Drivers.  All putative class members have entered into an Independent Contractor Agreement ("ICA") with TransAm that contained the same or substantially similar terms.  All putative class members entered into Equipment Lease Agreements whereby putative class members agreed to lease back to TransAm Trucking

the truck that was leased to the driver from TransAm Leasing.  The terms for the Equipment Lease Agreement required that all putative class members be responsible for all maintenance and repairs, insurance, taxes, and fuel and other costs.  As part of the ICA, all putative class members are only allowed to haul loads for TransAm Trucking.  Pursuant to the ICA, all putative class members are compensated on a per mile basis.  Thus, even if there are minor individualized differences among Leased Drivers, the common questions relevant to determining if Leased Drivers were improperly misclassified as independent contractors predominate over individualized issues.  To the extent that variances among Leased Drivers exist with respect to damages, "the possibility that individual issues may predominate the issue of damages. . . does not defeat class certification by making [the liability] aspect of the case unmanageable.  *Fox v. TransAm Leasing, Inc.*, 2014 WL 2604035 * (D. Kan. June 11, 2014). Thus, common issues predominate over individual issues for purposes of Rule 23(b)(3).

Importantly, opposing a class certification on the basis that some putative class members are exempt as independent contractors is premature until the parties engage in further "merits" discovery.  The district court's analysis of whether the prerequisites for class certification have been satisfied "does not require an actual determination of the merits of the plaintiffs' claims." *Farrar v. Mobil Oil Corp.*, 234 P.3d 19, 24 (Kan. Ct. App. 2010) (citing *Dragon I,* 89 P.3d 908).

Moreover, it is the alleged employer's *right* to interfere with a worker's performance, rather than the alleged employer's *actual* interference with the work performed by any specific member of the putative class, that renders the worker an "employee" for purposes of Kansas employment statutes such as the KWPA. *See Wallis v. Secretary of Kan. Dept. of Human Resources,* 689 P.2d 789, 792 (Kan. 1984).  This is a distinction with a very substantial difference for purposes of Rule 23 certification.  That is, whether Defendant *exercised* its rights

as to control and direction consistently with regard to members of the putative class is irrelevant under the legal landscape of the KWPA as to an employer/employee relationship—only the Defendant's *right* to do so need be sufficiently common among class members so as to predominant. *Compare Shepard v. Lowes HIW, Inc.,* 2013 W.L. 4488802 * 4 (N.D. Cal. Aug. 19, 2013 (certifying Rule 23 class involving California's "right to control" test for employee status, regardless of whether alleged employer uniformly exercised such control); *with Salem v. Corporate Transportation Group, Ltd.,* 2013 W.L. 6061340 * 6-7 (S.D.N.Y. Nov. 15, 2013) (denying Rule 23 class involving New York's "control in fact" test for employee status, which would require individualized examination of actual control exercised by alleged employer over the various putative class members); *See also Sherman v. American Eagle Express, Inc.*, 2012 WL 748400 *10 (E.D. Pa. March 8, 2012)(certifying a class under Pennsylvania law based on the employer's "right to control" rather than degree of control actually exercised). Here, Defendant cannot deny that its *right to control* the work of the various putative class members—including control of work assignments through dispatching, advertising and marketing for business, etc.—was common and substantially identical as to the members of the putative class.

Lastly, variations in damages among class members are not a sufficient basis to deny class certification for lack of predominance. Despite such variations in damages, common issues nonetheless predominate if such various damages, nonetheless, stem from a unified factual and legal basis of liability. *Butler v. Sears, Roebuck and Co.,* 727 F.3d 796, 800-02 (7th Cir. 2013).

### 2.      Superiority.

The requirement that a class action be the superior method of resolving the claims insures that there is no other available method of handling the litigation which has greater practical advantages.

Here, the evidence as to the KWPA claims overlap as to all class members. There would be little value, and profound inefficiency, in requiring each putative class member to prosecute individual claims. Substantial discovery has been completed as to various aspects of the KWPA claims and defenses as to the putative class. Consistency in discovery issues, efficiency of the resources of the parties and the Court, consistency in the Court's rulings, and the prevention of redundant pleadings and costs, make it desirable to concentrate all litigation in class form. *E.g., Meyer*, 297 F.R.D. at 89. Moreover, as discussed above, given that the test for an employer/employee relationship under the KWPA will be determined under Defendant's "right to control" the Leased Drivers, rather than Defendant's actual exercise of such control as to each Leased Driver, there should be no insurmountable difficulties in managing this litigation as a class claim under Rule 23.

**WHEREFORE**, the Plaintiffs respectfully request that this Court grant this Motion and issue an order:

a.   Finding that the Plaintiffs have met the requirements of Fed.R.Civ.P. 23(a) and 23(b)(3) regarding their claims asserted under the KWPA, K.S.A. § 44-313 *et seq.* in Count II of their Complaint;

b.   Certifying the class as follows:

All current and former "Leased Drivers" employed by Defendant since August 21, 2006;

c.   Designating Larry Blair and Charlie Davis as class representatives of the KWPA claim;

d.   Approving Plaintiffs' counsel to act as class counsel in this matter.

Respectfully submitted,

**BRADY & ASSOCIATES**

*s/Mark A. Kistler*
Mark A. Kistler          KS# 17171
Brady & Associates
10901 Lowell Avenue, Suite 280
Overland Park, KS 66210
(913) 696-0925
(913) 696-0468 (fax)
mkistler@mbradylaw.com

**ATTORNEYS FOR PLAINTIFFS**


**THE WOODY LAW FIRM PC**

TERESA A. WOODY  KS #16949
1621 Baltimore Avenue
Kansas City, Missouri 64108
(816) 421-4246
(816) 471-4883 [Fax]
teresa@woodylawfirm.com

**SIRO SMITH DICKSON PC**

RIK N. SIRO     D.Kan. #77812
ERIC W. SMITH     KS #16539
ATHENA M. DICKSON   KS #21533
1621 Baltimore Avenue
Kansas City, Missouri 64108
(816) 471-4881
(816) 471-4883 [Fax]
Rsiro@sirosmithdickson.com
Esmith@sirosmithdickson.com
Adickson@sirosmithdickson.com

## <u>Certificate of Service</u>

The undersigned hereby certifies that on this 15th day of July, 2014, a copy of the above and

foregoing was filed via CM/ECF and served upon:

    SIEGFREID BINGHAM, P.C.
    Rachel H. Baker
    Frederick H. Riesmeyer, II
    Sharon A. Coberly
    Shannon Johnson
    911 Main Street, Suite 2800
    Kansas City, MO  64105
    816-421-4460
    816-474-3447
    **ATTORNEYS FOR DEFENDANT**

                *s/ Mark A. Kistler*_____
                Mark A. Kistler