## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| LARRY BLAIR | |
| and | |
| CHARLIE DAVIS, | |
| On Behalf of Themselves and All Other Persons Similarly Situated, | |
| *Plaintiffs,* | |
| vs. | Case No. 09-2443-EFM-KGG |
| TRANSAM TRUCKING, INC., | |
| *Defendant.* | |

## MEMORANDUM AND ORDER

In 2009, Plaintiffs Blair and Davis, on behalf of themselves and all other persons similarly situated, filed suit alleging that Defendant TransAm Trucking, Inc. ("TransAm") violated the Fair Labor Standards Act ("FLSA") and the Kansas Wage Payment Act ("KWPA"). Plaintiffs bring this action as a collective action under the FLSA for minimum wage violations, and as a Rule 23 class action for KWPA violations. Plaintiffs, who are truck drivers, allege that TransAm failed to pay them minimum wages and made improper deductions from their paychecks.

This action has been ongoing for nearly a decade. Plaintiffs have amended the complaint twice, and the scheduling order has been revised six times. The final pretrial conference was eventually held on June 22, 2017, and the Pretrial Order (Doc. 433) was entered the following day.

Plaintiffs state three claims in the Pretrial Order, which supersedes all previous pleadings. Plaintiffs' first claim is a collective action brought under the FLSA's minimum wage provision, 29 U.S.C. § 206 by the two Named Plaintiffs and approximately 1,928 opt-in Plaintiffs. Plaintiffs assert that TransAm has misclassified the FLSA class members as "independent contractors" because the opt-in Plaintiffs were "employees" pursuant to the application of the "economic realities" test for employee status under the FLSA, and that Defendant failed to pay them wages in the amount of at least the applicable federal minimum hourly wage for all hours worked in the relevant weekly pay periods.

Plaintiffs' second claim is a Rule 23 class action brought under the KWPA by the two Named Plaintiffs and an approximate 8,691 members class. Plaintiffs allege that TransAm has misclassified the Rule 23 KWPA class members as "independent contractors" because the Plaintiffs were "employees" pursuant to the application of the "right to control" test for employee status under the KWPA, and TransAm failed to pay them wages in the amount of at least the applicable federal minimum wage for all hours worked during numerous weekly pay periods, and such unpaid minimum wages constituted "wages due" under the KWPA.

Plaintiffs' third claim is also brought by the Rule 23 KWPA class. Plaintiffs again allege that TransAm has misclassified them as "independent contractors" because they were "employees" under the KWPA, and TransAm improperly deducted banking fees from the Plaintiffs' wages and thereby failed to pay the Plaintiffs all "wages due" in violation of the KWPA.

-2-

There are fourteen motions that are now pending before this Court. The Court will address the parties' motions in five different sections and will set forth the applicable parties, facts, and law in each respective section.[1] In the first Section, the Court will address TransAm's motion for judgment on the pleadings. In Section II, the Court will address TransAm's motion to decertify the FLSA collective action. In Section III, the Court will address TransAm's motion to decertify the Rule 23 class. In Section IV, the Court will address both parties' motions for summary judgment. And finally, in Section V, the Court will address the remaining motions.

The Court has received extensive briefing on these motions, and deems oral argument unnecessary.

## I.    TransAm's Motion for Judgment on the Pleadings

### A.    Factual and Procedural Background

In the Pretrial Order, TransAm included an affirmative defense that it believed Plaintiffs' second claim fails to state a claim upon which relief could be granted, and included a motion for judgment on the pleadings as an additional motion TransAm intended to file before the dispositive-motion deadline.[2] Plaintiffs did not object. The pleadings are now closed, and trial is set to begin on June 19, 2018.

TransAm's motion raises two issues. The first issue is whether unpaid "wages in the amount of at least the applicable federal minimum wage" are recoverable as "wages due" under

---

[1] There will be some duplication of the facts and law in the following sections.

[2] Doc. 433, p. 24. Although TransAm included the general defense at issue—failure to state a claim—in the Pretrial Order numerous times, TransAm failed to include in Section 8(b) of the Pretrial Order a Rule 12(c) motion for judgment on the pleadings. Plaintiffs did not object to TransAm's assertion that Plaintiffs had failed to state a claim. After realizing its inadvertent omission, TransAm filed a motion to modify the Pretrial Order (Doc. 434) to include in Section 8(b) a Rule 12(c) motion for judgment on the pleadings. The Court granted TransAm's motion on July 31, 2017 in a text entry (Doc. 476).

the KWPA.  Assuming that such a claim may be brought under the KWPA, the second issue becomes whether the claim is preempted by the FLSA.  For the reasons explained below, the Court concludes that under Kansas law, the KWPA does not provide a cause of action for the recovery of state or federal minimum wages.  And to the extent that the KWPA could be interpreted to allow a claim for unpaid federal minimum wages, it is preempted by the FLSA.

## B.    Legal Standard

Under Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings after the pleadings are closed as long as the motion is made early enough not to delay trial.[3]  The standard for dismissal under Rule 12(c) is the same as a dismissal under Rule 12(b)(6).[4]  So to survive a motion for judgment on the pleadings, a complaint must present factual allegations, assumed to be true, that "raise a right to relief above the speculative level," and must contain "enough facts to state a claim to relief that is plausible on its face."[5]  All reasonable inferences from the pleadings are granted in favor of the non-moving party.[6]  Judgment on the pleadings is appropriate when "the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law."[7]

---

[3] Fed. R. Civ. P. 12(c).

[4] *Myers v. Koopman*, 738 F.3d 1190, 1193 (10th Cir. 2013); *KMMentor, LLC v. Knowledge Mgmt. Prof'l Soc., Inc.*, 712 F. Supp. 2d 1222, 1231 (D. Kan. 2010).

[5] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 (2007).

[6] *Sanders v. Mountain Am. Fed. Credit Union*, 689 F.3d 1138, 1141 (10th Cir. 2012).

[7] *Id.* (quoting *Park Univ. Enters., Inc. v. Am. Cas. Co.*, 442 F.3d 1239, 1244 (10th Cir. 2006)).

## C.    Discussion

In Count II of the Second Amended Complaint, Plaintiffs allege that "Defendant has had a policy and practice of violating K.S.A. § 44-314(d) by refusing to allow its Leased Drivers to receive all of their 'wages due' by refusing to pay them minimum wages as required by the FLSA and by making improper deductions from their wages."[8]    As outlined in the Pretrial Order, Plaintiffs reiterate this claim verbatim in their "factual contentions" section, but modify the claim slightly in their "legal claims" section.[9]    There, Plaintiffs claim that TransAm violated the KWPA when it failed to pay Plaintiffs "wages in the amount of at least the applicable federal minimum wage for all hours worked during relevant weekly pay periods, and such unpaid minimum wages constituted 'wages due' under the KWPA."[10]    Regardless, it is clear that Plaintiffs are using the KWPA as a vehicle to recover FLSA-mandated minimum wages.

TransAm now argues that "minimum wages as required by the FLSA" are not recoverable as "wages due" under the KWPA.   According to TransAm, a Kansas state law claim for minimum wages must be brought under the Kansas Minimum Wage Maximum Hours Law (the "KMWMHL").   However, as TransAm points out, the KMWMHL expressly exempts employers

---

[8] Doc. 88, p. 14.

[9] Doc. 433, pp. 8, 23.

[10] Doc. 433, p. 23.   In full, Plaintiffs claim:

Defendant has misclassified the Plaintiffs in the Rule 23 KWPA class as "independent contractors" because the Plaintiffs were "employees" pursuant to the application of the "right to control" test for employee status under the KWPA, and Defendant failed to pay *the opt-in Plaintiffs* wages in the amount of at least the applicable federal minimum wage for all hours worked during relevant weekly pay periods, and such unpaid minimum wages constituted "wages due" under the KWPA, K.S.A. §§ 44-313 et seq.  (Emphasis added).

It appears that Plaintiffs mistakenly referred to "opt-in Plaintiffs," italicized above, when they meant to say "Rule 23 Plaintiffs."  Count I is brought under the FLSA, which requires "similarly situated" plaintiffs to opt in to the collective action.  But this claim is a class action under Rule 23, which does not include such a requirement.

covered by the FLSA, therefore Plaintiffs in the Rule 23 class are not entitled to recover FLSA-mandated minimum wages.  Plaintiffs counter that multiple cases in this District "have found that the KWPA is *not* preempted by the FLSA," and that the Kansas Supreme Court has held "that unpaid [overtime] wages pursuant to the FLSA constituted wages due under the KWPA and nothing in the FLSA suggests that violations of its minimum wage requirements are treated differently than overtime."[11]

As the issues raised in this motion implicate federal and state wage-and-hour laws, the Court will begin with an overview of the applicable laws.  Next, the Court will address whether FLSA-mandated minimum wages are recoverable as "wages due" under the KWPA.  Assuming that such a claim may be brought under the KWPA, the Court will then address whether the claim is preempted by the FLSA.

1.    *The FLSA and Kansas Wage Laws*

The FLSA, enacted by Congress in 1938, protects employees by prescribing the minimum and overtime wages that employers must pay.  The parties do not dispute that TransAm is an employer subject to the FLSA.[12]  The federal minimum wage has been $7.25 per hour since 2007.[13]

The FLSA provides a private right of action to recover for violations, including a suit by "one or more employees for and in behalf of himself or themselves and other employees similarly situated."[14]  "In 1947, Congress amended this provision to require that a plaintiff in a FLSA suit

---

[11] Doc. 487, pp. 2–3.

[12] Doc. 433, p. 2.

[13] 29 U.S.C. § 206.

[14] 29 U.S.C. § 216(b).

'give his consent in writing to become such a party and such consent is filed in the court in which such action is brought.' "[15]  In other words, similarly situated plaintiffs must affirmatively "opt in" to become a party to a FLSA "collective action."[16]

Many states, such as Kansas, have also enacted their own wage laws.  In Kansas, the KMWMHL "is the state counterpart" to the FLSA and applies to claims for unpaid minimum and overtime wages.[17]  However, the KMWMHL explicitly provides that it "shall not apply to any employers and employees who are covered under the provisions of the [FLSA] . . . ."[18]  Just like the FLSA, the KMWMHL requires employers to pay to each employee wages at $7.25 an hour.[19]

Kansas also has enacted the KWPA, which requires employers to pay employees all "wages due" to the employee at least once per month.[20]  As explained by the Kansas Supreme Court:

> The KWPA controls several aspects of wages and benefits for the Kansas worker that are not covered by the [FLSA].  The KWPA governs when wages must be paid, the manner in which they must be paid, and the circumstances in which wages can be withheld.  The KWPA also requires employers to provide certain notice requirements with respect to the payment of wages and the provision of benefits.  It provides for remedies and penalties for violation of its requirements.  Notably, the KWPA does not contain any express provision relating to the payment of overtime, which is typically pursued under a FLSA claim.[21]

---

[15] *Knepper v. Rite Aid Corp.*, 675 F.3d 249, 253 (3d Cir. 2012) (quoting Portal-to-Portal Act of 1947, ch. 52 § 5(a), 61 Stat. 84, 87 (codified at 29 U.S.C. § 216(b))) (internal brackets omitted).

[16] *See Castaneda v. JBS USA, LLC*, 819 F.3d 1237, 1245 (10th Cir. 2016).

[17] *Dollison v. Osborne Cty.*, 241 Kan. 374, 737 P.2d 43, 48 (1987).

[18] K.S.A. § 44-1203(c).

[19] K.S.A. § 44-1203(a)(2).

[20] K.S.A. § 44-314(a).

[21] *Craig v. FedEx Ground Package System, Inc.*, 300 Kan. 788, 335 P.3d 66, 73 (2014) (citations omitted) (emphasis added).

Nor does the KWPA contain any express provision relating to the payment of minimum wages, or the minimum rate of pay an employer must pay its employees.[22]  Unlike the KMWMHL, the KWPA does not exempt employers covered by the FLSA.[23]

Group actions based on Kansas wage laws are not brought in federal courts as "collective actions."  Instead, they are governed by Rule 23 of the Federal Rules of Civil Procedure.  Under Rule 23, suits may be filed as "class actions" on behalf of putative classes so long as certain prerequisites are met.[24]  After class certification under Rule 23(b)(3), the court provides notice to putative class members, providing information about the class action and granting them an opportunity to exclude themselves or "opt-out" of the class.[25]  The class members will be bound by the final judgment unless they choose to opt-out.[26]

Here, in Count I, Plaintiffs claimed that TransAm violated the FLSA's minimum wage provisions "by failing to pay the Plaintiffs and other similarly situated Leased Drivers a minimum hourly wage during numerous applicable pay periods."  After the collective action was conditionally certified on August 20, 2015, approximately 1,928 opt-in Plaintiffs filed consents to join the collective action.  In Count II, Plaintiffs claimed that TransAm has had a policy and practice of violating the KWPA, specifically K.S.A. § 44-314(d), "by refusing to allow its Leased Drivers to receive all of their 'wages due' by refusing to pay them minimum wages as required by the FLSA . . . ."  After the class was conditionally certified under Rule 23, notice was sent to

---

[22] *See generally* K.S.A. §§ 44-313–44-327.

[23] *See* K.S.A. § 44-313(a).

[24] Fed. R. Civ. P. 23(a)–(b).

[25] Fed. R. Civ. P. 23(c)(2).

[26] Fed. R. Civ. P. 23(c).

putative class members, granting them an opportunity to opt-out. The class currently consists of approximately 8,691 members.

Both Count I and Count II seek damages for TransAm's alleged failure to pay Plaintiffs minimum wages under the FLSA. This is known as a "hybrid action," a recent trend that has "troubled district courts across the country because of the inherent conflict between the opt-in requirement of FLSA collective actions and the opt-out provisions of Rule 23(b)(3) class actions."[27]

### 2.    *The KWPA Does Not Support a Claim for FLSA Minimum Wage Damages*

The first issue to resolve is whether the KWPA supports a FLSA minimum wages claim against a FLSA-covered employer for failing to pay the employee all "wages due." As the Court is construing a Kansas statute, it must be given the meaning it would have in the Kansas courts.[28] Unfortunately, there are no decisions of the Kansas Supreme Court, or of lower courts in Kansas, addressing this specific issue. The Court must therefore attempt to predict the interpretation that would be given the statute by the Kansas courts, "based on its language, on the decisions of other state appellate courts, and on the evident purposes of the statute."[29]

The plain language of K.S.A. § 44-314(a) states: "[e]very employer shall pay all wages due to the employees of the employer at least once during each calendar month, on regular paydays designated in advance by the employer." The KWPA defines "wages," as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece,

---

[27] *Pliego v. Los Arcos Mexican Rests., Inc.*, 313 F.R.D. 117, 123 (D. Colo. 2016).

[28] *Williams v. United Parcel Serv., Inc.*, 527 F.3d 1135, 1140 (10th Cir. 2008).

[29] *Id.*

commission *or other basis* less authorized withholding and deductions."[30]    And the italicized language, "or other basis," has been defined by the Kansas Department of Labor to include:

> all agreed compensation for services for which the conditions required for entitlement, eligibility, accrual or earning have been met by the employee.  Such compensation may include, but is not limited to, profit sharing, fringe benefits, or compensation due as a result of services performed under an employment contract that has a wage rate required or implied by state or federal law.  Conditions subsequent to such entitlement, eligibility, accrual or earning resulting in a forfeiture or loss of such earned wage shall be ineffective and unenforceable.[31]

Applying these definitions, Kansas appellate courts have consistently held that "wages" are determined by the "employment contract and employer policies."[32]  But the Kansas courts have not explicitly addressed whether the KWPA contemplates compensation owed because of statutory rights—not contractual rights—such as the KMWMHL or the FLSA's minimum wage provisions.  Based on the existing case law, and the evident purposes of the KWPA, the Court joins the majority of this District and concludes that minimum wages are not recoverable under the KWPA.

        a.       The Kansas Supreme Court did not hold that unpaid minimum wages constitute "wages due" under the KWPA

In their entire argument, Plaintiffs cite just one Kansas case—*Elkins v. Showcase, Inc.*[33]— for the proposition that unpaid minimum wages pursuant to the FLSA constitute "wages due" for the purposes of the KWPA.  In *Elkins*, a waiter brought a KWPA claim for "back wages" owed under "an employment agreement" which provided payment at $2.01 per hour with the employer

---

[30] K.S.A. § 44-313(c) (emphasis added).

[31] K.A.R. § 49-20-1(d).

[32] *Dillard Dep't Stores, Inc. v. State Dep't of Human Res.*, 28 Kan. App. 2d 229, 13 P.3d 358, 362 (2000).

[33] 237 Kan. 720, 704 P.2d 977 (1985).

"claiming full legal tip credit" of $1.34 per hour.[34]  In addition, the employer utilized a "tip pooling system" whereby the employer would deduct from the tipped employees' daily tips an amount equal to 6% of each employee's total daily sales (not tips), pool that money, and then pay nontipped employees from the pool.[35]  As a result, the employer withheld 72% of the tips earned by the waiter.[36]  The waiter did not provide written authorization for the 6% deduction.[37]

At the administrative level, the administrative hearing officer concluded that the employer violated the K.S.A. § 44-319, which provided at the time:

> (a) No employer may deduct, withhold or divert any portion of an employee's wages unless: (1) The employer is required or empowered to do so by state or federal law; . . . .  (3) the employer has a signed authorization by the employee for deductions for a lawful purpose accruing to the benefit of the employee.[38]

In reaching this conclusion, the administrative hearing officer concluded that the employer's "system of deduction for tip pooling does not conform to requirements of the FLSA which places a generally acceptable limit of fifteen percent (15%) of reported tips as the maximum amount an employer may divert into a tip pool."[39]

The first issue raised on appeal was whether the state administrative hearing officer had jurisdiction to determine violations of the FLSA.  The *Elkins* Court held that the hearing officer did in fact have jurisdiction under the KWPA to determine whether the waiter's wages had

---

[34] *Id.* at 979–80.

[35] *Id.* at 980–81.  For example, on February 16, 1981, the waiter's total sales were $312.19.  The waiter received $28.00 in tips from those sales.  But the employer withheld $18.00—approximately 6% of the employee's total sales.  Thus, the waiter only retained $10.00 of the tips he originally received.

[36] *Id.* at 981.

[37] *Id.*

[38] *Id.* at 982; K.S.A. § 44-319(a)(1), (3).

[39] *Elkins*, 704 P.2d at 981.

wrongfully been withheld by the employer.[40]  As the waiter successfully argued, the hearing officer

was required to determine whether the employer violated § 44-319, "which provides, in substance,

that no employer may withhold, deduct, or divert any portion of an employee's wages unless the

employer is required or empowered to do so *by state or federal law*."[41]  Thus, the Court noted,

"the provisions of the FLSA are material only if an issue arises whether an employer is empowered

by that act to withhold any portion of an employee's wages."[42]  Indeed, the hearing officer only

considered the FLSA to determine whether the employer had authority to withhold 72% of the

waiter's tips.[43]

The employer then argued that the hearing officer erred in concluding that the amounts

paid into the tip pool were "wages" under the KWPA.  The Court agreed with the officer's

determination that the amounts paid into the tip pool were "wages" under the KWPA.[44]  "Wages"

include "all agreed compensation for services including . . . fringe benefits for which the

conditions required for entitlement . . . have been met by the employee."[45]  The employer argued

that the waiter "knew of the tip pooling arrangement when he was hired and further that this tip

pool was a condition precedent to the receipt of any amounts due to the plaintiff."[46]  According to

---

[40] *Id.* at 983.

[41] *Id.* (emphasis in original).

[42] *Id.*

[43] *See id.* at 981–84.

[44] *Id.* at 985–86.

[45] *Id.* at 985 (quoting K.A.R. § 49-20-1(F)).

[46] *Id.* at 986.

the employer, the waiter did not have a right to compensation from the tip pool until it was paid

out according to the terms of the employment contract.

The *Elkins* Court disagreed:

> The respondent took advantage of the tip credit allowed under the Fair Labor
> Standards Act to meet its minimum wage obligation. 29 U.S.C. § 203(m) provides
> that for an employer to take advantage of tips being included within the calculation
> of the minimum wage rate, the tips must be retained by the employee or pooled
> among employees who customarily and regularly receive tips. Respondent's
> argument that the employee had no right to compensation from the tip pool until it
> was paid out is clearly contrary within the meaning of the above section.[47]

Thus, the Court affirmed the administrative hearing officer's judgment.

In the present case, Plaintiffs suggest that under *Elkins*, a KWPA claim is not limited to

"wages due" pursuant to the agreement of the parties, but it may encompass "wages due" pursuant

to the minimum wage provisions of the FLSA. The Court disagrees with this interpretation for

two reasons.

First, *Elkins* cannot be read to support the proposition that "wages due" encompasses more

than the wages due pursuant to the agreement of the parties. *Elkins* did not, at any point, address

the KWPA's "wages due" provision (§ 44-314), which requires the employer to "*pay all wages*

due" to its employees.[48] Rather, *Elkins* addressed § 44-319, which provides that an employer may

not "*withhold*, *deduct* or *divert* any portion of an employee's wages."[49] This distinction is

important, because the "wages" disputed in *Elkins* were tips, paid by *customers*. The Court noted

that when an employee receives a tip, "customers, not the employer, have made the additional

---

[47] *Id.*

[48] *See generally id.* at 977–89; K.S.A. § 44-314(a) (emphasis added).

[49] *See Elkins*, 704 P.2d at 982; K.S.A. § 44-319(a) (emphasis added).

payment of a fringe benefit to the employee of the employer for receiving a standard of service."[50] Thus, the KWPA's mandate for the *employer* to "pay all wages due"[51] to the employee does not apply to tips; those wages are paid by *customers*. However, tips are still "wages," so an employer can run afoul of § 44-319 by withholding, deducting, or diverting an employee's earned tips.[52] This does not mean, as Plaintiffs assert, that "every employer *shall pay*"[53] any additional wages beyond those agreed to by the parties.[54]

Second, *Elkins* does not suggest that the requirement to pay all "wages due" encompasses "wages due" pursuant to the minimum wage provisions of the FLSA. *Elkins* in no way suggests that the waiter was ever paid less than the federal minimum wage. The minimum wage at the time was $3.35 per hour.[55] The waiter was paid $2.01 per hour with the employer "claiming full legal tip credit" of $1.34 per hour.[56] In other words, so long as the waiter received at least $1.34 per hour in tips, the employer complied with the FLSA. The waiter in *Elkins* claimed that he was entitled to all the tips he received (which averaged $38.88 per day).[57] He did not claim that the tips he ultimately received (which averaged $10.96 per day) caused him to be paid less than the federal minimum wage.

---

[50] *Elkins*, 704 P.2d at 986 (internal quotations omitted).

[51] K.S.A. § 44-314(a).

[52] K.S.A. § 44-319(a).

[53] K.S.A. § 44-314(a) (emphasis added).

[54] *See Fitzgerald v. City of Ottawa, Kan.*, 975 F. Supp. 1402, 1407 (D. Kan. 1997) ("The [KWPA] provides a mechanism for penalizing employers who withhold payment of *earned* wages; it does not enhance contractual remedies for those who enter into agreements with parties who happen to be their employers.") (emphasis in original).

[55] 29 U.S.C. § 206(a) (1982).

[56] *Elkins*, 704 P.2d at 979–80.

[57] *See id.* at 981.

Moreover, the *Elkins* Court only discussed the FLSA in determining "whether an employer is empowered by that act to withhold any portion of an employee's wages."[58]    Again, the issue was whether the employer was authorized by the FLSA to deduct a portion of the waiter's tips under § 44-319.[59]  Section 44-319 permits deductions from an employee's wages if the employer is "empowered to do so" by *federal law*.[60]  Under the FLSA at the time, an employer was not empowered to deduct from a tipped employee's tips if the employer also took advantage of the FLSA's tip credit.[61]  But employers that chose not to take the tip credit would have been empowered to do so.[62]  The FLSA was only implicated in *Elkins* because § 44-319 expressly incorporates federal law in determining whether an employer may make a deduction or not. Section 44-314, which mandates that an employer must "pay all wages due" to its employees, does not reference federal law for determining what "wages" are "due."[63]

Thus, *Elkins* offers no support for Plaintiffs' claim for minimum wages as "wages due" under the KWPA.  And Plaintiffs have provided no additional Kansas cases, nor has the Court located any, suggesting that "wages due" encompasses the FLSA's minimum wage provisions.[64]

---

[58] *Id.* at 983.

[59] *Id.* at 986.

[60] K.S.A. § 44-319(a)(1) (emphasis added).

[61] 29 U.S.C. § 203(m) (1982).

[62] *See* 29 U.S.C. § 203(m) (1982).

[63] *See* K.S.A. § 44-314.  Subsection (h) provides that "[t]he end of the pay period for which payment is made on a regular payday shall be not more than 15 days before such regular payday unless a variance in such requirement is authorized by state or federal law."  However, this provision has no bearing on whether the "wages due" include the FLSA's minimum wage.

[64] Although not cited by the parties, the Court is aware of one case in which a Kansas district court awarded damages at "the applicable minimum wage" for work an employee performed.  *See Coma Corp. v. Kan. Dep't of Labor*, 283 Kan. 625, 154 P.3d 1080 (2007).  However, in that case, the employee's claim was for "earned but unpaid wages" under an employment contract at a rate *higher* than the applicable minimum wage.  But because the employee was an undocumented worker, the district court determined that the contract was illegal and the employee was not

-15-

      b.    Four cases from this District have concluded that the KWPA does not support a claim for unpaid overtime or minimum wages

In addition to *Elkins*, the parties cite to cases from this District that have ruled on this issue. The majority of cases from this District have held that a claim for minimum wages cannot be brought as a claim for "wages due" under the KWPA.

In *Spears v. Mid-America Waffles, Inc.*,[65] Judge Murguia held that plaintiffs could not bring a claim under the KWPA for "failing to pay minimum wages."[66] Judge Murguia agreed with defendants that "plaintiffs cannot proceed with a claim under the KWPA because any claim for failing to pay minimum wages in Kansas falls under the [KMWMHL]—not the KWPA."[67] "And plaintiffs cannot state a claim under the KMWMHL because it is not applicable to employers and employees covered by the FLSA."[68] Accordingly, Judge Murguia denied plaintiffs' motion to amend the complaint to bring a KWPA claim because it would be futile.[69]

Next, in *Wheaton v. Hinz JJ, LLC*,[70] Judge Rogers followed *Spears*, holding that "a plaintiff may only assert a claim under FLSA because Kansas law allows minimum wage violations to be

---

entitled to wages at the rate in the contract. Thus, the court awarded the employee damages at "the applicable minimum wage"—less than he was entitled to under the contract.

    Regardless, the Kansas Supreme Court reversed, determining that the contract was legal and enforceable, and that the employee was entitled to wages agreed to in the contract. *Id.* at 625 syl. 2. Although the district court implicated minimum wages in connection with a KWPA claim, *Coma* does not support the proposition that a minimum wage claim can be brought under the KWPA. The claim was for wages earned under an employment contract, not for wages the employee was entitled to under a minimum wage statute.

[65] 2011 WL 6304126 (D. Kan. 2011).

[66] *See id.* at *4–5.

[67] *Id.* at *4.

[68] *Id.*

[69] *Id.* at *5.

[70] 2014 WL 5311310 (D. Kan. 2014).

pursued under the KMWMHL alone, which specifically exempts FLSA-covered employers."[71]  In doing so, Judge Rogers concluded that "[t]his case is distinguishable from *Elkins* because, unlike this case, there was no allegation in *Elkins* that the restaurant employer failed to pay minimum wage."[72]

And in *Larson v. FGX International, Inc.*,[73] Judge Marten held that the KWPA is "not a proper mechanism" for asserting minimum wage and overtime claims.[74]  Judge Marten noted that, "under Kansas law, non-FLSA overtime and minimum wage claims are brought through the KMWMHL," not the KWPA.[75]  And, when the employer is covered by the FLSA, claims for minimum or overtime wages must be brought under the FLSA.[76]

And one additional case has been decided since the parties submitted their briefs.  In *McGowan v. Genesis Health Clubs Management, Inc.*,[77] Judge Crabtree held that "plaintiff's KWPA claim for overtime violations fails to state a plausible claim for relief because Kansas law precludes state statutory claims to recover overtime wages against FLSA-covered employers, like defendant."[78]

---

[71] *Id.* at *2.

[72] *Id.*

[73] 2015 WL 1034334 (D. Kan. 2015).

[74] *Id.* at *3.

[75] *Id.*

[76] *Id.*

[77] 2018 WL 572052 (D. Kan. 2018).

[78] *Id.* at *5.

c.    Three cases from this District have allowed a KWPA claim for minimum or overtimes wages to proceed

Plaintiffs respond that "multiple better-reasoned cases in this District have found that the KWPA is *not* preempted by the FLSA."[79]  But as TransAm pointed out in its reply, preemption is only one of the two issues.  If the KWPA does not support a cause of action for the recovery of unpaid minimum wages, then the claim cannot proceed and the preemption analysis would not be necessary.  For this proposition, Plaintiffs rely solely on *Elkins*.  Regardless, the Court has considered the cases from this District cited by Plaintiffs.  The Court does not find them to be persuasive.

First, in *Veale v. Sprint Corp.*,[80] the defendant argued that the plaintiff's KWPA claim for overtime should be dismissed because the KWPA does not provide a substantive cause of action to seek overtime wages.[81]  Judge Van Bebber disagreed because the KWPA requires employers to pay an employee's "earned wages," and allowed the claim to proceed.[82]  Recently, Judge Crabtree declined to follow *Veale*, noting that "[t]he court never addressed—and it doesn't appear that defendant ever argued—that the KMWMHL governed plaintiff's claim for overtime wages and precluded such a claim if the defendant was covered by the FLSA."[83]  The Court agrees with Judge Crabtree.  *McGowan* provided a more thorough analysis than *Veale* did, because *McGowan*

---

[79] Doc. 487, p. 3 (emphasis in original).

[80] 1997 WL 49114 (D. Kan. 1997).

[81] *Id.* at *2.

[82] *Id.* (citing K.S.A. § 44-315(a)).  Besides quoting § 44-315(a), the *Veale* Court did not analyze the issue further.  *See generally id.*

[83] *McGowan*, 2018 WL 572052, at *5 (citing *Veale*, 1997 WL 49114, at *2).

specifically addressed the argument that the KMWMHL exempts the employer from liability for Plaintiffs' minimum wage claim under the KWPA,[84] while *Veale* did not.[85]

The other two cases cited by Plaintiffs are *Tarcha v. Rockhurst University Continuing Education Center, Inc.*[86] and *Rukavitsyn v. Sokolov Dental Laboratories, Inc.*[87] The Court finds these cases unpersuasive for two reasons. First, both cases relied on *Veale* to reach the conclusion that a plaintiff can seek damages under the KWPA for overtime "wages due" based on the FLSA.[88] However, the *Veale* Court was presented with a conclusory argument and thus declined to undertake a deeper analysis of the issue, while the *Spears* Court did. This Court finds *Spears*, which concluded that a minimum wage claim cannot be brought under the KWPA, to be more persuasive than *Veale*, which reached the opposite conclusion. And because *Tarcha* and *Rukavitsyn* relied on *Veale* without considering *Spears*,[89] this Court also finds *Tarcha* and *Rukavitsyn* to be unpersuasive.

Second, both of these cases relied on yet another case—*Garcia v. Tyson Foods, Inc.*[90]— for the proposition that a plaintiff could use the FLSA to support a KWPA claim for unpaid

---

[84] *See id.* at *5.

[85] *See Veale*, 1997 WL 49114, at *2.

[86] 2012 WL 1998782 (D. Kan. 2012).

[87] 2012 WL 3066578 (D. Kan. 2012).

[88] *Tarcha*, 2012 WL 1998782, at *3 ("Further, in *Veale v. Sprint Corp.*, this Court rejected the argument that a plaintiff cannot bring an action under the KWPA for overtime compensation based on overtime wages determined by the FLSA.") (citing *Veale*, 1997 WL 49114, at *2); *Rukavitsyn*, 2012 WL 3066578, at *2 ("Likewise, the court in *Veale v. Sprint Corp.* rejected the argument that a plaintiff cannot bring an action under the KWPA for overtime compensation based on overtime wages determined by the FLSA.").

[89] Neither *Tarcha* nor *Rukavitsyn* discussed, or even cited *Spears*, despite the fact that *Spears* was decided the year prior.

[90] 766 F. Supp. 2d 1167, 1187 (D. Kan. 2011).

overtime compensation.[91]  But *Garcia* does not actually support this conclusion, because "*Garcia* did not involve allegations of unpaid overtime compensation."[92]  Rather, the plaintiffs in *Garcia* alleged that the employer did not pay them for time they spent at work donning, doffing, and walking.[93]  Judge Lungstrum held that plaintiffs could assert KWPA claims based on these allegations "to recover *non-overtime* wages owed but not paid by [the employer]."[94]  In footnote 15 of the opinion, Judge Lungstrum explained that plaintiffs—who had not opted to join the FLSA class—could not seek to recover overtime wages under the KWPA because "employers like [defendant] who are covered by the FLSA are expressly exempted from Kansas' overtime statute"—the KMWMHL.[95]  "Thus, permitting plaintiffs to recover overtime wages from [defendant] under the KWPA is incompatible with the exemption provision of the KMWMHL and would undermine the integrity of Kansas' wage and hour statutory scheme as a whole."[96]

*Tarcha* and *Rukavitsyn* reason that footnote 15 analyzed whether the plaintiffs who had not opted to join the FLSA class could state viable claims under the KMWMHL.[97]  This Court respectfully disagrees because the overall issue addressed in footnote 15 was whether plaintiffs

---

[91] *Tarcha*, 2012 WL 1998782, at *4 ("The Court finds that plaintiffs may rely on the FLSA as the legal basis for a KWPA claim." (citing *Garcia*, 766 F. Supp. 2d at 1187)); *Rukavitsyn*, 2012 WL 3066578, at *2 (explaining that "courts in the District of Kansas have held that plaintiffs may rely on the FLSA . . . to form the legal basis for KWPA claims") (citing *Garcia*, 766 F. Supp. 2d at 1187).

[92] *McGowan*, 2018 WL 572052, at *4.

[93] *Garcia*, 766 F. Supp. 2d at 1187.

[94] *Id.* at 1186 (emphasis added).

[95] *Id.* at 1186 n.15.

[96] *Id.*

[97] *Tarcha*, 2012 WL 1998782, at *3; *Rukavitsyn*, 2012 WL 3066578, at *3 n.35.

-20-

could seek damages under the KWPA "for 'all time,' including overtime."[98]  Footnote 15 held that plaintiffs could not bring a KWPA claim for overtime wages against FLSA-covered employers.[99] The obvious implication of this holding is that Kansas explicitly exempts FLSA-covered employers from the KMWMHL's minimum and overtime wage provisions, and plaintiffs cannot avoid this restriction by bringing those same claims under the KWPA.[100]

Accordingly, the three cases cited by Plaintiffs are not persuasive.  The Court elects to follow the holdings reached in *Spears*, *Wheaton*, *Larson*, and *McGowan*.

> d.    Legislative History and Canons of Construction

The Court agrees with the majority of this District: FLSA minimum and overtime wages are not recoverable as "wages due" under the KWPA.  "And, it predicts that the Kansas Supreme Court—if presented with this issue—would reach the same conclusion as these cases."[101]  Again, the Kansas Supreme Court has already explained the full extent of the KWPA:

> The KWPA governs when wages must be paid, the manner in which they must be paid, and the circumstances in which wages can be withheld.  The KWPA also requires employers to provide certain notice requirements with respect to the payment of wages and the provision of benefits.  It provides for remedies and penalties for violation of its requirements.  Notably, the KWPA does not contain any express provision relating to the payment of overtime, which is typically pursued under a FLSA claim.[102]

---

[98] *Garcia*, 766 F. Supp. 2d at 1186 n.15.

[99] *Id.*

[100] *See McGowan*, 2018 WL 572052, at *4 (declining to follow *Tarcha* and *Rukavitsyn* and concluding that footnote 15 stands for the proposition that a claim for overtime wages against a FLSA-covered employer cannot be brought under the KWPA).

[101] *Id.* at *5.

[102] *Craig*, 335 P.3d at 73 (citations omitted).

Nor does the KWPA contain a provision relating to the payment of minimum wages. This is because, when the KWPA was enacted, the FLSA already governed minimum wage rates and established a private cause of action. The KWPA, however, "controls several aspects of wages and benefits for the Kansas worker that *are not covered* by the [FLSA]."[103] Indeed, "[t]he KWPA's primary concern was to protect low income workers who were shorted, docked, or cheated out of pay for services performed."[104] Plaintiffs have cited no authority, nor has the Court lcoated any, suggesting that the KWPA was intended to guarantee a minimum rate of pay for those services.[105]

The KWPA, therefore, was not intended to provide a separate means to recover for FLSA violations, but to provide workers with a means to recover for violations *not covered* by the FLSA. Thus, the KWPA provides a statutory mechanism for "enforcing an employment contract,"[106] but "it does not enhance contractual remedies for those who enter into agreements with parties who happen to be their employers."[107] In essence, the requirement to pay all "wages due" is a breach of contract provision.[108] The KWPA allows employees to enforce their *contractual* rights to wages

---

[103] *Id.* (emphasis added).

[104] *Id.* (citing An Act Providing for Wage Payment and Collection: Hearing on H.B. 1429 Before the House Comm. On Labor and Industry, 1973 Leg., 68th Sess. (Kan. 1973) (statement of T. McCune, Kansas Department of Labor)).

[105] The Kansas Legislature did not contemplate minimum wage protections until a few years after the KWPA was enacted, when it enacted the KMWMHL. *See Tarcha*, 2012 WL 1998782, at *4 n.2 (noting that the KWPA was enacted in 1973 and the KMWMHL was enacted in 1977).

[106] *See Campbell v. Husky Hogs, L.L.C.*, 292 Kan. 225, 255 P.3d 1, 7 (2011) (citation omitted).

[107] *Fitzgerald*, 975 F. Supp. at 1407.

[108] *Cf. Sibley v. Sprint Nextel Corp.*, 315 F.R.D. 642, 653 n.14 (D. Kan. 2016) ("Under the applicable law of Kansas, damages is an essential element of a claim for breach of contract. To prevail on a derivative KWPA claim, the plaintiff must prove his employer failed to pay him 'all wages due,' which is the same showing.") (internal citations omitted).

owed pursuant to the parties' agreement. It does not allow employees to enforce other *statutory* rights, such as the right to a minimum wage.

Furthermore, the relevant canons of construction demonstrate that the KMWMHL controls all state-law minimum and overtime wage claims. As the Kansas Supreme Court explained in *Chelsea Plaza Homes, Inc. v. Moore*,[109] "[i]t is a cardinal rule of law that statutes complete in themselves, relating to a specific thing, take precedence over general statutes or over other statutes which deal only incidentally with the same question, or which might be construed to relate to it."[110] And when "there is a conflict between a statute dealing generally with a subject, and another dealing specifically with a certain phase of it, the specific legislation controls in a proper case."[111]

In *Chelsea Plaza Homes, Inc.*, the defendant-tenant proceeded to trial on her counterclaim, alleging violation of the Residential Landlord Tenant Act ("RLTA") and the Kansas Consumer Protection Act ("KCPA").[112] The counterclaim sought $2,000 in damages pursuant to the KCPA, K.S.A. § 50-636, for each of three alleged violations of the RLTA. The three alleged violations of the RLTA pertained to three paragraphs contained within the lease agreement. Each of the RLTA violations "was averred to be a deceptive practice proscribed by K.S.A. 50-626(B)(8)" of the KCPA.[113] At conclusion of the trial, the district court concluded that "no violation of the [KCPA] was proven."

---

[109] 226 Kan. 430, 601 P.2d 1100 (1979).

[110] *Id.* at 1102.

[111] *Id.* (citing *Garden City Educators' Ass'n v. Vance*, 224 Kan. 732, 585 P.2d 1057 (1978); *State ex rel. Mellinger v. Throckmorton*, 169 Kan. 481, 219 P.2d 413 (1950)).

[112] *See Skeet v. Sears, Roebuck & Co.*, 760 F. Supp. 872, 876 (D. Kan. 1991) ("*Chelsea Plaza Homes, Inc.* was a unique case in which the plaintiff could recover alternatively under the KCPA or the RLTA.").

[113] *Chelsea Plaza Homes*, 601 P.2d at 1102.

On appeal, the Kansas Supreme Court first resolved "a significant issue inherent in the case." The Court recognized that "the counterclaim is the result of a hybridization of the [RLTA] and the [KCPA]," and explained:

> Specific alleged violations of the RLTA are used as the deceptive practices of the [KCPA]. The reason for this is clear. The RLTA permits only the recovery of Actual damages by a tenant, and those only when the prohibited provisions are deliberately used by the landlord (K.S.A. 58-2547); whereas, the [KCPA], for deceptive acts or practices (K.S.A. 50-626(B)(8)), permits recovery of actual damages or $2000, whichever is greater, plus reasonable attorneys' fees (K.S.A. 50-634 and 636 (now 1978 Supp.)). We must initially determine whether the [RLTA] is a complete and specific act which takes precedence over the [KCPA] in the area to which it pertains.[114]

In analyzing the two Acts, the Court noted that the KCPA governed all "consumer transactions," which was defined broadly.[115] In fact, the KCPA was "clearly broad enough to include all leases of real estate." The RLTA, on the other hand, was enacted to govern "the more substantive aspects of landlord-tenant relationships," and only encompassed landlord-tenant transactions.[116]

Thus, the Court determined, the KCPA covered a very broad area of transactions; whereas, the RLTA covered "one very specific small area of transactions, and is complete within itself for that area."[117] Invoking the more-specific-statute rule of construction, the Court held that "for all

---

[114] *Id.* at 1102.

[115] *Id.* at 1103. " 'Consumer transaction' means a sale, lease, assignment or other disposition for value of property or services within this state (except insurance contracts and securities regulated under federal or state law) to a consumer or a solicitation by a supplier with respect to any of these dispositions." *Id.* at 1103 (quoting K.S.A. § 50-624(C)).

[116] *Id.* (quoting *Clark v. Walker*, 225 Kan. 359, 590 P.2d 1043 (1979)).

[117] *Id.* at 1103–04. The RLTA was "complete within itself" because "the legislature set forth the obligations, rights, and remedies of both landlords and tenants . . . ." *Id.* On the other hand, a statute—even if designed to cover a specific, small area of transactions—is not considered "complete within itself" if the narrow statute does not address "rights and remedies" available to those injured by violations of the statute. *See Skeet*, 760 F. Supp. at 876. In such a case, a plaintiff would be entitled to pursue a claim under a broader statute that does provide remedies, even if the conduct causing the injury fell within the purview of the narrower statute. *See id.*

transactions within its purview the [RLTA] controls and preempts the field. The attempted hybridization of the two acts herein has resulted in a sterile hybrid which is not viable, let alone capable of reproducing itself."[118] Because the counterclaim should have been brought under the RLTA—not the KCPA—the trial court did not err in determining that there was no violation of the KCPA.[119]

Here, the general statute—the KWPA—is in conflict with the specific statute dealing with the same subject—the KMWMHL. *Chelsea Plaza Homes* is directly on point. There, plaintiffs' claim was brought under the KCPA, which broadly encompasses all "consumer transactions," even though the allegations only concerned "landlord-tenant transactions" and fell directly within the purview of the narrower RLTA. Here, Plaintiffs' claim is brought under the KWPA, which broadly encompasses all "wages due," even though the allegations only concern unpaid "minimum wages" and fall directly within the purview of the narrower KMWMHL. And, just like the RLTA in *Chelsea Plaza Homes*, the KMWMHL is "complete in itself." It provides obligations, rights, and importantly, a remedy for minimum wage violations—employees may bring an action in state court to recover the full amount of unpaid minimum wages, as well as costs and reasonable attorney fees.[120] Accordingly, for all transactions within the KMWMHL's purview the KMWMHL controls and preempts the field.[121]

---

[118] *Chelsea Plaza Homes*, 601 P.2d at 1104.

[119] *Id.* at 1105.

[120] K.S.A. § 44-1211(a).

[121] *See Chelsea Plaza Homes, Inc.*, 601 P.2d at 1104. This conclusion is supported by the fact that neither party—nor the Court in its own research—have been able to find a Kansas case in which a claim for unpaid minimum wages was brought under the KWPA. *See Larson*, 2015 WL 1034334, at *3 n.2 ("Notably, the court has not located Kansas cases where KMWMHL claims were brought through the KWPA; neither have the parties provided such authority.").

Thus, Plaintiffs "may only assert a claim under [the] FLSA because Kansas law allows minimum wage violations to be pursued under the KMWMHL alone, which specifically exempts FLSA-covered employers."[122]  Since there appears to be no dispute that Plaintiffs and TransAm are covered by the FLSA, Plaintiffs' claim for unpaid minimum wages must be dismissed.

### 3.    Regardless, Plaintiffs' Claim Under the KWPA is Preempted

Furthermore, "to the extent that the KWPA could be interpreted as a mechanism for asserting FLSA-based claims for minimum or overtime wages, it would be preempted by §§ 206 and 207 of the FLSA."[123]  "As a general rule, state law claims attempting to assert causes of action expressly provided for by federal statute are preempted."[124]  Federal law preempts state law "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" ("conflict preemption").[125]  In these cases, the state law will be nullified "to the extent that it actually conflicts with federal law."[126]  "[A]ny state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must

---

[122] *Wheaton*, 2014 WL 5311310, at *2; *see also McGowan*, 2018 WL 572052, at *5 ("The court thus infers from the plain language of the statute that the Kansas legislature, when enacting the KMWMHL, intended to exclude FLSA-covered employees from state overtime wage laws."); *Larson*, 2015 WL 1034334, at *3 (concluding that KWPA claims for unpaid minimum wages against an FLSA-covered employer are "not plausible because they are legally impossible.  To allow otherwise would be incompatible with Kansas's statutory wage and hour scheme.").

[123] *Larson*, 2015 WL 1034334, at *3.

[124] *Id.* (citing *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1399 (10th Cir. 1997)); *see also Hammond v. Lowe's Home Ctrs., Inc.*, 316 F. Supp. 2d 975, 979 (D. Kan. 2004) ("As a general proposition, state law claims that merely seek to enforce the defined remedies of the FLSA are preempted.").

[125] *Pueblo of Pojoaque v. New Mexico*, 863 F.3d 1226, 1235 (10th Cir. 2017) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992)) (internal quotations omitted).

[126] *Hillsborough Cty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985).

yield."[127]   For example, the Tenth Circuit has previously held that state common law causes of action for retaliatory discharge are precluded where an adequate statutory remedy exists under the FLSA.[128]

        a.     Differences between the FLSA and the KWPA

Here, the FLSA and the KWPA have similar goals.[129]   However, an important difference between the statutes is that the FLSA establishes the amount of wages an employer must pay its employees, while the KWPA does not.   "Rather than providing substantive rights, the KWPA provides a mechanism for recovering wages due."[130]

In addition, the FLSA specifically includes an "opt-in" provision to join a representative while the KWPA does not.   Under the FLSA, "[n]o employee shall be a party plaintiff to any [collective] action unless he gives his consent in writing to become such a party and such consent is filed in court . . . ."[131]   The FLSA's "opt-in" requirement was added to "strike a balance to maintain employees' rights but curb the number of lawsuits."[132]

---

[127] *Fielder v. Casey*, 487 U.S. 131, 138 (1988) (quoting *Free v. Bland*, 369 U.S. 663, 666 (1962)) (internal quotation marks omitted); *see also Perez v. Campbell*, 402 U.S. 637, 652 (1971) ("[A]ny state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause.").

[128] *Conner*, 121 F.3d at 1399.

[129] *See Craig*, 335 P.3d at 73 ("The KWPA's primary concern was to protect low income workers . . . ."); *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981) ("The principal congressional purpose in enacting the [FLSA] was to protect all covered workers from substandard wages and oppressive working hours . . . .").

[130] *Koehler v. Freightquote.com, Inc.*, 2013 WL 3878170, at *2 (D. Kan. 2013) (citing *Garcia*, 766 F. Supp. 2d at 1187).

[131] 29 U.S.C. § 216(b).

[132] *De Ascencio v. Tyson Foods, Inc.*, 342 F.3d 301, 306 (3d Cir. 2003) (quoting 93 Cong. Rec. 2,082 (1947)); *see also* 93 Cong. Rec. 2,087 ("[T]he attention of the Senate is called to a dramatic influx of litigation, involving vast alleged liability, which has suddenly entered the Federal courts of the Nation.").

        b.     Plaintiffs' KWPA claim is duplicative of Plaintiffs' FLSA claim and therefore preempted by the FLSA

The Tenth Circuit has not directly addressed whether the FLSA preempts state-law wage claims that would allow plaintiffs to pursue a Rule 23 class action and a FLSA collective action simultaneously. Although the FLSA allows states to impose a higher minimum wage, it does not explicitly authorize states to create alternative remedies for FLSA violations.[133]

However, the Fourth Circuit has held that the FLSA preempts state law claims that "depend on establishing that [the defendant] violated the FLSA."[134]  In *Anderson*, plaintiffs brought claims for breach of contract, negligence, and fraud—claims that provided remedies that were more generous than those provided in the FLSA enforcement scheme.[135]  These "state claims all depend[ed] on establishing that [defendant] violated the FLSA . . . ."[136]  The Fourth Circuit explained that " 'the mere existence of a federal regulatory or enforcement scheme'—even if the scheme is an appreciably detailed one—'does not by itself imply preemption of state remedies.' "[137]  Yet, the court concluded that the FLSA contains "an unusually elaborate enforcement scheme," and this enforcement scheme provides the exclusive remedy for enforcing

---

[133] *See* 29 U.S.C. § 218(a) ("No provision of this chapter or of any order thereunder shall excuse noncompliance with any . . . State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter or a maximum work week lower than the maximum workweek established under this chapter . . . ."); *Pettis Moving Co. v. Roberts*, 784 F.2d 439, 441 (2d Cir. 1986) ("Section 218(a) of the FLSA explicitly permits states to set more stringent overtime provisions than the FLSA." (internal citation omitted)).

[134] *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 193 (4th Cir. 2007).

[135] *Id.* at 192 (noting that contract claim was arguably subject to a longer limitations period, and punitive damages may be awarded under North Carolina law for proof of fraud, malice, or willful or wanton conduct).

[136] *Id.* at 193.

[137] *Id.* (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 87 (1990)).

the Act.[138]   The court reasoned that § 216(b)–(c) contains "special feature[s] that would be rendered superfluous if workers were able to circumvent that scheme while pursuing their FLSA rights."[139]   Accordingly, the FLSA preempted the duplicative state law claims.

However, some courts have held that the FLSA did not preempt state-law wage claims when the state law provided additional rights not guaranteed by the FLSA.[140]   Take one of this Court's prior opinions for example.   In *Tommey v. Computer Sciences Corp.*,[141] the plaintiff brought quantum meruit and unjust enrichment claims under Kansas common law alongside a FLSA claim for unpaid overtime wages.   This Court noted that some courts have allowed a claim for unjust enrichment or quantum meruit to proceed when the claim seeks something more than what the FLSA can provide—such as regular wages not paid at the contracted rate or "gap time" wages.   The Court held that plaintiff's complaint contained sufficient facts to encompass a quantum meruit claim for unpaid "gap time" wages.   As plaintiff was seeking more than what she was entitlted to under the FLSA, the Court allowed her quantum meruit claim to proceed.   However, the Court dismissed the claim to the extent she was seeking to recover overtime wages.[142]   And with regards to the unjust enrichment claim, this Court dismissed the claim because

---

[138] *Id.* at 192, 194.

[139] *Id.* at 194.

[140] *See, e.g.*, *Williamson v. Gen. Dynamics Corp.*, 208 F.3d 1144, 1154 (9th Cir. 2000) (concluding that state fraud claims do not conflict with FLSA's purpose of protecting employees any more than claims for wrongful death, assault, or murder, but noting that claims "that are directly covered by the FLSA (such as overtime and retaliation disputes) must be brought under the FLSA").

[141] 2013 WL 1000659 (D. Kan. 2013).

[142] *Id.* at *2.

the allegations were "duplicative of Plaintiff's FLSA claim and therefore preempted by Plaintiff's FLSA claim."[143]

Thus, the FLSA does not preempt a state-law claim when the state statute provides more substantive rights than the FLSA.  But, with the exception of one Northern District of Iowa case, "courts that have directly considered the preemption issue have found that the FLSA preempts duplicative state-law claims."[144]

Such is the case here.  Plaintiffs claim they were "employees," misclassified as "independent contractors," and not paid wages in the amount of "at least the applicable federal minimum wage for all hours worked during relevant weekly pay periods, and such unpaid minimum wages constituted 'wages due' under the KWPA."  The KWPA does not provide any substantive rights; it merely provides a mechanism to recover wages that are due.[145]  Thus, Plaintiffs' KWPA claim for minimum wages is duplicative of the FLSA claim.  Plaintiffs are not seeking anything more than what the FLSA provides.

The Court agrees with the Fourth Circuit's reasoning that allowing Plaintiffs to use procedures other than those established in § 216(b) would render that section superfluous.[146]  In particular, by using the KWPA to enforce their FLSA rights, Plaintiffs nullify § 216(b)'s opt-in

---

[143] *Id.* at *3.

[144] *Zanders v. Wells Fargo Bank N.A.*, 55 F. Supp. 3d 1163, 1173 (S.D. Iowa 2014).  *See generally Williamson*, 208 F.3d at 1153–54 (noting that claims directly covered by the FLSA—such as overtime and retaliation disputes—must be brought under the FLSA, but finding that the plaintiffs' fraud claim was not preempted where the employer's conduct was not covered by any FLSA provision); *Anderson*, 508 F.3d at 193 (holding that the FLSA preempts state law claims that "depend on establishing that [the defendant] violated the FLSA"); *but cf. Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870, 886 (N.D. Iowa 2008) (noting that "[i]n fact, nearly every court to consider the issue recognizes that state law claims that merely duplicate or depend on the FLSA are preempted by federal law," despite holding the opposite).

[145] *Koehler*, 2013 WL 3878170, at *2 (citing *Garcia*, 766 F. Supp. 2d at 1187).

[146] *Anderson*, 508 F.3d at 184.

procedure.  As enacted, the FLSA did not require FLSA collective action plaintiffs to affirmatively opt in.[147]  But in 1947, Congress amended the FLSA because the Act was being "interpreted judicially in disregard of long-established customs, practices, and contracts between employers and employees, thereby creating wholly unexpected liabilities . . . upon employers" and that if such interpretations of the Act were to continue, "the payment of such liabilities would bring about financial ruin of many employers . . . ."[148]  The opt-in requirement was thus included to seek "a balance between protecting employees and shielding employers from excessive liability."[149]  As a KWPA claim brought under Rule 23 does not require plaintiffs to affirmatively opt in, the Rule 23 class is much larger than the FLSA class.[150]  The KWPA therefore "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[151]

## D.    Conclusion

Plaintiffs "may only assert a claim under [the] FLSA because Kansas law allows minimum wage violations to be pursued under the KMWMHL alone, which specifically exempts FLSA-covered employers."[152]  Since there appears to be no dispute that Plaintiffs and TransAm are covered by the FLSA, Plaintiffs' claim for unpaid minimum wages must be dismissed.

---

[147] *See* 29 U.S.C. § 216 (1940) ("Action to recover such liability may be maintained in any court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated, or such employee or employees may designate an agent or representative to maintain such action for and in behalf of all employees similarly situated.").

[148] Portal-to-Portal Act of 1947, 61 Stat. 84 (1947) (codified at 29 U.S.C. § 251).

[149] *Zanders*, 55 F. Supp. 3d at 1174.

[150] In this case, there are approximately 1,928 opt-in Plaintiffs in the FLSA collective action, but there are approximately 8,691 class members in the Rule 23 class. Doc. 433, p. 6.

[151] *Pueblo of Pojoaque*, 863 F.3d at 1235 (quoting *Gade*, 505 U.S. at 98) (internal quotations omitted).

[152] *Wheaton*, 2014 WL 5311310, at *2; *see also McGowan*, 2018 WL 572052, at *5; *Larson*, 2015 WL 1034334, at *3.

Further, "to the extent that the KWPA could be interpreted as a mechanism for asserting FLSA-based claims for minimum or overtime wages, it would be preempted by §§ 206 and 207 of the FLSA."[153]  TransAm is thus entitled to judgment as a matter of law on Plaintiffs' KWPA claim for minimum wages.

## II.    TransAm's Motion to Decertify the FLSA Class (Doc. 447)

## A.    Factual and Procedural Background

Plaintiffs' first claim is brought under the FLSA's minimum wage provision, 29 U.S.C. § 206.  Plaintiffs assert that TransAm misclassified the Plaintiffs in the opt-in FLSA collective action as "independent contractors" because the Plaintiffs were "employees" pursuant to the application of the "economic realities" test for employee status under the FLSA, and that Defendant failed to pay the opt-in Plaintiffs wages in the amount of at least the applicable federal minimum hourly wage for all hours worked in the relevant weekly pay periods.

This Court conditionally certified the collective action on August 20, 2015.[154]  In so doing, the Court concluded that the Leased Drivers were "similarly situated" and were "together the victims of a single decision, policy or plan" for purposes of the FLSA:

> Plaintiffs maintain that potential class members are similarly situated because they all received the same training, were provided with the same handbook of policies, and entered into the same independent contractor and equipment lease agreements. They all were paid under similar per-mileage pay policies by TransAm.  They all had essentially the same job duties of driving to make deliveries.  They all were classified as independent contractors.  And they all were prohibited from driving for anyone other than TransAm.[155]

---

[153] *Larson*, 2015 WL 1034334, at *3.

[154] Doc. 146.

[155] Doc. 146, p. 19; *Blair v. TransAm Trucking, Inc.*, 2015 WL 5006076, at *9 (D. Kan. 2015).

The conditionally certified FLSA class was defined as: "[d]rivers who were classified by Defendant as independent contractors and who leased trucks from TransAm Leasing, Inc. and performed driving work between November 5, 2008 to [August 20, 2015]."[156]  After notice was sent out, approximately 1,928 individuals opted in to the collective action (referred to in this section as "Leased Drivers").

Through the course of discovery, TransAm took the deposition of 52 Leased Drivers. Additionally, Plaintiffs' designated experts conducted a survey of the Leased Drivers that "contains 27 straight forward questions that go to TransAm's ability to control various tasks and economic realities of the driver, and whether or not TransAm encouraged drivers to become Leased Drivers rather than employee drivers, all of which are relevant and material to the issue of whether the Leased Drivers are actually employees of TransAm."[157]  These questions included:

(1) whether they applied to work as an employee (company driver) or independent contractor;

(2) whether they were told they would have to wait before they could start work if they wanted to be a company driver;

(3) whether TransAm encouraged them to be an independent contractor instead of a company driver;

(4) whether they felt pressured to sign the "independent contractor" and truck leasing agreements in order to get a job;

(5) whether TransAm encouraged them to become an independent contractor with promises of greater earnings and miles;

(6) whether they tried to switch back to become a company driver but were refused by TransAm;

(7) whether TransAm gave them time to consider the documents before signing up as an independent contractor;

(8) whether the contractor and leasing documents were easy to read understand;

(9) their amount of prior experience prior to driving for TransAm;

(10) whether they put any money down to reduce monthly payments at the time of signing the documents to become an independent contractor;

---

[156] Doc. 146, p. 17; Doc. 148, p. 17.

[157] Doc. 491, pp. 3–4.  Plaintiffs' experts sent the survey to 1,732 Leased Drivers, and received 477 completed responses.

(11)    whether they were able to negotiate the terms of the agreements;

(12)    whether TransAm allowed them to use their truck to haul loads for third parties;

(13)    whether they had information available about "more desirable or higher paying loads" available to them when TransAm assigned a load;

(14)    whether they received any negative consequences if they refused a load;

(15)    whether they relied on TransAm to provide insurance;

(16)    whether TransAm placed a Drive Cam in their truck to monitor them;

(17)    whether TransAm monitored their truck location and speed via GPS;

(18)    whether TransAm required them to have maintenance and repairs done by TransAM;

(19)    whether TransAm prohibited mechanical or cosmetic modification of the truck;

(20)    whether TransAM required them to submit truck for inspections;

(21)    whether TransAm intervened due to a delivery problem and took their load away by sending another truck and driver;

(22)    whether TransAm allowed them to advertise or market their independent services;

(23)    whether they were able to negotiate freight rates with TransAm;

(24)    whether they attempted to hire a driver to work for them;

(25)    if "yes" to 24, whether TransAm exercised control and required its approval over who they could hire;

(26)    whether TransAm specified a time of pickup and delivery on loads; and

(27)    whether TransAm mandated the maximum speeds they could drive.[158]

The 477 respondents were only able to offer a unanimous response to one question: they all answered that they did not put any money down to reduce weekly payments when they signed their independent contractor and lease agreement.[159]  Thus, having reviewed the discovery, TransAm now argues that there are numerous significant distinctions between the Leased Drivers. TransAm contends: "[g]iven that a liability determination under the FLSA, as well as TransAm's defenses in this matter, will depend upon the varying reported experiences by the drivers on the misclassification issue, as well as a weekly individualized analysis as to whether liability exists, it

---

[158] *See* Doc. 491-2.

[159] Doc. 491-2, p. 4.

is clear continued certification of the opt-in collective action is inappropriate."[160]   Therefore, TransAm argues, the Court should decertify the collective action.

In response, Plaintiffs argue that the factual distinctions between the Leased Drivers identified by TransAm have no bearing on the central facts that bind the Leased Drivers together and constitute their commonly shared legal basis as "employees" under the FLSA: their economic dependence on TransAm.   Plaintiffs also argue that the fact that damages would need to be calculated on a week-by-week basis for each Leased Driver is no basis for decertification.

## B.    Discussion

The FLSA permits legal action against any employer "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."[161]   Unlike class actions under Federal Rule of Civil Procedure 23(b)(3), a collective action brought under § 216(b) of the FLSA includes only those similarly situated individuals who opt in to the class.[162] But the FLSA does not define what it means to be "similarly situated."   Instead, the Tenth Circuit has approved an ad-hoc, two-step approach to § 216(b) certification claims.[163] The ad-hoc approach employs a two-step analysis for determining whether putative opt-in plaintiffs are similarly situated to the named plaintiffs.[164]

---

[160] Doc. 452, p. 2.

[161] 29 U.S.C. § 216(b).

[162] *See* 29 U.S.C. § 216(b).

[163] *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1105 (10th Cir. 2001).

[164] *Id.* at 1102–03.

First, in the initial "notice stage," the court "determines whether a collective action should be certified for purposes of sending notice of the action to potential class members."[165] The notice stage "require[s] nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan."[166] The standard for conditional certification at the notice stage is lenient and typically results in certification for the purpose of notifying potential plaintiffs.[167]

During the second stage, which occurs at the conclusion of discovery, a defendant typically files a motion to decertify the collective action.[168] Upon ruling on a motion to decertify, "the court then makes a second determination, utilizing a stricter standard of 'similarly situated.' "[169] In determining whether plaintiffs are similarly situated, "a court reviews several factors, including (1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations."[170] The decision whether to decertify a collective action is within the District Court's discretion.[171]

---

[165] *Brown v. Money Tree Mortg., Inc.*, 222 F.R.D. 676, 679 (D. Kan. 2004) (citation omitted).

[166] *Thiessen*, 267 F.3d at 1102 (citations and internal quotations marks omitted) (alteration in original).

[167] *See id.* at 1103.

[168] *Thiessen*, 267 F.3d at 1102–03.

[169] *Id.* at 1103.

[170] *Id.*

[171] *Id.* at 1102 (citations omitted). *See also In re Chipotle Mexican Grill, Inc.*, 2017 WL 4054144, at *2 (10th Cir. 2017) (noting that the district court generally has discretion to deny certification for trial management reasons).

1.    *Plaintiffs' factual and employment settings are not similar*

"With respect to the first factor, courts have held general allegations of an overarching policy to be insufficient—instead requiring 'substantial evidence of a single decision, policy or plan.' "[172]  "The court will compare the named plaintiffs with the opt-ins, and evaluate the similarities and dissimilarities in employment responsibilities and circumstances."[173]  Here, Plaintiffs claim that TransAm misclassified the Leased Drivers as independent contractors and failed to pay them the minimum wage as required by the FLSA.[174]  However, in determining whether there exists substantial evidence of a "single decision, policy or plan," the fact that the Leased Drivers were classified as "independent contractors" is irrelevant.[175]  In other words, the Court must determine whether the Leased Drivers' experiences were similar enough to say that they shared a factual nexus regarding their status as "employees."  "Decertification will be granted where the claimants' responsibilities and duties were so varying that it cannot be said they share a factual nexus based on a particular policy or practice."[176]

---

[172] 1 McLaughlin on Class Actions § 2:16, *Limitations on applicability of class action device—Collective actions under the Fair Labor Standards Act* (14th ed. 2017) (quoting *Moss v. Crawford & Co.*, 201 F.R.D. 398, 409–10 (W.D. Pa. 2000)).

[173] *Id.*

[174] Because the FLSA only provides protections to "employees," the central issue in this case is whether Plaintiffs were misclassified as "independent contractors."  *See* 29 U.S.C. § 206.

[175] *See Green v. Harbor Freight Tools USA, Inc.*, 888 F. Supp. 2d 1088, 1098 (D. Kan. 2012) ("The Court finds that this is not a case in which Plaintiffs can rely on a common job description as evidence that a collective action [is] appropriate.  A job title alone is insufficient to establish the exempt status of an employee.") (internal quotation omitted).

[176] 1 McLaughlin on Class Actions § 2:16, *Limitations on applicability of class action device—Collective actions under the Fair Labor Standards Act* (14th ed. 2017).  *See also Russell v. Ill. Bell Tele. Co.*, 721 F. Supp. 2d 804, 814 (N.D. Ill. 2010) (decertifying individual claims arising from testimony that "[o]ne plaintiff claims pay for time she spent blowing up balloons for the company, and another claims she should have been paid for time she spent checking her sales numbers"); *Reed v. Cty. of Orange*, 266 F.R.D. 446, 454 n.7, 455 (C.D. Cal. 2010) (holding that first factor weighed in favor of decertification because plaintiffs' varying responsibilities and duties resulted in "claims

The parties agree that the test for determining whether the Leased Drivers are employees is the "economic realities" test, which employs a non-exhaustive list of six factors.[177]  These six factors are: (1) the degree of control exerted by the alleged employer over the worker; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the permanence of the working relationship; (5) the degree of skill required to perform the work; and (6) the extent to which the work is an integral part of the alleged employer's business.[178]  It also "includes inquiries into whether the alleged employer has the power to hire and fire employees, supervises and controls employee work schedules or conditions of employment, determines the rate and method of payment, and maintains employment records."[179]  "None of the factors alone is dispositive; instead, the court must employ a totality-of-the-circumstances approach."[180]  Additionally, "[t]he focal point in deciding whether an individual is an employee is whether the individual is economically dependent on the business to which he renders service, or is, as a matter of economic fact, in business for himself."[181]

With the economic realities test in mind, the Court must assess whether the Leased Drivers are similarly situated such that a collective action would be appropriate in this instance.  However, the Court's task is not to consider the merits of whether the economic realities test is satisfied, but

---

[that] are simply too varied . . . .  Plaintiffs' 'other' claims vary from assignment to assignment and individual to individual").

[177] *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 506 (10th Cir. 2012) (quoting *Baker v. Flint Eng'g & Const. Co.*, 137 F.3d 1436, 1440 (10th Cir. 1998)).

[178] *Baker*, 137 F.3d at 1440.

[179] *Id.*

[180] *Id.*

[181] *Doty v. Elias*, 733 F.2d 720, 722–23 (10th Cir. 1984) (citations omitted).

rather to decide whether the factual and employment settings of the Leased Drivers are similar. As demonstrated below, the Leased Drivers are not "similarly situated" because the "economic realities" test necessitates a "totality of the circumstances" approach to determine whether it has been satisfied. The relevant facts that must be considered under the "economic realities" test widely vary between Leased Drivers, and thus, the "totality of the circumstances" is unique to each Leased Driver. Accordingly, the Leased Drivers' disparate factual and employment settings weigh in favor of decertification.[182]

> a. Degree of control exerted by TransAm was unique to each Leased Driver

The first factor considers the nature and degree of the alleged employer's control as to the manner in which the work is to be performed. Stated another way, the finder of fact must determine whether the Leased Drivers have the independence "which characterizes a person conducting their own business."[183] For example, in a case from the Tenth Circuit, the employer exerted control consistent with employee status where: the workers were told when to report to work, when to take breaks, on what portion of the project they will be working, and when their workday ends; and the

---

[182] This conclusion is typical in cases where it must be determined whether the putative plaintiffs are employees or independent contractors. Courts typically deny collective certification in these cases, because the proof necessary to determine whether the putative plaintiffs are employees or independent contractors cannot generally be applied to the class as a whole. *See, e.g.*, *Pena v. Handy Wash, Inc.*, 2015 WL 11713032 (S.D. Fla. 2015); *Collinge v. IntelliQuick Delivery, Inc.*, 2015 WL 1292444 (D. Ariz. 2015); *Rehberg v. Flowers Baking Co. of Jamestown, LLC*, 2015 WL 1346125 (W.D.N.C. 2015); *Carrera v. UPS Supply Chain Solutions, Inc.*, 2012 WL 12860750, at *8 (S.D. Fla. 2012); *Andel v. Patterson-UTI Drilling Co.*, 280 F.R.D. 287, 290 (S.D. Tex. 2012); *Demauro v. The Limo, Inc.*, 2011 WL 9191, at *3 (M.D. Fla. 2011).

[183] *Dole v. Snell*, 875 F.2d 802, 808 (10th Cir. 1989). *See also* Khara Singer Mack, 133 *Am. Jur. Trials* § 13 (2017 update) ("The main claim in independent contractor vs. employee status litigation is that the employer controls the work of independent contractors, and the contractor, in fact, loses his or her independence. Plaintiff's counsel must be able to show that the independent contractor is unable to contract with other employers, and the contractor is entirely dependent on the employer with which he has a contract.").

workers were prevented from offering services to third parties while working on a project for the employer.[184]

Here, Plaintiffs are not "similarly situated" with respect to this factor. Plaintiffs' "economic control" survey and the Leased Drivers' deposition testimony demonstrate that TransAm exerted varying degrees of control over the Leased Drivers, and this factor cannot be analyzed with collective evidence.

Plaintiffs identify certain facts in arguing that TransAm exerted sufficient control over the Leased Drivers to weigh in favor of "employee" status. But the record shows that, while these facts may be true for some Leased Drivers, these facts do not apply to many others. For example, the evidence varies widely with respect to whether TransAm: (1) unilaterally dictated the terms of the truck lease and independent contractor agreements ("ICAs");[185] (2) required Leased Drivers to use a computer system with instructions regarding routes, fuel usage, and driving speeds;[186] (3) controlled Leased Drivers' truck operating speeds;[187] (4) controlled all load assignments;[188] (5)

---

[184] *Baker*, 137 F.3d at 1441.

[185] Some Leased Drivers had significant bargaining power with respect to many of the contract terms. *See, e.g.*, Doc. 490-18, pp. 24-26; Doc. 490-13, pp. 29–31. But others testified that they were pressured into agreeing to certain contract terms. *See, e.g.*, Doc. 468-20, p. 15; Doc. 468-21, pp. 55, 93–96.

[186] The only testimony Plaintiffs reference is the deposition of TransAm employee Rhonda McFarland. She testified that the computer system, known as the Eaton Vorad system, was required at one time, but was "eventually phased out . . . so there was a period of time when some trucks had them and some did not. Doc. 485-10, p. 35.

[187] The evidence shows that Leased Drivers had the ability to change the speed setting on their truck's electronic control module. Doc. 490-45. One Leased Driver testified that his speed was capped at 70 mph until after he purchased the truck, at which point he was able to drive faster than 70 mph. Doc. 485-11, pp. 104–06.

[188] Although not asked in Plaintiffs' survey, TransAm's analysis of driving records suggests that 31.9% rejected or declined a load during the time they drove for TransAm, while 68.1% did not. Doc. 452-4, p. 169. Testimony indicates that TransAm disciplined some Leased Drivers for refusing loads (Doc. 452-2, p. 134), while others were free to refuse loads and were never disciplined or retaliated against (Doc. 490-13, pp. 91–92).

prohibited Leased Drivers from modifying their trucks;[189] (6) placed restrictions on Leased Drivers' ability to hire employees/assistants;[190] (7) controlled Leased Drivers' access to funds in their "maintenance Savings" accounts for truck maintenance;[191] (8) and required Leased Drivers to obtain approval from TransAm upon at least 8 days' notice to take time off work.[192]

Although Plaintiffs' survey shows Leased Drivers were "similarly situated" in some respects,[193] TransAm asserts that *all* 27 questions "are relevant and material" to the economic control TransAm exerted. Yet most of Plaintiffs' survey questions received non-uniform responses (less than 95% agreement).[194] For example, 41% of respondent Leased Drivers answered that TransAm monitored them in their trucks via camera, but 59% answered that they were not monitored.[195]

Moreover, there are many pertinent "control" questions that Plaintiffs' survey does not account for, and deposition testimony shows that Leased Drivers are not "similarly situated" with

---

[189] Of respondents, 84.1% were prohibited from modifying their trucks, while 15.9% felt they were free to do so. Doc. 491-2, p. 6.

[190] Of the 74 respondents who hired an employee, 73% felt that TransAm exercised control or required approval over whom they could hire, while 27% felt that TransAm did not exercise such control or require its approval. Doc. 491-2, p. 7.

[191] Although not asked in Plaintiffs' survey, TransAm's analysis of driving records suggests that 73.2% of Leased Drivers participated in the Maintenance Savings Account, while 26.8% did not. Doc. 452-4, p. 169.

[192] In support of this proposition, Plaintiffs cite to the TransAm Owner Operator Handbook, which simply states: "If you give us a minimum of eight-days' notice, it will help us locate a load that will get you as close as possible to your home." Doc. 485-13, p. 12. One Leased Driver testified that "[his] understanding of it is that you give an eight-day notice," to take time off. But other Leased Drivers testified that they were free to take as much time off as they desired whenever they wanted to. Doc. 490-16, p. 108. One Leased Driver would routinely take a vacation for two-to-three months per year. Doc. 490-14, pp. 36–38.

[193] There were ten questions that were answered the same by at least 95% of respondents.

[194] 17 questions received less than 95% agreement, and 7 questions received less than 80% agreement.

[195] Doc. 491-2.

respect to these facts, either.  Some Leased Drivers testified that they could choose when and where they would have maintenance performed on their trucks,[196] while others testified that TransAm dictated where maintenance had to be done.[197]  And Leased Drivers offered similarly conflicting testimony over whether TransAm's "fuel optimizer" and PrePass programs were optional, and whether they could choose their own fuel locations.[198]

In this case, the factual similarities are far outweighed by the distinctions between the Leased Drivers.  Accordingly, TransAm exerted more control over some Leased Drivers than others, making it impossible to analyze the "control" factor of the economic realities test for the class with collective evidence.[199]

> b.    Leased Drivers' opportunity for profit and loss varied significantly

The second factor of the economic realities test considers the alleged employee's opportunity for profit or loss.  As Plaintiffs note, there are a number of similarities concerning the Leased Drivers' opportunities for profit or loss: they were all paid under similar per-mileage pay

---

[196] Doc. 452-28, p. 142; Doc. 452-29, p. 48.

[197] Doc. 452-5, pp. 117–18.

[198] Doc. 452-22, p. 14 (testifying that he was "basically forced" to buy TransAm's "fuel optimizer" service); Doc. 452-21, p. 57 (testifying that he made the decision himself not to purchase the "fuel optimizer" service); Doc. 452-31, p. 78 (testifying that he was not required to purchase TransAm's PrePass program); Doc. 452-16, p. 51–52 (testifying that he paid for the PrePass program because it was not optional); Doc. 452-11, p. 51 (testifying that he could go wherever he wanted to get fuel); Doc. 452-8, pp. 36–37 (testifying that she was not free to vary from TransAm's suggestions of where to get fuel without penalty).

[199] *Compare* Doc. 452-24, pp. 58–59 ("TransAm controlled everything about my working for them.  They dispatched me.  They told me where to fuel at.  They told me what routes to take . . . .  But TransAm was my boss and employer.  Independent contractor is a misnomer.  Independent contractor means that I can go and pick my own loads, drive for other people, hire my truck out.  You know what I mean?  Those things, we could not do."); *with* Doc. 490-16, pp. 90–91 ("Q: And so you brought your 2009 Peterbilt that you were lease-purchasing and continued to drive it for TransAm Trucking, Inc., beginning on September 4th of 2013, correct?  A: I beg to differ with your choice of words.  I'm not driving for TransAm.  I'm driving for myself.  I'm leased to TransAm."), *and* 490-10, pp. 50–51 (testifying that he chose to become an independent contractor instead of a company driver because he wanted more freedom).

policies by TransAm; Leased Drivers could not negotiate the rate to haul a load;[200] and Leased Drivers were all responsible for their own maintenance costs.  Thus, according to Plaintiffs, there is no need to perform an individual analysis of this factor with respect to each individual Leased Driver.

Despite these similarities, the disparities amongst the Leased Drivers are more significant. Perhaps most notably, some Leased Drivers—including both of the Named Plaintiffs—hired one or more employees to drive for them.[201]  The Leased Drivers who chose to hire employees had full discretion to choose how much to pay their employees, and they were responsible for their employees' wages and tax withholdings.  This would weigh in favor of "independent contractor" status under the FLSA.[202]  Yet other Leased Drivers did not have employees and drove their trucks themselves, which would weigh in favor of "employee" status.  And there were also some Leased Drivers that hired a "team driver" and split driving duties with their partner.  This reflects widely-varying opportunities for profit or loss amongst the Leased Drivers.

The flexibility afforded Leased Drivers in determining the number of hours that they work is also relevant in determining whether an individual had opportunities for profit or loss.[203]  But they reported varying degrees of flexibility.  As mentioned above, some felt that they were entirely

---

[200] One respondent to Plaintiffs' "economic control" survey indicated that they were able to negotiate freight rates with TransAm or its customers.

[201] *See, e.g.*, Doc. 452-36, pp. 177–79 (noting in her deposition testimony that it was her sole decision to hire her son-in-law to be a team driver with her, and that she decided what to pay him, and it was her responsibility to withhold social security and taxes).

[202] *See Barlow*, 703 F.3d at 506 ("[W]e agree with the district court that Barlow was an independent contractor.  Barlow and his partner created a licensed, limited liability company in order to provide janitorial services. Barlow kept records for the company, opened a separate bank account, and filed a corporate tax return. . . . This suggests Barlow was in business for himself as a janitor.") (internal citations omitted).

[203] *See Johnson v. Unified Gov't of Wyandotte Cty.*, 371 F.3d 723, 730 (10th Cir. 2004).

dependent on TransAm to assign them sufficient miles, they could not turn down a load without repercussion, and they were restricted in their ability to take home time. Some Leased Drivers, however, testified that they had significant freedom in choosing the loads they wished to accept, they could turn down undesirable loads, and they could take time off whenever they wished. Additionally, some Leased Drivers testified that they voluntarily agreed to drive over the holidays in exchange for a cash incentive payment,[204] while others indicated they did not receive the cash incentive as promised.[205]

Furthermore, the Leased Drivers offered varying reports regarding the duties they performed to receive compensation. Some simply drove for TransAm. At least one Leased Driver, however, made visits to truck driving schools about once a month, for which he earned about $35,000 from TransAm.[206] But this opportunity was not available to everybody, as one Leased Driver offered to make school visits but TransAm never took him up on the offer.[207] Similarly, some Leased Drivers earned extra pay by serving as a driver coach,[208] while others said they "absolutely" would not coach for privacy reasons.[209]

---

[204] Doc. 452-24, p. 83 (testifying that he received a $1,000 bonus for making himself available to drive over the Christmas holiday).

[205] Doc. 452-37, p. 70 ("Well, if you're—supposedly, if you're available for dispatch over the Christmas holidays, which I think are defined as from December 20th to January 6th, you get a thousand dollars extra. . . . But I did not get that. I did not get that last year even though I was available for dispatch.").

[206] Doc. 490-37, pp. 46–47.

[207] Doc. 452-16, pp. 94–95.

[208] Doc. 452-9, p. 92 (noting that he earned four cents more per mile by coaching). According to TransAm, 14.47% of Leased Drivers drove as a coach during the time they drove for TransAm under an ICA. Doc. 452-4, p. 169.

[209] Doc. 452-38, p. 48.

Accordingly, the Leased Drivers are not "similarly situated" with respect to their opportunities for profit or loss.  It would be necessary to perform individual inquiries into each of the Leased Drivers to determine whether their individual opportunities for profit or loss weighed in favor of "employee" or "independent contractor" status.

c.    Leased Drivers reported varying levels of investments in the business

Although largely unaddressed by the parties, the third factor used to determine whether a worker qualifies as an "employee" is the worker's investment in the business.  "The investment 'which must be considered as a factor is the amount of large capital expenditures, such as risk capital and capital investments, not negligible items, or labor itself.' "[210]  "This factor 'is interrelated to the profit and loss consideration.' "[211]  "In making a finding on this factor, it is appropriate to compare the worker's individual investment to the employer's investment in the overall operation."[212]

Here, the Leased Drivers' individual investments differed.  The Leased Drivers either: (1) leased a truck from TransAm Leasing without an option to purchase the truck; (2) leased a truck from TransAm with the option to purchase; (3) leased *multiple* trucks and hired employees to drive for them; or (4) purchased their own truck from a third party.[213]

---

[210] *Baker*, 137 F.3d at 1442 (quoting *Dole*, 875 F.2d at 810).

[211] *Id.* (quoting *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1537 (7th Cir. 1987)).

[212] *Id.*

[213] Again, the Court defined membership in the Collective Action to include those who were "classified by Defendant as independent contractors and who leased trucks from TransAm Leasing, Inc. and performed driving work."  Some Leased Drivers leased a truck from TransAm Leasing, thus qualifying for the class, but later in their relationship with TransAm bought their own truck and continued driving for TransAm.  *See, e.g.*, Doc. 490-14, pp. 36–41, 89–91, 132–35.

Because the Leased Drivers have all made differing levels of investments into their businesses, it would not be possible to perform a uniform analysis on the entire class. Accordingly, the Leased Drivers are not "similarly situated" with respect to their investments in the business.

d.    Permanence of the working relationship varied amongst Leased Drivers

"Independent contractors" generally "have fixed employment periods and transfer from place to place as particular work is offered to them, whereas 'employees' usually work for only one employer and such relationship is continuous and of indefinite duration."[214]  Again, the evidence relevant in applying this factor varies for each Leased Driver. Some drove for TransAm for a year or less, while others drove for TransAm for many years.[215]  And Leased Drivers signed ICAs for six-month, one-year, two-year, and even five-year terms.[216]  Just like the first three factors, this factor cannot be analyzed without individualized evidence.

e.    Degree of skill required and extent to which the work is an integral part of the employer's business

Although the final two factors have largely been unaddressed by the parties, the Court notes that these factors could likely be satisfied with representative evidence. The degree of skill required to perform the duties seems to be uniform amongst the class. And it seems possible to collectively determine whether or not the Leased Drivers' work was an integral part of TransAm's business. Thus, the Leased Drivers are "similarly situated" with respect to these two factors.

---

[214] *Baker*, 137 F.3d at 1442 (quoting *Dole*, 875 F.2d at 811).

[215] *See* Doc. 490-51, p. 41.

[216] *See* Doc. 490-14, p. 39; Doc. 490-51, p. 84.

f.      The Leased Drivers are not "similarly situated"

Despite the disparities noted above, Plaintiffs contend that disparate work experiences are not enough to decertify, and that there would need to be substantive disparities that would impact the overall application of the economic realities test between the members of the collective action. In particular, Plaintiffs argue that the following facts do not serve as a basis for decertification: (1) some Leased Drivers hired employees;[217] (2) the Leased Drivers were not uniformly punished for declining load assignments, had varying degrees of freedom to take home time, and had varying opportunities to work over the Christmas Holidays, make presentations at driving schools, and to serve as driving coaches;[218] (3) differences relating to fuel and work efficiency;[219] (4) differences

---

[217] *See Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1321 (5th Cir. 1985). In *Beliz*, a worker was found to be an employee of the farmer for whom he worked despite the fact that he hired, supervised, and paid a crew of forty-five individuals to assist him with his work. While he increased his earnings by hiring those workers and sharing in their piece-rate earnings, "this was not based on risk of loss of any capital investment or his entrepreneurial skill but was simply a piece-rate override, measured by the difference between the total amount [the putative employer] paid for each bin and the amount paid pickers for the buckets. *Id.* at 1328.
     *Contra Eberline v. Media Net, L.L.C.*, 636 F. App'x 225, 229 (5th Cir. 2016) (affirming conclusion under "economic realities test" that worker was an "independent contractor" because the "installers could (1) control the days and hours they worked; (2) perform custom work or additional services for customers to earn extra profits; and (3) hire assistants to help with their installation assignments"); *Freund v. Hi-Tech Satellite, Inc.*, 185 F. App'x 782, 783–84 (11th Cir. 2006) (upholding conclusion that worker was "independent contractor"; amongst other reasons, employer exerted "very little control" over worker due in part to the fact that worker was free to establish his own subcontracting corporation and hire his own employees).

[218] *See Hughes v. Family Life Care, Inc.*, 117 F. Supp. 3d 1365, 1372 (N.D. Fla. 2015) (explaining that in circumstances where the worker's "only freedom with respect to the jobs she undertakes is the freedom to limit those she accepts" the "opportunity for profit or loss" factor weighs in favor of "employee" status).

[219] *See Molina v. S. Fla. Exp. Bankserv, Inc.*, 420 F. Supp. 2d 1276, 1286 (M.D. Fla. 2006) (noting that ability to determine efficient methods of deliveries and to attempt to control fuel costs are *de minimus* in relation to the overall cost of providing driving services, such that those choices did not weigh in favor of "independent contractor" status).

-47-

between the length of leases and option to purchase terms;[220] and (5) differences as to whether the Leased Drivers bought insurance from TransAm or another source.[221]

It may be true that any one of these facts, by itself, would not serve as an independent basis for decertification. However, these disparities—when viewed collectively—become *substantive*, such that the Court would be required to "conduct an individualized analysis of each putative plaintiff before it could be satisfied that each one fell under the auspices of the FLSA."[222] This is true because the "economic realities" test requires a totality-of-the-circumstances approach, and none of the factors are dispositive.[223]

But in this case, the totality-of-the-circumstances is unique to each individual Leased Driver. Many Leased Drivers exhibited characteristics that weigh in favor of "employee status." For example, some Leased Drivers had no bargaining power; were provided equipment by TransAm; were assigned loads by TransAm and were not free to turn any down; had their driving speed limited by TransAm; could not take time off when they desired; were prohibited from modifying their trucks; and were directed by TransAm when and where to get fuel, maintenance, and repairs. But there were many other Leased Drivers that exhibited characteristics that weigh in favor of "independent contractor" status. Some Leased Drivers hired their own employees; purchased their own truck(s); were free to turn down loads or find more preferable routes; were

---

[220] *See Hughes*, 117 F. Supp. 3d at 1373 (concluding that contract that automatically renews monthly can provide sufficient permanency for employee status under the FLSA).

[221] *See Flores v. Velocity Express, LLC*, 250 F. Supp. 3d 468, 484 (N.D. Cal. 2017) (concluding that employer "could and did exercise significant control" over drivers for a number of reasons, including that the employer required the drivers to enroll in its insurance program or to obtain insurance that complied with the employer's requirements).

[222] *See Andel*, 280 F.R.D. at 290.

[223] *See Baker*, 137 F.3d at 1440.

not speed-restricted; took a vacation whenever they wanted, for as long as they desired; modified their trucks and placed advertising outside; and were not restricted in where they could get fuel, maintenance, or repairs. Thus, it cannot be said categorically that every Leased Driver falls (or does not fall) under the auspices of the FLSA. Nor can it be said categorically that all Leased Drivers are "economically dependent" on TransAm or that each Leased Driver is "in business for himself."[224]

Essentially, Plaintiffs are arguing that there are no substantive differences between the Leased Drivers, therefore the Leased Drivers are "similarly situated" as a matter of law. But their argument is belied by the very nature of the fact-specific, totality-of-the-circumstances approach that is required by the "economic realities" test. "[I]t is not what the [workers] *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive."[225] And here, the Leased Drivers' experiences—what they actually *did*—varied greatly which would require individual analyses. Accordingly, the Leased Drivers are not "similarly situated" with respect to their employment and factual settings.

> 2.    *Various defenses available to TransAm supports decertifying the class*

In deciding whether to decertify a collective action, the Court must next consider whether an employer's defense(s) can be addressed on a class-wide basis.[226] Courts have granted motions for decertification based on this factor because individualized defenses inhibit the efficiency of

---

[224] *Doty*, 733 F.2d at 722–23 (citations omitted).

[225] *See Dole*, 875 F.2d at 808 (emphases and alterations in original).

[226] *See Thiessen*, 267 F.3d at 1107; *Montoya v. Rescue Indus., Inc.*, 1999 WL 240247, at *2 (10th Cir. 1999) (citing *Bayles v. Am. Med. Response of Colo., Inc.*, 950 F. Supp. 1053, 1067 (D. Colo. 1996) (decertifying collective action because, among other reasons, employer's defense could not be addressed on a class-wide basis)).

proceedings on a collective basis.[227]  Indeed, this Court previously held that this factor warranted decertification when "Defendants' defenses as to each Plaintiff [were] . . . highly individualized" such that Defendants would "be required to call hundreds of Plaintiffs to testify as to their claims . . . ."[228]  "Nevertheless, it is within the Court's discretion as to 'whether the potential defenses would make the class unmanageable.' "[229]

TransAm argues that there are three defenses that cannot be addressed on a class-wide basis: liability, damages, and statute of limitations.

a.    Liability

TransAm anticipates arguing that some, if not all, of the Leased Drivers were properly classified as "independent contractors" and therefore exempt from the FLSA's minimum wage provisions.  As discussed in detail above, whether an individual was in fact an "employee" or an "independent contractor" is determined by applying all six factors of the "economic realities" test. Two of these factors can be analyzed collectively: degree of skill required to perform the work, and extent to which the work is an integral part of the employer's business.  However, Plaintiffs' appear to give these factors the least weight.  In arguing for summary judgment on the Leased Drivers' status as "employees" under the FLSA, Plaintiffs devote much of their argument to the first four factors.[230]  And Plaintiffs are not "similarly situated" with respect to these four factors.

---

[227] *Green*, 888 F. Supp. 2d at 1103 (citing *Aquilino v. Home Depot U.S.A., Inc.*, 2011 WL 564039, at *9 (D.N.J. 2011)).

[228] *Scott v. Raudin McCormick, Inc.*, 2010 WL 5093650, at *4 (D. Kan. 2010).

[229] *Green*, 888 F. Supp. 2d at 1103 (quoting *Zavala v. Wal-Mart Stores, Inc.*, 2010 WL 2652510, at *10 (D.N.J. 2010)).

[230] *See* Doc. 468, pp. 24–40.

TransAm's liability is therefore premised on a test of which four of the six factors cannot be analyzed with collective evidence. To argue that some (or all) of the Leased Drivers were not "employees" under the FLSA, TransAm would be required to introduce individualized evidence. This would cause the proceedings to "devolve into numerous mini-trials, causing the jury to evaluate testimony from countless witnesses and other evidence that is unique to particular Plaintiffs, and thus incompatible with collective actions."[231] "Available defenses and procedural fairness go hand-in-hand, as the efficiency gained by holding one trial as opposed to many cannot be obtained at the expense of a defendant's due process rights."[232]

Thus, TransAm's inability to offer its liability defense on a class-wide basis weighs in favor of decertification.

b.    Damages

Additionally, TransAm argues that the FLSA collective action should be decertified because, even if the Court determines the Leased Drivers were "employees" under the FLSA, damages must be determined week-by-week and driver-by-driver. Plaintiffs counter that because TransAm treated Plaintiffs as independent contractors, TransAm made no effort to track Plaintiffs' weekly hours worked or to compare their earnings with the FLSA's minimum wage obligations. Accordingly, Plaintiffs cite *Tyson Foods, Inc. v. Bouaphakeo*[233] to argue that they do not need to prove each individual's weekly minimum wage damages, but can rely on "just and reasonable inference" through "representative evidence" as to damages.

---

[231] *Green*, 888 F. Supp. 2d at 1104 (internal quotations omitted).

[232] *Scott v. Chipotle Mexican Grill, Inc.*, 2017 WL 1287512, at *9 (S.D.N.Y. 2017) (quotation omitted).

[233] 136 S. Ct. 1036, 1046–47 (2016).

"[W]hen employers violate their statutory duty to keep proper records, and employees thereby have no way to establish the time spent doing uncompensated work, the 'remedial nature of [the FLSA] and the great public policy which it embodies . . . militate against making' the burden of proving uncompensated work 'an impossible hurdle for the employee.'"[234]  Thus, if the Leased Drivers could establish that they were "employees," and TransAm had a statutory obligation to pay them minimum wages, the Leased Drivers would be able to provide representative evidence as to damages.

However, Plaintiffs have completely ignored the fact that TransAm is still entitled to defend against each claim individually.[235]  This case involves claims for minimum wage damages over a span of multiple years by nearly 2,000 Leased Drivers.  TransAm would have to offer "week-by-week, driver-by-driver" evidence to argue that, with respect to many of these claims, their records show that during specific weeks the individual Leased Driver received the statutory minimum wage.[236]  This defense cannot be offered on a class-wide basis, and therefore weighs in favor of decertification.

---

[234] *Id.* at 1047 (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)).

[235] *Cf. Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011) (holding that a Rule 23 class cannot be certified on the premise that defendant would be denied the opportunity to litigate its statutory defenses to individual claims).

[236] During the class period, Leased Drivers were paid via a weekly settlement statement.  Plaintiffs' damages expert used the miles and net pay on each settlement statement as part of his damages calculation.  However, this does not account for Leased Drivers who received cash advances some weeks, or for Leased Drivers who turned in their trip paperwork late.  TransAm explains that, if a Leased Driver received a $500 cash advance one week, the money would be deducted from the next week's settlement statement.  Thus, the gross pay from the second week's settlement statement may be less than the minimum wage, and therefore included in Plaintiffs' damages calculation.  In these instances, TransAm would need to introduce evidence of the first week's cash advance to defend against unwarranted damages.  *See Chen v. Cayman Arts, Inc.*, 757 F. Supp. 2d 1294, 1301 (S.D. Fla. 2010).

c.    Statute of Limitations

The Leased Drivers' FLSA claim is generally subject to a two-year statute of limitations.[237]
If they establish that TransAm acted willfully, the Court can extend the limitations period to three
years.[238]  Opt-in plaintiffs commence their action on the date they file their opt-in consent.  This
means that the "statute of limitations period continues to run with respect to each potential
plaintiff's [claims] until that plaintiff files the written consent form."[239]

TransAm argues that Plaintiffs' expert, in calculating damages, failed to appropriately
account for the applicable statute of limitations and tolling.  According to TransAm, "many
members of the class do not have viable claims against TransAm for specific weeks and an in-
depth individual analysis will be required to determine which claims are viable."  "A plaintiff-by-
plaintiff, week-by-week analysis is required to first determine whether Plaintiffs' claims are on-
face timely or untimely, and to apply the appropriate amount of tolling to each of Plaintiffs'
untimely claims in order to determine whether Plaintiff is entitled to recovery."

Plaintiffs counter that these "issues require nothing more than a mathematical calculation
of the number of weeks for which members of the Collective Action worked during the relevant
limitations period, and assessing each member's weekly minimum wage damages without those
weeks."  "In sum, calculating weekly damages for each member of the Collective Action will
require no more than a mathematical exercise of counting backwards in a uniform number of weeks

---

[237] 29 U.S.C. § 255(a).

[238] *Id.*

[239] *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 199 (S.D.N.Y. 2006).

from the filing of each Collective Action member's consent to join, then tallying the weekly damages therein for each of them."

It certainly is possible to resolve statute of limitation issues using "nothing more than a mathematical calculation."  However, as Plaintiffs have themselves suggested, this mathematical exercise must be applied *individually* for each Leased Driver based on the date that they filed their consent to join.  And, as one would expect, the 1,928 Leased Drivers did not file their consents on the same date.[240]  This also weighs in favor of decertification.

### 3.    Fairness and Procedural Considerations

"Fairness and procedural considerations are important when addressing whether Plaintiffs are similarly situated."[241]  "The primary objectives of a § 216(b) collective action are: (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity."[242]

In *Green*, Judge Robinson wrote:

[Defendant] claims that because the facts are so individualized, it would be impossible to proceed with this action using representative testimony.  As discussed, [Defendant] contends that hundreds of witnesses would be required to testify, "which will devolve into numerous mini-trials, causing the jury to evaluate testimony from countless witnesses and other evidence that is unique to particular Plaintiffs," and thus incompatible with collective actions.  The Court agrees.  Given the Court's determination that Plaintiffs are not similarly situated with respect to key issues in the exemption analysis, the pursuit of individualized actions is a necessary result.  Moreover, proceeding as a class would not be efficient, as it would likely result in two trials, one to establish liability and a second to determine damages.  While decertification places opt-in Plaintiffs at "square one," they are

---

[240] Consents were filed sporadically between October 19, 2015 and July 11, 2016.

[241] *Green*, 888 F. Supp. 2d at 1104 (citing *Thiessen*, 267 F.3d at 1103).

[242] *Id.* (quoting *Raudin McCormick*, 2010 WL 5093650, at *4 (D. Kan. 2010)).

-54-

not overly prejudiced because many have likely benefitted from the implementation of class-wide discovery on many of the issues relevant to their FLSA claims. Thus, the Court concludes this factor militates against maintaining class certification.[243]

Judge Robinson's analysis is pertinent here. While proceeding as a collective action would lower costs to plaintiffs through the pooling of resources, there are very few issues of law and fact that arose from the same alleged activity. Almost every aspect of this case would require individual evidence pertaining to each of the 1,928 Leased Drivers. Such "individualized analysis would contravene a primary purpose behind class action lawsuits, *i.e.*, the promotion of judicial economy."[244]

Additionally, the fairness factor necessitates decertification. While there are many Leased Drivers who have exhibited characteristics of an "independent contractor," TransAm cannot possibly present individualized evidence to allow the jury to correctly determine which Leased Drivers were covered by the FLSA and which were not. It would be a miscarriage of justice for TransAm to pay minimum wage damages to a subset of Leased Drivers who are not actually owed any minimum wage damages. Likewise, it would be improper for Leased Drivers who were not owed a minimum wage to receive such damages.[245]

Accordingly, all three factors weigh in favor of decertification.

---

[243] *Id.*

[244] *Andel*, 280 F.R.D. at 290.

[245] *See Rindfleisch v. Gentiva Health Servs., Inc.*, 22 F. Supp. 3d 1295, 1304 (N.D. Ga. 2014) (concluding that the "fairness factor" necessitates decertification because the evidence indicated that a sub-set of Plaintiffs were not owed any damages).

### 4.    Conclusion

In determining whether the Leased Drivers are "similarly situated" at the decertification stage, the Court must analyze three factors under a relatively strict standard: "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations."[246]    Here, all three factors suggest that the Leased Drivers are not "similarly situated."    As this Court previously held in a similar case:

> In light of the individualized and fact-intensive inquiry that will be required as discussed above, the Court concludes that decertifying the . . . class is required.    As discussed, this case is fraught with questions requiring distinct proof as to individual plaintiffs . . . .    In addition, Defendants' defenses relating to each individual Plaintiff's claim . . . cannot be addressed on a class-wide basis.    Although the FLSA does not require potential class members to hold identical positions, the similarities necessary to maintain a collective action under § 216(b) must extend beyond the mere fact that Plaintiffs hold the same job title.    Otherwise, it is doubtful that § 216(b) would further the interests of judicial economy, and it would undoubtedly present a ready opportunity for abuse.[247]

Therefore, based on the foregoing, Plaintiffs' conditionally certified class is hereby decertified, and the opt-in Plaintiffs will be dismissed by operation of this Order.

### III.    Motion to Decertify the Rule 23 Class (Doc. 446)

On August 20, 2015, the Court certified the Rule 23 class, finding that the Rule 23 Plaintiffs had satisfied the four elements of Rule 23(a) and the requirements of Rule 23(b)(3).[248]    The Rule 23 class currently consists of approximately 8,691 Plaintiffs who assert two KWPA claims.[249]    The

---

[246] *See Thiessen*, 267 F.3d at 1103.

[247] *Raudin McCormick*, 2010 WL 5093650, at *5 (quotation omitted).

[248] Doc. 146, p. 17; *Blair*, 2015 WL 5006076, at *8.

[249] The opt-in Plaintiffs to the FLSA collective action are also members of the Rule 23 class.

first KWPA claim asserts that TransAm failed to pay them wages in the amount of at least the applicable federal minimum wage for all hours worked during numerous weekly pay periods, and that such unpaid minimum wages constituted "wages due" under the KWPA. And the second claim asserts that TransAm improperly deducted banking fees from the Plaintiffs' wages and thereby failed to pay the Plaintiffs all "wages due" in violation of the KWPA. As only "employees" are covered under the KWPA, both claims are premised on TransAm having misclassified the Rule 23 Plaintiffs as "independent contractors," when they in fact qualified as "employees" entitled to the KWPA's protections. TransAm now argues that the Rule 23 class action should be decertified for the same reasons as the FLSA collective action, and that the "improper deductions" claim would also require individualized determinations, such that Plaintiffs can no longer satisfy their burden under Rule 23.

The Court has discretion under Rule 23(c)(1)(C) to amend an order that previously granted class certification.[250] "[T]he defendant must logically provide some reason for the court to change its conclusion."[251] "Yet, it remains the plaintiff's burden to prove that the requirements of Rule 23 are met."[252] Here, TransAm argues that extensive discovery has been conducted since the original certification order, and the evidence shows that Plaintiffs no longer meet their burden

---

[250] *See DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1201 (10th Cir. 2010).

[251] *Schell v. OXY USA Inc.*, 2013 WL 4857686, at *3 (D. Kan. 2013).

[252] *Arkalon Grazing Ass'n v. Chesapeake Operating, Inc.*, 2014 WL 3089556, at *1 (D. Kan. 2014).

under Rule 23(b)(3).[253]  The Court agrees that consideration of TransAm's motion to decertify is proper here.[254]

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that a class action "is superior to other available methods for fairly and efficiently adjudicating the controversy."  The requirements of Rule 23(b)(3) ensure that a class is sufficiently cohesive to warrant adjudication by representation.[255]  The predominance question asks whether common issues are more prevalent or important than individual issues.[256]  "[P]redominance may be destroyed if individualized issues will overwhelm those questions common to the class."[257]

Here, the Rule 23 class must be decertified for two reasons.  First, Plaintiffs' KWPA claim for unpaid minimum wages has been dismissed.  This claim represented approximately 98% of the damages sought by the Rule 23 class.[258]  And, although not addressed by the parties, it is not clear whether the Court would even retain jurisdiction over the remaining KWPA claim for improper

---

[253] TransAm points out that, since the certification order, the issuance of a discovery questionnaire was sent out to thousands of Plaintiffs, more than 50 class members were deposed, and both parties have submitted expert reports.

[254] *Cf. Schell*, 2013 WL 4857686, at *3 (noting that Court would not grant motion to decertify where the defendant failed to show that facts or law had materially changed or developed).

[255] *Amchem Prods. v. Windsor*, 521 U.S. 591, 622–23 (1997).

[256] *CGC Holding Co v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014).

[257] *Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213, 1220 (10th Cir. 2013).

[258] Plaintiffs' damages expert, Dr. Jeremy Albright, recently calculated that the Rule 23 Plaintiffs were owed more than $51 million for unpaid minimum wages, but only $634,882 for improper deductions. Doc. 433, p. 18; Doc. 459-2, p. 7.

deductions.[259]  Additionally, the recently-produced evidence shows that the Rule 23 class should not have been certified in the first place.[260]

Second, the evidence shows that common questions of law or fact no longer predominate with respect to the remaining KWPA claim for improper deductions either.  In support of this claim, Plaintiffs allege that TransAm violated the KWPA by making improper deductions from their wages.  Particularly, TransAm issued banking cards, and TransAm "has had a policy and practice of providing compensation to its Leased Drivers" via those bank cards, and charged Plaintiffs a transaction fee each time money was transferred or withdrawn from such cards.[261]

---

[259] By dismissing TransAm's KWPA claim for unpaid minimum wages, jurisdictional issues would be raised if the Rule 23 class were allowed to proceed with their KWPA claim for improper deductions.  Plaintiffs' claim that the Court has original jurisdiction over the KWPA claims under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), and supplemental jurisdiction under 28 U.S.C. § 1367.  Under CAFA, district courts have original jurisdiction of "any civil action in which the matter in controversy exceeds the sum or value of $5,000,000," among other requirements.  However, Plaintiffs are only claiming $634,882 for improper deductions, raising the issue of whether the Court would have continuing CAFA jurisdiction.  This also raises the issue of whether the Court would have supplemental jurisdiction over a state claim brought by 8,691 Plaintiffs for $634,882 when all except the two Named Plaintiffs have been dismissed from the original claim granting federal question jurisdiction.  That said, the parties have not argued this issue, and this Order is decertifying the Rule 23 class, so the jurisdictional issues do not need to be addressed.

[260] The KWPA unpaid minimum wages claim is entirely duplicative of the FLSA claim, and the recently-produced evidence shows that the class should not have been certified under Rule 23(b)(3) for the same reasons that opt-in Plaintiffs are not "similarly situated" to proceed as a collective action.  The opt-in Plaintiffs in the decertified collective action are also Rule 23 class members.  Both classes were seeking damages for the same FLSA minimum wage violations.  Proving these violations would require an individualized, case-by-case assessment, and class certification should not have been granted.  *See, e.g., Harris v. Express Courier Int'l, Inc.*, 2017 WL 5606751, at *4–8 (W.D. Ark. 2017) (decertifying FLSA collective action and denying motion to certify Rule 23 class action when the FLSA and the state wage law claim "afford class members essentially the same relief" and neither a collective action nor a class action would "provide an efficient and cost-effective mechanism to resolve the liability questions in this case" because both required individualized inquiries into whether the putative plaintiffs were protected under the FLSA); *Hernandez v. Fresh Diet, Inc.*, 2014 WL 5039431 (S.D.N.Y. 2014) (granting motion to decertify FLSA collective action and denying motion to certify state claims as a Rule 23 class action when Plaintiffs' testimony varied "significantly with respect to the degree of control relevant to determining their alleged status as employees" and therefore "common questions do not predominate over individual questions as required under Rule 23(b)(3), largely for the reasons" the Court stated in decertifying the FLSA collective action) (internal brackets omitted).  *See also Culpepper v. Irwin Mortg. Corp.*, 491 F.3d 1260, 1276 (11th Cir. 2007) (concluding that district court did not abuse its discretion in decertifying a class because the "action should not have been certified as a class action in the first place . . . .").

[261] Doc. 433, p. 11.

Plaintiffs concede that 62.27% of the class members received their pay by direct deposit to their personal bank account.[262]  These Leased Drivers did not accumulate any transaction fees because "they did not have their pay put on a prepaid card at all."[263]  Thus, contrary to Plaintiffs' claims, there is not a common class-wide policy or practice of imposing improper deductions.

Furthermore, amongst the Plaintiffs that were issued banking cards, individualized issues overwhelm those questions common to the class.  During the class period, Plaintiffs utilized banking cards from any of three different companies—Comdata, TCH, and EFS.[264]  The transaction fees at issue were for various amounts of $1.00 and less.  In addition, Plaintiffs signed an authorization for transaction fees associated with cash and fuel advances.  TransAm anticipates arguing that these deductions were lawful under K.S.A. § 44-319(a)(3), because the transaction fees were only assessed when the drivers voluntarily requested a benefit, such as an advance on money that had not yet been earned.[265]  In doing so, an individual inquiry must be made as to whether the class members who were assessed transaction fees expressly authorized the fees, and then whether each individual fee was to the employee's benefit.  Thus, there is "no common proof . . . possible to demonstrate injury for all class members, because to determine whether or not a charge was authorized will require individualized proof."[266]

---

[262] *See* Doc. 451, p. 5; Doc. 451-6, p. 5; Doc. 488, p. 4.

[263] Doc. 451, p. 6.

[264] Doc. 450-3, p. 2.

[265] *See* K.S.A. § 44-319(a)(3) ("[N]o employer may withhold, deduct or divert any portion of an employee's wages unless: . . . the employer has a signed authorization by the employee for deductions for a lawful purpose accruing to the benefit of the employee . . . .").

[266] *Cf. Midland Pizza, LLC v. Sw. Bell Tel. Co.*, 277 F.R.D. 637, 642 (D. Kan. 2011).

Accordingly, the class is not sufficiently cohesive to warrant adjudication by representation on either KWPA claim.  TransAm's motion to decertify the Rule 23 class is therefore granted. [267]

### IV.    Motions for Summary Judgment

Summary judgment is proper if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[268]  A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[269]  The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[270]  If the movant carries its initial burden, the nonmovant may not simply rest on its pleading, but must instead "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant.[271]  These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits— conclusory allegations alone cannot survive a motion for summary judgment.[272]  The Court views all evidence and reasonable inferences in the light most favorable to the non-moving party.[273]

---

[267] *See XTO Energy, Inc.*, 725 F.3d at 1220 (citing *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1170 (11th Cir. 2007) ("A plaintiff may claim that every putative class member was harmed by the defendant's conduct, but if fewer than all of the class members enjoyed the legal right that the defendant allegedly infringed, or if the defendant has non-frivolous defenses to liability that are unique to individual class members, any common questions may well be submerged by individual ones")).

[268] Fed. R. Civ. P. 56(a).

[269] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[270] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citation omitted).

[271] *Id.* (citing Fed. R. Civ. P. 56(e)).

[272] *Mitchell v. City of Moore, Ok.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citation omitted).

[273] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

**A.**     **Plaintiffs' Motion for Partial Summary Judgment**

Plaintiffs argue in their Motion for Partial Summary Judgment (Doc. 443) that the Plaintiffs in the opt-in collective action were "employees" of TransAm pursuant to the application of the "economic realities" test under the FLSA, and that Plaintiffs in the Rule 23 class action were "employees" under the "right to control" test for employee status under the KWPA.

> *1.*     *The remaining Named Plaintiffs are not entitled to summary judgment on "employee" status under the FLSA "economic realities" test*

In arguing that members of the FLSA collective action were "employees" under the FLSA, Plaintiffs relied heavily on deposition testimony of opt-in Plaintiffs that are being dismissed from the case by this Order.  The Court's decertification determination drastically changes the landscape of this case, by reducing it from nearly 2,000 opt-in Plaintiffs down to just the two Named Plaintiffs.  Of Plaintiffs' 81 statements of fact in support of their motion, 13 facts pertain to Named Plaintiff Blair, and only seven of the facts pertain to Named Plaintiff Davis.

Viewing the evidence in the light most favorable to TransAm, there are only four uncontroverted facts between the two Named Plaintiffs.  First, Plaintiff Blair was a Leased Driver from March 2007 to February 2008.  Second, Plaintiff Davis was a Leased Driver from approximately December 2005 until May 2010.  Third, Plaintiff Blair testified that the status of a truck as either leased to a Leased Driver or driven by an employee driver of TransAm switches back and forth; TransAm can simply make a software change to convert a given truck from a leased truck to a truck driven by an employee, or vice versa.  And fourth, Plaintiff Blair also testified that a driver any Plaintiff wished to hire must go through the full driver training by TransAm, and TransAm reserves and exercises the right to say whom Plaintiffs may have driving under the ICA, and TransAm can terminate such drivers.

The "economic realities" test is a comprehensive six-factor test used to determine whether a worker was "economically dependent on the business to which he renders service, or is, as a matter of economic fact, in business for himself."[274]  "None of the factors alone is dispositive; instead, the court must employ a totality-of-the-circumstances approach."[275]  Because there are entirely insufficient facts pertaining the Named Plaintiffs' economic dependence on TransAm, they are not entitled to judgment on their "employee" status under the FLSA as a matter of law.

2.    *The remaining Named Plaintiffs are not entitled to summary judgment on "employee" status under the KWPA "right to control" test*

The "right to control" test is a 20-factor test used to determine whether a worker is an "employee" or an "independent contractor."  The 20-factor test considers:

> (1) the employer's right to require compliance with instructions (economic reality test's degree of control factor);
> (2) the extent of any training provided by the employer;
> (3) the degree of integration of the worker's services into the business of the employer (economic reality test's integral part of employer's business factor);
> (4) the requirement that the services be provided personally by the worker;
> (5) the extent to which the worker hires, supervises, and pays assistants;
> (6) the existence of a continuing relationship between the worker and the employer (economic reality test's permanence of the working relationship factor);
> (7) the employer's establishment of set work hours;
> (8) the requirement that the worker devote full-time to the employer's business;
> (9) the degree to which the work is performed on the employer's premises;
> (10) the degree to which the employer sets the order and sequence of work;
> (11) the requirement that the worker submit regular or written reports to the employer;
> (12) the manner of payment to the worker, *e.g.*, by the hour, day, or job;
> (13) the extent to which the employer pays the worker's business or travel expenses;
> (14) the degree to which the employer furnishes tools, equipment, and material (economic reality test's investment in business factor);

---

[274] *Doty*, 733 F.2d at 722–23 (citations omitted).

[275] *Baker*, 137 F.3d at 1441.

(15) the incurrence of significant investment by the worker (economic reality test's investment in business factor);

(16) the ability of the worker to make a profit or suffer a loss (economic reality test's opportunity for profit or loss factor);

(17) whether the worker can work for more than one firm at a time;

(18) whether the worker makes his or her services available to the general public on a regular and consistent basis;

(19) whether the employer has the right to discharge the worker; and

(20) whether the worker has the right to terminate the relationship at any time without incurring liability.[276]

"This test includes economic reality considerations, while maintaining the primary focus on an employer's right to control."[277]

Here, there are insufficient facts for the Court to apply numerous factors. There are no uncontroverted facts pertaining to: (1) the degree of control TransAm exerted over Named Plaintiffs; (8) whether they were required to work full time; (16) their ability to make a profit or suffer a loss; (17) whether they could work for more than one firm at a time; or (18) whether they made their services available to the public.

Plaintiffs concede that factors 4, 5, 10, 12, 13, 14, and 15 would weigh at least slightly in favor of "independent contractor" status, and that factors 7 and 9 are neutral.[278] Of the remaining

---

[276] *Craig*, 335 P.3d at 76.

[277] *Id.*

[278] With respect to factor 14, Plaintiffs point to *Craig*, where the Kansas Supreme Court ultimately determined that FedEx drivers were "employees" under the "right to control" test. When analyzing factor 14, the Court noted that "one expects an independent contractor to possess the tools, equipment, and materials necessary to fulfill its obligations under the contract." *Id.* at 89. After noting that FedEx did require the drivers to possess their own tools, thus weighing in favor of independent contractor status, the Court discounted this factor because FedEx "injected its control" on this subject by providing mechanisms for drivers to obtain the items from FedEx, and to pay for them through payroll deductions. The *Craig* Court thus held that the factor "superficially supports an independent contractor relationship, albeit the context must be considered in reviewing the totality of the circumstances." *Id.* at 90.

While this Court agrees that TransAm provided a mechanism for drivers to obtain the trucks Plaintiffs drove, it is not clear in reading *Craig* whether factor 14 actually weighed in favor of "employee" status, in favor of "independent contractor" status, or if it was neutral. Regardless, in this case, there are insufficient facts for the Court

factors, the Court concludes that several factors weigh at least slightly in favor of "employee" status: (2) TransAm provided training to the Named Plaintiffs; (3) their work was integral to TransAm's business; (6) they entered into ICAs with one-year renewal provisions; (11) they were required to submit documentation to be paid for each delivery; (19) TransAm retained the right to terminate Plaintiffs upon 14 days' notice; and (20) Plaintiffs also had the right to terminate the ICA upon 14 days' notice.

Although six factors weigh in favor of an employee-employer relationship, the Court cannot apply five factors, two are neutral, and seven weigh in favor of an independent contractor relationship. Viewing the evidence and reasonable inferences in the light most favorable to TransAm, Plaintiffs are not entitled to judgment as a matter of law regarding "employee" status under the KWPA.[279] Accordingly, Plaintiffs' motion for partial summary judgment is denied.

## B.    TransAm's Motion for Summary Judgment

In its motion, TransAm argues that (1) Plaintiffs' KWPA claim for FLSA minimum wages is preempted; (2) TransAm is entitled to summary judgment on Plaintiffs' claim under K.S.A. § 44-314(d); (3) TransAm is entitled to summary judgment on Plaintiffs' claim for "improper deductions" under the KWPA because Plaintiffs authorized the charges that they claim were improperly deducted from their wages; (4) certain Plaintiffs should be precluded from arguing they were misclassified because those Plaintiffs previously took the opposite position in a separate lawsuit against TransAm in the District of Kansas; (5) Plaintiffs were properly classified as "independent contractors" under the KWPA; (6) the Court should enter summary judgment

---

to consider this factor in context by "reviewing the totality of the circumstances." Viewing the evidence in the light most favorable to TransAm, this Court finds that factor 14 weighs in favor of "independent contractor" status.

[279] *See LifeWise Master Funding*, 374 F.3d at 927.

precluding Plaintiffs from recovering a third year of minimum wage or liquidated damages; and (7) Plaintiffs have no evidence of damages for their FLSA damages claim.

First, TransAm's argument that Plaintiffs' KWPA claim for FLSA minimum wages is preempted is now moot, because the Court is granting TransAm's motion for judgment on the pleadings, which raised the same argument.

Second, TransAm's motion is denied with respect to summary judgment on Plaintiffs' claim under K.S.A. § 44-314(d). TransAm's argument focuses on Plaintiffs' damages report, which estimated damages for the entire Rule 23 Class. That report does not contain specific information relating to the two remaining Named Plaintiffs, so TransAm has provided no evidence suggesting that it is entitled to judgment as a matter of law.

Third, TransAm's motion is denied with respect to the KWPA "improper deductions" claim. TransAm points to the ICA, which states: "[Plaintiff] specifically authorizes [TransAm] to make deductions for the following items: (a) any and all Comdata and/or TCH card charges and transaction fees attributable to [Plaintiff].[280] The KWPA provides that an employer may not deduct from an employee's wages unless "the employer has a signed authorization by the employee for deductions for a lawful purpose accruing to the benefit of the employee . . . ."[281] However, an individual inquiry must be made to determine whether the deductions actually accrued "to the benefit of the employee." TransAm is not entitled to judgment as a matter of law simply because Plaintiffs provided TransAm a signed authorization for the deductions.

---

[280] Doc. 451-7 pp. 8–9, 11.

[281] K.S.A. § 44-319(a)(3).

Fourth, TransAm's motion is denied with respect to TransAm's argument that certain Rule 23 Plaintiffs in this case should be precluded from arguing that they are "employees" under the FLSA and KWPA.  In this section of its motion, TransAm claims that approximately 6,500 Rule 23 class members were also class members in another class action against TransAm in *Fox v. TransAm Trucking, Inc.*[282]  And, according to TransAm, the *Fox* Plaintiffs alleged that they were "independent contractors under a statute only applicable to independent contractors."  Invoking the doctrines of judicial, collateral, and equitable estoppel, TransAm argues that the overlapping plaintiffs should not be able to argue the opposite here.

In *Fox*, the plaintiffs alleged violations of the federal Truth-in-Leasing regulatory scheme ("TIL") due to TransAm and TransAm Leasing, Inc. charging unlawful satellite communication usage fees.  Although the *Fox* plaintiffs adopted the label of "independent contractors," the court certified the class to include "[a]ll persons, including entities, who operated under an "Independent Contractor Agreement . . . ."[283]

Here, TransAm has provided no authority to establish that TIL is "only applicable to independent contractors."  On the contrary, TIL was promulgated to protect "*individual owner-operators* due to their weak bargaining position."[284]  To show that TIL applies, an owner-operator does not need to prove they are an "independent contractor."  Rather, an owner-operator only must establish that "(1) he was an 'owner' of the truck and trailer as that term is defined in the

---

[282] 2014 WL 2604035 (D. Kan. 2014).

[283] *Id.* at *9.

[284] *Owner Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co., Inc.*, 367 F.3d 1108, 1110 (9th Cir. 2004) (emphasis added).

regulations; and (2) he 'leased' that equipment to defendants."[285]  As it would be possible to own a truck yet still qualify as an "employee," the terms "independent contractors" and "owner-operators" are not mutually exclusive.[286]  Accordingly, the Rule 23 Plaintiffs would not be precluded from arguing that they are "employees" in this case.[287]  Furthermore, there are only two Named Plaintiffs remaining, and TransAm has not established that they were class members in *Fox*.  TransAm's motion for summary judgment is therefore denied with respect to this argument.

Fifth, TransAm's motion for summary judgment is denied with respect to its assertion that Plaintiffs were properly classified as "independent contractors" under the KWPA.  There are not enough uncontroverted facts to apply the "right to control" test to say that either party is entitled to judgment as a matter of law.

Sixth, TransAm's motion is denied with respect to the argument that certain opt-in Plaintiffs should be precluded from recovering a third year of minimum wage or liquidated damages.  TransAm's argument is that portions of the opt-in Plaintiffs' claims are affected by the statute of limitations.  As this Order is dismissing the opt-in Plaintiffs from the case, this issue is moot.

Finally, TransAm's motion is granted with respect to the final issue.  TransAm is entitled to judgment precluding Named Plaintiffs from recovering a third year of minimum wage or

---

[285] *Shimko v. Jeff Wagner Trucking, LLC*, 2014 WL 7366190, at *2 (W.D. Wis. 2014).

[286] *See, e.g.*, *Corporate Express Delivery Sys. v. NLRB*, 292 F.3d 777, 780–81 (D.C. Cir. 2002) (concluding that owner-operator drivers were "employees" and not "independent contractors" under the National Labor Relations Act).

[287] *See Berger Transfer & Storage v. Cent. States, Se. & Sw. Areas Pension Fund*, 85 F.3d 1374, 1377 (8th Cir. 1996) (refusing to apply offensive issue preclusion over issue of whether owner-operators were "employees" or "independent contractors" in the present case despite the fact that an owner-operator was previously ruled to be an "employee" in a state workers' compensation case).

liquidated damages.  The three-year statute of limitations is an exception to the two-year statute, and a party claiming the exception carries the burden to show the violation was willful.[288]  To meet the willfulness standard, the Supreme Court requires a claimant show the employer either knew or showed reckless disregard as to whether its conduct was prohibited by the FLSA.[289]

TransAm argues that it employs Company Drivers as well as Owner Operators such as Plaintiffs.  In compliance with its obligations under the FLSA, TransAm requires that its Company Drivers enter the total number of hours driven on a daily basis, in part, to ensure that Company Drivers receive the minimum wage each week.  In addition, TransAm points out that the Internal Revenue Service previously confirmed TransAm properly classified its workers as independent contractors.  The Department of Labor confirmed this finding in a subsequent investigation.  Accordingly, TransAm argues, even if the finder of fact concludes that TransAm misclassified the Owner Operators, it cannot be said that TransAm acted willfully in failing to pay minimum wage.

Here, the uncontroverted facts simply do not support the inference that TransAm violated the FLSA willfully.  In their response, Plaintiffs only offered the conclusory statement that there are genuine issues of material fact as to whether TransAm willfully misclassified Plaintiffs as "independent contractors."  Plaintiffs have not offered a single fact that—even if viewed in the

---

[288] *See* 29 U.S.C. § 255(a); *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 134–35 (1988).

[289] *See McLaughlin*, 486 U.S. at 135.  Plaintiffs cite to *Fowler v. Incor*, 279 F. App'x 590, 599 (10th Cir. 2008) for the proposition that "[t]o avoid liquidated damages, an employer bears the burden to show that 'to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of [the FLSA].' "  Doc. 488, p. 48.  In doing so, Plaintiffs are attempting to mislead the Court.  *Fowler* clearly states "[a]lthough a standard of willfulness applies to both liquidated damages and the statute of limitations under the FLSA, the definitions and burdens of proof differ for each."  *Fowler*, 279 F. App'x at 599.  The issue here is whether TransAm willfully violated the FLSA such that the three-year statute of limitations should apply—it does not concern liquidated damages.  Thus, the "good faith" burden is inapplicable.  Had Plaintiffs continued to read the case, *Fowler* clearly states that "[t]he employee bears the burden of proving that the employer acted willfully" for the three-year statute of limitations to apply.  *Id.* at 600.

light most favorable to Plaintiffs—would suggest TransAm "knew or showed reckless disregard as to whether its conduct was prohibited by the FLSA."[290]

Accordingly, the Court also grants TransAm's motion to the extent that Named Plaintiffs will only be allowed to seek damages pursuant to the two-year statute of limitations.  However, as this Order is dismissing the opt-in Plaintiffs from this case, and they will be free to pursue litigation on their own behalf, the Court does not extend this ruling to the dismissed opt-in Plaintiffs.

## V.    Remaining Motions

The Court's ruling on the previous motions have rendered the remaining nine motions moot, as these motions all pertain to expert opinions regarding class characteristics and damages, discovery disputes, or the withdrawal of certain opt-in Plaintiffs (Docs. 448, 454, 455, 456, 457, 460, 465, 495, and 518).

**IT IS THEREFORE ORDERED** that TransAm's Motion for Judgment on the Pleadings (Doc. 463) is hereby **GRANTED.**

**IT IS FURTHER ORDERED** that TransAm's Motion to Decertify FLSA class (Doc. 447) is **GRANTED.**

**IT IS FURTHER ORDERED** that TransAm's Motion for Decertification of the Rule 23 Class (Doc. 446) is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Partial Summary Judgment (Doc. 443) is **DENIED.**

**IT IS FURTHER ORDERED** that TransAm's Motion for Summary Judgment (Doc. 445) is **GRANTED** in part and **DENIED** in part.

---

[290] *See McLaughlin*, 486 U.S. at 135.

-70-

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Exclude Evidence and for Other Relief Due to Defendant's Spoliation of Evidence (Doc. 448) is **DENIED** as moot.

**IT IS FURTHER ORDERED** that TransAm's Motion to Exclude Plaintiffs' Expert Jeremy J. Albright (Doc. 454) is **DENIED** as moot.

**IT IS FURTHER ORDERED** that TransAm's Motion in Limine to Bar Plaintiffs' Survey Evidence (Doc. 455) is **DENIED** as moot.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Withdraw Certain Opt-In Plaintiffs (Doc. 456) is **DENIED** as moot.

**IT IS FURTHER ORDERED** that TransAm's Motion to Exclude Plaintiffs' Expert Michael Belzer, Ph.D. (Doc. 457) is **DENIED** as moot.

**IT IS FURTHER ORDERED** that TransAm's Motion in Limine to Exclude Plaintiffs' Hours-Worked Calculation (Doc. 460) is **DENIED** as moot.

**IT IS FURTHER ORDERED** that TransAm's Motion to Strike Plaintiff's Experts' Improper "Rebuttal" Opinions (Doc. 465) is **DENIED** as moot.

**IT IS FURTHER ORDERED** that TransAm's Motion for Sanctions to Strike Declarations (Doc. 495) is **DENIED** as moot.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion in Limine to Exclude or Otherwise Limit the Expert Testimony of Mr. Robert W. Crandall (Doc. 518) is **DENIED** as moot.

**IT IS SO ORDERED.**

Dated this 28th day of March, 2018.


ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE